# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CITRIBEL NV,<br><br>       *Plaintiff,*<br><br>  v.<br><br>UNITED STATES,<br><br>       *Defendant,*<br><br>  and<br><br>ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC,<br><br>       *Defendant-Intervenor.* | Court No. 24-00010 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com


*Counsel for Plaintiff Citribel N.V.*

Dated: July 12, 2024

# <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C) ...............1

I.    Administrative Determination to Be Reviewed ...............................1

II.   Issues of Law and Fact Presented....................................................2

III.  Reasons for Contesting the Final Results ........................................3

IV.   Standard of Review...........................................................................4

STATEMENT OF FACTS .......................................................................6

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENTS .........................................................................................16

I.    Commerce's Presumption About Conversion Costs Does Not Reflect a
      Reasonable Interpretation of the Statute.........................................16

II.   Commerce Failed to Explain the Nature of Its Presumption About
      Conversion Costs and What Type of Information Would be Necessary to
      Rebut It ...........................................................................................21

III.  Commerce Failed to Provide an Adequate Explanation Based on Case-
      Specific Facts...................................................................................26

CONCLUSION ........................................................................................31

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. C. Aukerman Co. v. R.L. Chides Constr. Co.*,
  960 F.2d 1020.1037 (Fed. Cir. 1992) ...................................................................29

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  70 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) .......................................................21

*Allegheny Ludlum Corp. v. United States*,
  112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) .......................................................4

*Alloy Piping Products, Inc. v. United States*,
  Slip Op. 09-29 ..........................................................................................................21

*Coal. of American Flange Producers v. United States*,
  448 F.Supp. 3d 1340 (Fed. Cir. 2020) ...............................................................29

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...................................................................................................4

*Decca Hosp. Furnishings, LLC v. United States*,
  No. 05-00002 (Ct. Int'l Trade 2005) ...................................................................24

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
  361 F. Supp. 3d 1314, 1326 (Ct. Int'l Trade 2019) ....................................19, 20

*Jiaxing Brother Fastener Co., Ltd. v. United States*,
  428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020) .......................................................4

*Jindal Poly Films, Ltd. of India v. United States*,
  43 CIT __, 365 F. Supp. 3d 1379 (2019).............................................................30

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. ____ (2024).......................................................................................5, 16, 20

*Meihua Grp. Int'l Trading (Hong Kong) Ltd. v. United States*,
  No. 22-00069 (Ct. Int'l Trade 2024) ...................................................................24

*Michigan v. EPA*,
  576 U.S. 743 ...................................................................................................5, 16

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U. S. 29 (1983) ...................................................................................5, 17, 30

*SFK USA, Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001) ...............................................................30

*Shandong Huarong Gen. Corp. v. United States*,
  159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ...........................................19

*Taian Ziyang Food Co., Ltd. v. U.S.*,
  783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)..........................................29

*Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
  361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019)..........................................19

*Timken U.S. v. United States*,
  421 F.3d 1350 (Fed. Cir. 2005) ...............................................................30

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951).....................................................................................4

## Statutes

19 U.S.C. § 1516a(b)(l)(B)(i) ........................................................................4, 29

19 U.S.C. § 1677b(b) .............................................................................2, 12, 15, 17

## Other Authorities

73 Fed. Reg. 26,364, 26,365 (May 9, 2008) .............................................12

87 Fed. Reg. 54,463 (September 6, 2022) ..................................................6

88 Fed. Reg. 50,100 (August 1, 2023)........................................................17

88 Fed. Reg. 90,167 (December 29, 2023).......................................*passim*

*Certain Hot-Rolled Steel Flat Products from the Republic of Turkey:*
   *Final Determination of Sales at Less Than Fair Value*, 81 Fed.
   Reg. 53,428 (August 12, 2016) and accompanying Issues and
   Decision Memorandum........................................................................12

*Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of*
   *Antidumping Duty Administrative Review; 2018-2019,* 86 Fed.
   Reg. 30589 (June 9, 2021) and accompanying Issues and Decision
   Memorandum.................................................................................7, 13

## <u>PLAINTIFFS' STATEMENT PURSUANT TO U.S. CIT RULE 56.2(C)</u>

**I.     Administrative Determination to Be Reviewed**

Plaintiff Citribel NV ("Plaintiff" or "Citribel") contests the final results of the administrative review of the antidumping duty order on *Citric Acid and Certain Citrate Salts from Belgium*.  The contested final results cover entries of subject merchandise from Belgium during the period of review ("POR") from July 1, 2021 through June 30, 2022.  *See Citric Acid and Certain Citrate Salts From Belgium: Final Results of Antidumping Duty Administrative Review*; 2021-2022; 88 Fed. Reg. 90,167 (December 29, 2023) (the "Final Results").

Plaintiff challenges the factual and legal conclusions of the U.S. Department of Commerce (the "Department" or "Commerce") in the Final Results as stated in the associated "Issues and Decision Memorandum."  *See Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Citric Acid and Certain Citrate Salts from Belgium; 2021-2022* (December 22, 2023) ("Final IDM").  Specifically, Plaintiff challenges Commerce's quarterly cost analysis based on the presumption that conversion costs must be normalized due to the way they are incurred and recorded.

II.    **Issues of Law and Fact Presented**

1.    **Is Commerce's presumption that conversion costs must be normalized consistent with a reasonable interpretation of Section 773(b) of the Tariff Act of 1930, as amended?**

No, the statute provides that Commerce's cost test must be based on the cost of production, which is defined as the sum of the raw material costs, conversion costs, and other expenses.  *See* 19 U.S.C. § 1677b(b)(1) & (3). Commerce's presumption completely normalizes conversion costs, resulting in "quarterly" COMs that do not account for any change in the conversion costs.

2.    **Did Commerce provide an adequate explanation about its presumption about conversion costs and what type of information would be required to rebut the presumption?**

No, Commerce failed to explain the nature of its presumption or what type of information would be necessary to rebut it.  This deprived Citribel of a meaningful opportunity to present relevant factual information and make effective arguments against the presumption.

3.    **Did Commerce consider the specific facts provided by Citribel to support that its conversion costs should not be normalized?**

No, Commerce failed to consider or address any of the factual information provided by Citribel specific to this case regarding whether its conversion costs should be normalized.  Commerce's decision was based solely on its presumption, without consideration of the case-specific facts.

4.    **Did Commerce provide an adequate explanation about its decision to use Citribel's annualized conversion costs, based on case-specific facts?**

No, Commerce failed to provide an adequate explanation based on case-specific facts.

**5.     Did Citribel's costs significantly increase during the POR?**

Yes, Citribel's raw material and conversion costs increased significantly during the POR.  The increase in Citribel's conversion costs was due to various macroeconomic factors, rather than the way those costs were recorded in accounting.

**6.     Did Citribel's rising costs result in margin distortions?**

Yes, Citribel's rising costs resulted in margin distortions.  Citribel's prices in the earlier quarters of the POR reflected its costs during those quarters.  Using Citribel's annual costs, Commerce treated those sales as "below-cost" sales, even though they were made at prices above their costs at the time.

**7.     Did Commerce address the problem identified by Citribel in Commerce's quarterly cost analysis?**

No, Commerce failed to address the problem identified by Citribel.  Instead, it simply defended its position with a conclusory statement, asserting that it followed its "normal" approach.

**III.     Reasons for Contesting the Final Results**

Plaintiff contests the Final Results because Commerce's factual and legal conclusions are unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  Commerce unlawfully decided not to use its quarterly cost methodology.  In doing so, Commerce compared Citribel's "quarterly" cost of manufacturing ("COM") consisting of its *quarterly* raw material costs and *annualized* conversion costs.  This decision was based on the presumption that conversion costs must be normalized due to the way they are

incurred and recorded. Commerce's reliance on this presumption in the underlying case was unlawful.

## IV.    Standard of Review

The court will hold Commerce's determinations unlawful where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "If Commerce fails 'to consider or discuss record evidence, which, on its face, provides significant support for an alternative conclusion{,} {Commerce's determination} is unsupported by substantial evidence.'" *Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp. 3d 1364, 1381 n.35 (Ct. Int'l Trade 2020) (quoting *Ceramark Tech., Inc. v. United States*, 11 F. Supp. 3d 1317, 1323-24 (Ct. Int'l Trade 2014). "{I}t is also well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000).

4

In applying its standard of review involving Commerce's interpretation of a statute, the Court must exercise its independent judgment in deciding whether the agency has acted within its statutory authority, as the Administrative Procedure Act (APA) requires, and it may not defer to an agency's interpretation of the law simply because a statute is ambiguous. *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, at 6 (2024). "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U. S. 743, 750 (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U. S. 359, 374). Not only must an agency's decision be within the scope of its lawful authority, the process by which an agency reaches its decision "must be logical and rational." *Id.* "It follows that agency action is lawful only if it rests 'on a consideration of the relevant factors.' *Id.* (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U. S. 29, 43 (1983).

## STATEMENT OF FACTS

Citribel is a Belgian producer and exporter of merchandise subject to the antidumping duty order on citric acid and certain citrate salts.  *See Citric Acid and Certain Citrate Salts From Belgium: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 90167 (December 29, 2023).

On September 6, 2022, Commerce initiated the administrative review of the antidumping duty order covering entries made from July 1, 2021 through June 30, 2022 (the "POR").  *See* Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 54,463 (September 6, 2022).

On September 15, 2022, Commerce issued its initial questionnaire to Citribel. The initial questionnaire defined the cost of manufacturing ("COM") as "the cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods during the POR."[1]

On October 31 2022, Citribel responded to Sections B and C of the Department's initial questionnaire.  The home market and U.S. sales reported in

---

[1] *See* Initial Questionnaire, at D-12.  Appx4410

the Sections B and C response indicated that the price of the subject merchandise increased drastically during the POR.[2]

On November 7, 2022, Citribel submitted its response to Section D of the Department's initial questionnaire.  In that response, Citribel explained that both its costs and prices for citric acid changed drastically during the POR, and reported its costs on a quarterly basis.[3]  Citribel's quarterly costs consisted of: (1) quarterly raw material costs, and (2) quarterly conversion costs (i.e., labor, variable overhead, and fixed overhead).

In its Section D response, Citribel also provided an analysis demonstrating: (1) that the change in its cost of manufacturing ("COM") is at least 25 percent between the low-COM quarter and the high-COM quarter, and (2) that there is a reasonably positive correlation between its costs and prices.[4]  These are the two requirements for the Department to apply its quarterly cost methodology.[5]

---

[2] Citribel's home market and U.S. prices are summarized in its Section D response, at Exhibits D-17.1 and D-17.2.  Appx1852-Appx1854; Appx1855-Appx1857.

[3] *Id*. at 1-2 & Exhibit D-1.  Appx1693; Appx1694; Appx1727; Appx1728.

[4] *Id*. at Exhibits D-17.1 and D-17.2.  Appx1852-Appx1854; Appx1855-Appx1857.

[5] *See e.g.*, *Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2018-2019,* 86 Fed. Reg. 30589 (June 9, 2021), and accompanying Issues and Decision Memorandum (June 3, 2021) ("ESBR from Brazil"), at Comment 1.

On December 2, 2022, Commerce issued a supplemental Section D questionnaire, instructing Citribel to report its "quarterly" costs using *annualized* conversion costs.[6]  This was contrary to the definition of "cost of manufacturing" in the initial questionnaire, which included both the raw material costs and the conversion costs.

On December 12, 2022, Citribel responded to the supplemental Section D questionnaire by submitting its revised "quarterly" costs consisting of its: (1) quarterly raw material costs, and (2) annualized conversion costs.[7]  Also, pursuant to Commerce's instructions, Citribel submitted a revised analysis showing that its revised "quarterly" costs increased by 9-14% between the low-COM quarter and the high-COM quarter.[8]

In its supplemental Section D response, Citribel also explained that it has experienced a significant increase in its conversion costs due to the macroeconomic conditions caused by the economic recovery from the COVID-19 pandemic and the Russian invasion of Ukraine.[9]  Citribel provided supporting information including the EU inflation data, energy prices, and labor cost indices.[10]

---

[6] *See* Supp. Sec. D QR at 5.  Appx4825.
[7] *See* SDQR, at Exhibit SD-6.  Appx1932; Appx1933.
[8] *Id*. at Exhibit SD-13.  Appx1948-Appx1951.
[9] *Id*. at 2-5.  Appx1890-Appx1893.
[10] *Id*. at Exhibit SD-1.1 through SD-5.2.  Appx1895-Appx1931.

On February 22, 2023, Citribel submitted its second supplemental Section D response and provided updated cost data based on its quarterly income statements. In this submission, Citribel iterated that its conversion costs increased sharply during the POR because of inflationary economic conditions, not the rates at which those expenses were recorded.[11] Citribel further argued that disregarding the actual changes in the conversion costs through annualization would result in a serious distortion in Commerce's margin calculations.[12]

On July 31, 2023, Commerce issued the preliminary results of the administrative review. *See Citric Acid and Certain Citrate Salts from Belgium: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022,* 88 Fed. Reg. 49,442 (July 31, 2023) (the "Prelim Results") and accompanying Issues and Decision Memorandum dated July 24, 2024 ("Prelim IDM") and Analysis Memorandum dated July 24, 2023 ("Prelim Analysis Memo").

In the Prelim Results, Commerce determined that its quarterly cost methodology was unwarranted for Citribel because the percentage difference between the low-COM quarter and the high-COM quarter did not exceed 25

---

[11] *See* 2SDQR, at 1-3.  Appx2006-Appx2008
[12] *Id.*

percent.[13]   To support this finding, Commerce claimed that it "analyzed the effect of these {conversion} cost increases had on total cost methodology for the subject merchandise."[14]   However, Commerce's analysis was based on Citribel's annualized conversion costs, which by definition could not account for any change.[15]

On August 30, 2023, Citribel submitted its administrative case brief contesting Commerce's decision not to use its quarterly cost methodology.  In the case brief, Citribel demonstrated again that its quarterly costs changed by more than 25% during the POR.[16]  Citribel also demonstrated that Commerce failed to analyze the effect of changing conversion costs only by examining annualized conversion costs.[17]  Citribel also argued that Commerce should conduct its price comparisons within the same quarter regardless of its decision on the use of quarterly costs.[18]

On December 29, 2023, Commerce issued its final results of the administrative review.  *See Citric Acid and Certain Citrate Salts from Belgium:*

---

[13] *See* Prelim IDM, at 12; *see also* Prelim Analysis Memo at 2.  Appx1276c; Appx1021.

[14] *See* Prelim Analysis Memo at 2.  Appx1021.

[15] *Id*. at Attachment 7.  Appx1255-Appx1258.

[16] *See* Citribel's Administrative Case Brief, at 4-5. Appx4229-Appx4230.

[17] *Id*. at 5-6. Appx4230; Appx4231.

[18] *Id*. at 12-14. Appx4237-Appx4239.

*Final Results of Antidumping Duty Administrative Review; 2021-2022,* 88 Fed.

Reg. 90167 (December 29. 2023) (the "Final Results"), and accompanying Issues

and Decision Memorandum dated December 22, 2023 ("Final IDM").

In the Final Results, Commerce again determined that its quarterly cost

methodology was unwarranted.  Commerce reasoned that conversion costs "may

be recorded at different rates from month to month throughout a given year" and

therefore "using an annual average for these costs normalizes these costs over the

entire year."[19]  Commerce further reasoned that the practice of using annualized

conversion costs in its quarterly cost analysis is the "type of line-drawing exercise"

left to Commerce's discretion.[20]  However, Commerce still did not explain how it

could use Citribel's annualized conversion costs to "analyze" the effect of

changing conversion costs on the company's cost of manufacturing ("COM").

Commerce also refused to match sales in the same quarter and asserted that

"Citribel failed to demonstrate that the 90/60 rule led to distortive or unreasonable

result."[21]

---

[19] *See* Final IDM, at 9.  Appx1287.
[20] *Id.* at 11.  Appx1289.
[21] *Id.* at 15.  Appx1293.

## SUMMARY OF ARGUMENT

This appeal stems from Commerce's decision not to use its quarterly cost methodology.  Section 773(b)(1) of the Tariff Act of 1930, as amended, allows Commerce, in certain circumstances, to disregard comparison-market sales made at less than the cost of production when determining normal value.  *See* 19 U.S.C. § 1677b(b).  The statute provides that the cost is calculated using a "period which would ordinarily permit the production" of the foreign like product.  *Id.* § 1677b(b)(3).  However, there is no guidance about whether Commerce may use average costs for the entire period of review or shorter periods such as quarters.[22]  Commerce addressed this issue by establishing two criteria for applying its quarterly cost methodology, which are: (1) the change in the respondent's cost of manufacturing is significant, and (2) the respondent's sales prices are reasonably linked with its cost of manufacturing.  This case only deals with the first criterion.[23]

---

[22] *See Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for Comment*, 73 Fed. Reg. 26,364, 26,365 (May 9, 2008).

[23] *See ESBR from Brazil*, at Comment 1; *see also Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (August 12, 2016) (*Hot-Rolled Steel from Turkey*), and accompanying Issues and Decision Memorandum at Comment 6.

Commerce defines the cost of manufacturing ("COM") as the cost of raw materials and the conversion costs (i.e., labor and overheads) incurred to produce the finished goods. Appx4410. To find a significant change in the COM, Commerce compares the respondent's quarterly COMs.[24]  If the difference between the low-COM quarter and the high-COM quarter is more than 25 percent, Commerce deems the change significant.[25]

To conduct the 25% test, Commerce normally calculates the respondent's "quarterly" COMs by combining its **quarterly** raw material costs and **annualized** conversion costs.[26]  Accordingly, the conversion costs do not change between quarters.  Below is an illustration of the methodology used by Commerce:

---

[24] *See e.g.*, *Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2018-2019,* 86 Fed. Reg. 30589 (June 9, 2021), and accompanying Issues and Decision Memorandum (June 3, 2021) ("ESBR from Brazil"), at Comment 1.

[25] *Id.*

[26] *See e.g.* Final IDM, at 9.  Appx1287.



Commerce's rationale for this methodology is that conversion costs are normally incurred erratically and may be recorded at different rates throughout a given year.[27]  Commerce has not explicitly stated that this is a rebuttable presumption.

In the underlying review, Citribel attempted to rebut Commerce's presumption about conversion costs.  Citribel provided evidence supporting that the changes in its conversion costs were due to macroeconomic factors, rather than the way those costs were recorded in accounting.  However, Commerce did not consider this evidence.

---

[27] *Id.*

Plaintiff challenges Commerce's "cookie cutter" use of its methodology for calculating "quarterly" COMs in the underlying review for the following reasons: (1) Commerce's presumption about conversion costs does not reflect a reasonable interpretation of the statute; (2) Commerce failed to explain the nature of its presumption about conversion costs and what type of information would be necessary to rebut it; and (3) Commerce failed to provide an adequate explanation based on case-specific facts.

## **ARGUMENTS**

I.    **Commerce's Presumption About Conversion Costs Does Not Reflect a Reasonable Interpretation of the Statute**

Section 773(b)(3) of the Tariff Act of 1930, as amended, provides that the cost of production shall be an amount equal to the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during <u>a period which would ordinarily permit the production of that foreign like product in the ordinary course of business</u>" and other amounts such as selling, general, and administrative expenses.  19 U.S.C. § 1677b(b)(3) (emphasis added).  However, the statute is silent on what this period is.  Thus, Commerce exercised its discretion to establish the two criteria for applying its quarterly cost methodology, which allegedly incorporates its presumption about conversion costs.

"{S}tatutory ambiguity is {…} not a reliable indicator of actual delegation of discretionary authority to agencies."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, at 21 (2024).  The Court must exercise its independent judgment in deciding whether the agency has acted within its statutory authority and may not defer to an agency's interpretation of the law simply because a statute is ambiguous.  *Id.* at 6.  "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (quoting

*Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374).  Not only must an agency's decision be within the scope of its lawful authority, the process by which an agency reaches its decision "must be logical and rational." *Id.* "It follows that agency action is lawful only if it rests 'on a consideration of the relevant factors.' *Id.* (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

In the underlying review, Citribel demonstrated that Commerce's presumption about conversion costs is neither logical nor rational.  Commerce presumes that conversion costs must be normalized due to the way they are incurred and recorded.  However, during the time of rapidly rising costs, normalized conversion costs do not accurately represent the costs incurred during "a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  Citribel iterated this point in its administrative case brief:

> During the POR, Citribel's costs increased sharply.  Citribel's prices in the earlier quarters reflect the actual costs in those quarters – not the average annual costs which were not even *known* to Citribel at the time.  If Commerce uses Citribel's average annual costs, almost all of Citribel's home market sales in the earlier quarters will become "below-cost" sales even though they were made at prices above their actual costs at the time.[28]

---

[28] Citribel's Administrative Case Brief, at 12.  Appx4237.

Furthermore, Commerce's presumption about conversion costs is incompatible with its rationale for the quarterly cost methodology. The primary rationale for applying the quarterly cost methodology is that the use of annual costs may result in margin distortions during the time of rapidly increasing costs:

> Application of the shorter cost-averaging period methodology is intended to achieve greater accuracy and fairness in our antidumping calculations, as the application of our normal methodology (i.e., using a POR weighted-average cost) would impact such calculations in a manner that is distortive.[29]

Thus, Commerce's 25% test is intended to measure a change in the cost of manufacturing ("COM"), which is defined as the sum of raw material and conversion costs. However, Commerce's presumption completely normalizes conversion costs, resulting in "quarterly" COMs that do not account for any change in the conversion costs.

Commerce's failure to account for changes in conversion costs directly contradicts the statutory language. The statute provides that Commerce's cost test must be based on the cost of production, which is defined as the sum of the raw material costs, conversion costs (i.e., "fabrication or other processing of any kind employed in producing the foreign like product"), and other expenses. *See* 19

---

[29] *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 50,100 (August 1, 2023) and accompanying Issues and Decision Memorandum, at 34.

U.S.C. § 1677b(b)(1) & (3).  Therefore, Commerce's test for determining a

significant cost change must also be based on the change in the total cost, not just

raw material costs.

In the Final Results, Commerce responded to Citribel's contention with a

conclusory statement that it acted within its discretion:

> We agree, generally, with Citribel that the purpose of using cost
> periods other than the normal annual average is to avoid distortions
> that arise when there are significant cost and price changes during the
> POR. However, *Steel Rebar from Turkey* also reaffirms the
> methodology and quarterly cost analysis utilized by Commerce in the
> instant case by demonstrating that a deviation away from our
> annualized standard methodology to the quarterly cost methodology is
> not warranted without passing the quarterly cost analysis in nonhigh
> inflationary contexts. Further, "determining the most appropriate
> threshold for departing from the agency's usual methodology Is {sic}
> the "type of line-drawing exercise properly left to the agency's
> discretion."[30]

However, Commerce's discretion is not boundless.  Despite the broad latitude

afforded to Commerce, its discretion must be exercised "in a manner consistent

with underlying objective of {the statute}—to obtain the most accurate dumping

margins possible." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp.

2d 714, 719 (Ct. Int'l Trade 2001).

Furthermore, Commerce's decision should be remanded for its misplaced

reliance on *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,

---

[30] Final IDM, at 11.  Appx1289.

19

361 F. Supp. 3d 1314, 1326 (Ct. Int'l Trade 2019).[31]  In this case, plaintiff Habas

contended that Commerce unlawfully refused to conduct its quarterly cost test

using only changes in raw material costs.  *Id.* at 1325. Habas asserted that

"Commerce's addition of POI-average transformation costs (labor and overhead)

to quarterly DIRMAT costs 'intrinsically dilutes any {T}COM fluctuations,'

particularly for products with a low DIRMAT to TCOM ratio." *Id.*  However, the

court in *Habas* did not address Commerce's presumption about the nature of

conversion costs.  Instead, the court upheld Commerce's examination of the "total

cost of manufacture because 'it accounts for all production costs, the total of which

impact pricing." *Id.* at 1326.  While recognizing that Commerce's analysis must

consider both raw material *and* conversion costs, the court did not address why it is

reasonable to presume that conversion costs must be normalized.  Moreover, the

court in *Habas* relied on the *Chevron* deference to sustain Commerce's decision.

*Id.*  Therefore, the precedential value of *Habas* should be revisited in light of

Supreme Court's recent reversal of *Chevron* in *Loper Bright Enterprises v.*

*Raimondo*, 603 U.S. ___ (2024)

---

[31] Commerce relied on *Habas* to state that "the CIT upheld Commerce's
methodology in using annualized conversion costs and to not use quarterly changes
in all components of COM as part of the quarterly cost analysis."  Final IDM, at
11.  Appx1289.

Lastly, Commerce's discretion does not relieve it from the obligation to address "an important aspect" of the problem raised by a party. An agency acts arbitrarily, and therefore unreasonably, when it "entirely fail{s} to consider an important aspect of the problem." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 70 F. Supp. 3d 1328, 1335, n.33 (Ct. Int'l Trade 2015) (citing *Motor Vehicle Mfrs. Ass'n* , 463 U.S. 29). A conclusory statement without "an explanation of the standards applied and of the analysis that led to Commerce's conclusion" does not "demonstrate a rational connection between the facts on the record and the conclusions drawn." *Alloy Piping Products, Inc. v. U.S.*, Slip Op. 09-29, Consol. Court No. 08-00027, at 14 (Ct. Int'l Trade Apr. 14, 2009) (citing Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). In the underlying review, Citribel identified an important problem with Commerce's quarterly cost analysis, which put the reasonableness of the analysis. Therefore, Commerce's willful blindness to the problem warrants a remand by the Court.

## II.     Commerce Failed to Explain the Nature of Its Presumption About Conversion Costs and What Type of Information Would be Necessary to Rebut It

In the underlying review, Commerce determined that Citribel's cost of manufacturing ("COM) did not change by more than 25% during the period of review ("POR"). This decision was made based on the comparison between

Citribel's "quarterly" COMs, consisting of its: (1) quarterly raw material costs, and
(2) annualized conversion costs.

Until the Final Results, Commerce did not explain its rationale for using the
annualized conversion costs. In the initial questionnaire, Commerce defined the
COM as "the cost of materials, labor, variable overhead, and fixed overhead
incurred to produce the finished goods during the POR."[32] Pursuant to this
definition, Citribel submitted its quarterly COMs, consisting of its: (1) quarterly
raw material costs, and (2) quarterly conversion costs (i.e., labor, variable
overhead, and fixed overhead). The quarterly COMs demonstrated that Citribel's
costs have changed by more than 25% during the POR.

However, Commerce issued a supplemental questionnaire, instructing
Citribel to report its "quarterly" COMs using *annualized* conversion costs. As seen
below, no rationale was provided for this request:

> On pages D-21-22 and in Exhibits D-17.1 and Exhibit D-17.2, Citribel
> explains why it believes it is appropriate to use quarterly costs in this
> review. The record reflects that Citribel reported its fixed overheard
> costs and variable overhead costs on a quarterly basis. Please revise
> and resubmit your request/analysis regarding quarterly cost by
> calculating conversion costs (e.g., DIRLAB, VOH, and FOH) on an
> annualized basis. Use these revised costs to resubmit the CONNUM-
> specific TOTCOM quarterly cost comparisons.[33]

---

[32] *See* Initial Questionnaire, at D-12.  Appx4410.
[33] *See* Supp. Sec D QR, at 5.  Appx4825.

Citribel responded to this request by providing its revised "quarterly" COMs, while still iterating that it has experienced actual changes in conversion costs due to macroeconomic conditions stemming from the economic recovery from the COVID-19 pandemic and the Russian invasion of Ukraine.[34] To support this claim, Citribel provided supplementary information, including EU inflation data, energy prices, and labor cost indices. [35]

In the Preliminary Results, Commerce acknowledged that Citribel experienced significant changes to its conversion costs (i.e., labor and overheads) due to the "price increases of energy and inflation."[36] Commerce further asserted that it analyzed the effect these cost changes had on total COM for the subject merchandise.[37] However, Commerce's "analysis" was based on Citribel's annualized conversion costs, which by definition could not account for any change in conversion costs.[38] There was no discussion about why it was appropriate to calculate Citribel's "quarterly" COMs using its annualized conversion costs.

---

[34] *See* SDQR, at 2-5.  Appx1890-Appx1893.

[35] *Id*. at Exhibit SD-1.1 through SD-5.2.  Appx1895-Appx1931.

[36] *See* Prelim IDM, at 12; *see also* Prelim Analysis Memo, at 2.  Appx1276c; Appx1021.

[37] *See* Prelim Analysis Memo, at 2.  Appx1021.

[38] *See* Prelim Analysis Memo, at Attachment 7.  Appx1255-Appx1258.

Commerce did not address any evidence presented by Citribel in relation to its conversion costs.

In the Final Results, Commerce *for the first time* explained its methodology for calculating the "quarterly" COMs.[39]  Commerce explained the rationale for the methodology as follows:

> {…} As we stated in *Yarn from Thailand*, conversion costs, such as labor, energy and overhead, are normally incurred erratically throughout a given year.  For example, bonuses, insurance costs, depreciation, repairs and maintenance, energy costs, etc. may be recorded at different rates from month to month through a given year; however, using an annual average for these costs normalizes these costs over the entire year.  Additionally, while significant changes in direct material costs are unexpected and may trigger a more rapid price change response, for conversion costs, it is normal for conversion costs to be incurred sporadically throughout the year. {…}[40]

Commerce did not clarify whether this general statement is a rebuttal presumption or what type of information would be necessary to rebut the presumption.  In fact, there is no administrative or judicial precedent in which Commerce has clearly articulated how parties may rebut this presumption.

"When a party is subject to a presumption, it has a right to attempt to rebut it." *Meihua Grp. Int'l Trading (Hong Kong) Ltd. v. United States*, No. 22-00069 (Ct. Int'l Trade 2024) (citing *Transcom, Inc. v. United States*, 182 F.3d 876, 883

---

[39] Final IDM, at 7-12. Appx1285; Appx1290.
[40] *Id*. at 10-11. Appx1287; Appx1288.

(Fed. Cir. 1999).  "If that party does not have notice that its interests are at stake in an administrative review, however, the party does not have a meaningful opportunity to rebut the presumption." *Id.*  Moreover, if Commerce relies on a presumption without explaining how to rebut it, the presumption becomes a "self-fulfilling, though baseless, 'fact'."  *See Decca Hospitality Furnishings, LLC v. United States*, No. 05-00002, at 41 (Ct. Int'l Trade 2005). "Such a result would render the presumption arbitrary, and accordingly, not in accordance with law." *Id.*

In the underlying review, Commerce failed to provide any guidance on what information would be necessary to demonstrate that Citribel's conversion costs should not be normalized.  This lack of clarity deprived Citribel of a meaningful opportunity to make effective arguments against Commerce's presumption about conversion costs.  Therefore, the Court should remand the case to Commerce, instructing it to provide such guidance and reopen the record, allowing Citribel a meaningful opportunity to submit relevant factual information and effectively argue against the presumption.

III.    **Commerce Failed to Provide an Adequate Explanation Based on Case-Specific Facts.**

Commerce's decision to use Citribel's annualized conversion costs (in calculating its "quarterly" COMs) was based on the presumption that conversion costs must be normalized due to the way they are incurred and recorded. However, Commerce has never articulated what type of information would be necessary to rebut this presumption. Despite this ambiguity, Citribel attempted to rebut this presumption by providing the following information:

- In 2022, most countries in Europe including Belgium started to experience significant inflation as the economic recovery from the Covid-19 pandemic increased demand for energy and disrupted global supply chains. *See* SDQR, at 2. Appx1890. The inflation was worsened by the Russian invasion of Ukraine. *Id.*

- Belgium experienced a significant increase in inflation during the POR. The annualized inflation rate for all items increased from 1.4% to 10.5%. For the energy sector, the inflation rate increased from 22.1% to 64.6%. *See* SDQR, at 3. Appx1891.

- The labor cost index for Belgium, which measures the change in the price businesses pay for labor, has increased by nearly five times during the POR. *Id.* at 3-4. Appx1891; Appx1891.

- The price of natural gas for Citribel has increased by 50% from the second half of 2021 to the first half of 2022. *See* SDQR at 3. Appx1891. Natural gas is one of the three most significant inputs for citric acid production. *Id.*

- The price of electricity for Citribel has increased by more than 50% from the second half of 2021 to the first half of 2022. *See* SDQR, at 3. Appx1891. Electricity affects Citribel's overall operational costs. *Id.*

Citribel also provided the following accounting data, all of which

demonstrated a significant increase in Citribel's conversion costs:

- Monthly bills of material. *See* DQR, at Exhibits SD-5.1 & 5.2.
  Appx1924-Appx1931.

- Semiannual and quarterly trial balances. *See* AQR, at Exhibit A-12;
  *see also* 2SDQ, at Exhibit 2SD-5. Appx1559-Appx1566; Appx1693-
  Appx2328-Appx2338.

- Quarterly COMs based on semi-annual and quarterly conversion
  costs. *See* 2SDQ, at Exhibits 2SD-1.3 & 1.4. Appx2255-Appx2258.
  These costs demonstrated a significant increase in Citribel's
  conversion costs while normalizing monthly fluctuations.

- Monthly breakdown of electricity and gas costs. *See* 3SDQR, at 7 &
  Exhibit 3SD-1. Appx2467; Appx2542.

- Monthly production quantities. *See* DQR, at Exhibit D-13.
  Appx1832-Appx1834. The rising costs led to a smaller production
  volume, which resulted in higher per-unit conversion costs. *See*
  SDQR, at 4. Appx1892.

Lastly, Citribel demonstrated that Commerce's use of the annualized

conversion costs resulted in a distortive result in the cost test and margin analysis:

> In the Preliminary Results, Commerce unlawfully used Citribel's
> annual costs and created a serious distortion in its below-cost analysis
> (and therefore the margin calculations). {…}

> During the POR, Citribel's costs increased sharply. Citribel's prices in
> the earlier quarters reflect the actual costs in those quarters – not the
> average annual costs which were not even *known* to Citribel at the
> time. If Commerce uses Citribel's average annual costs, almost all of
> Citribel's home market sales in the earlier quarters will become

"below-cost" sales even though they were made at prices above their actual costs at the time.[41]

However, Commerce did not consider any of this evidence during its decision-making process.

In the Preliminary Results, Commerce acknowledged that Citribel experienced significant changes to its conversion costs (i.e., labor and overheads) due to the "price increases of energy and inflation."[42]  Commerce further asserted that it analyzed the effect these cost changes had on total COM for the subject merchandise.[43]  However, Commerce's "analysis" was based on Citribel's annualized conversion costs, which by definition could not account for any change in conversion costs.[44]

In the Final Results, Commerce iterated its previous position with a conclusory statement that it is following its "normal approach" without any discussion of case-specific facts.[45]  "{T}he rule of law requires predictability, consistency, and uniformity in decisionmaking, and that similar cases be decided similarly.  However, the rule of law also requires that Commerce take pains to

---

[41] Citribel's Administrative Case Brief, at 11-12.  Appx4236; Appx4237.
[42] See Prelim IDM, at 12; see also Prelim Analysis Memo, at 2.  Appx1276c; Appx1021.
[43] See Prelim Analysis Memo, at 2.  Appx1021.
[44] Id. at Attachment 7.  Appx1255-Appx1258.
[45] See Final IDM, at 11.  Appx1289.

28

ensure that each issue in each case is decided on the specific facts on the record of that case. 'Cut-and-paste' decisionmaking and 'cookie cutter' justice are not permissible." *Taian Ziyang Food Co., Ltd. v. U.S.*, 783 F. Supp. 2d 1292, 1317 n.22 (Ct. Int'l Trade 2011). Therefore, Commerce's failure to consider the case-specific facts proffered by Citribel warrants a remand by the Court.

In the underlying review, Citribel presented sufficient evidence to put Commerce's presumption about conversion costs into genuine dispute. The Federal Circuit has found that rebutting a "presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more" and that once that evidence is proffered "a presumption is not merely rebuttable but completely vanished upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A. C. Aukerman Co. v. R.L. Chides Constr. Co.*, 960 F.2d 1020.1037 (Fed. Cir. 1992). Therefore, Commerce's continued reliance on its presumption was unlawful.

Commerce's decision was unlawful because it lacked adequate explanations based on case-specific facts. An agency's finding is unlawful if it is unsupported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). For its decision to be supported by substantial evidence, "Commerce must examine the record and provide a reasoned analysis." *Coalition of American Flange Producers v. United*

*States*, 448 F.Supp.3d 1340, 1350 (Fed. Cir. 2020).  Commerce's explanation must also be adequately detailed to permit judicial review.  *See Timken U.S. v. U.S.*, 421 F.3d 1350, 1355 (Fed. Cir. 2005).  "The antidumping statute is highly complex and often confusing, and we accordingly rely on Commerce in its antidumping determinations to make sense of that statute. The more complex the statute, the greater the obligation to the agency to explain its position with clarity." *SFK USA, Inc. v. United States*, 263 F.3d 1369, 1382-83 (Fed. Cir. 2001).  A conclusion based on substantial evidence and in accordance with law requires Commerce to examine the record and provide an adequate explanation for its findings such that the record demonstrates a rational connection between the facts accepted and the determination made. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Jindal Poly Films, Ltd. of India v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1379, 1383 (2019).  In the underlying case, Commerce failed to demonstrates a rational connection between its decision and the specific facts provided by Citribel.  Therefore, the Court should remand the case and instruct Commerce to provide adequate explanations based on the case-specific facts.

## **CONCLUSION**

For the reasons discussed in this brief, Plaintiff respectfully requests that the Court remand the case to Commerce, instructing the agency to reopen the record and reconsider its decision about the quarterly cost methodology, consistent with the arguments made in this brief.

Respectfully submitted,
*/s/ Pierce J. Lee*
Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 508-8780
Email: plee@crowell.com

*Counsel for Plaintiff Citribel nv*

31

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 6,068 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

*/s/ Pierce J. Lee*
Pierce J. Lee