**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| CITRIBEL NV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | Court No. 24-00010 |
| | ) | |
| and | ) | PUBLIC DOCUMENT |
| | ) | |
| ARCHER DANIELS MIDLAND | ) | |
| COMPANY, CARGILL, INCORPORATED, | ) | |
| AND PRIMARY PRODUCTS | ) | |
| INGREDIENTS AMERICAS LLC, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

## DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

---

| | |
|---|---|
| OF COUNSEL: | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
| SHANNI ALON<br>Attorney<br>Office of the Chief<br>Counsel for Trade Enforcement<br>Compliance<br>U.S. Department of Commerce | PATRICIA M. McCARTHY<br>Director<br><br>TARA K. HOGAN<br>Assistant Director |
| **COVER page 1 of 2<br>(continued on next page)** | RAVI D. SOOPRAMANIEN<br>Trial Attorney<br>U.S. Department of Justice |

<u>Cover continuation:</u>
CITRIBEL NV, case
Page 2 of 2 (from above)

<u>Cover continuation:</u>
CITRIBEL NV, case
(RAVI D. SOOPRAMANIEN)

---

Commercial Litigation Branch
Civil Division
Ben Franklin Station, P.O. Box 480,
Washington, DC 20044
Telephone: (202) 616-0856
Facsimile: (202) 307-0972
Ravi.Soopramanien@usdoj.gov

October 4, 2024

*Attorneys for Defendant*

# <u>TABLE OF CONTENTS</u>

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ............................................2

    I.   The Administrative Determination Under Review ...............2

    II.  The Issues Presented for Review ........................................2

STATEMENT OF FACTS ...........................................................................3

    I.   Background ...............................................................................3

    II.  Initiation Of Administrative Review ......................................4

    III.  Preliminary Results ................................................................7

    IV.  Case Briefs .............................................................................10

    V.   Final Results .........................................................................11

SUMMARY OF THE ARGUMENT ........................................................12

ARGUMENT ..............................................................................................14

    I.   Standard Of Review ..............................................................14

    II.  Commerce Appropriately Determined To Use Its
            Standard Annual Cost Methodology....................................16

           A.   Commerce's Standard Annual Cost
                  Methodology .................................................................16

           B.   Commerce's Use Of The Standard Annual
                  Cost Methodology Is Supported By
                  Substantial Evidence ...................................................21

           C.   Commerce's Determination Not To Depart
                   From Its Standard Cost Methodology Was
                  Reasonable ...................................................................25

           D.   Citribel Presents Arguments That Were Not
                 Raised In The Review Proceedings Below...................30

i

CONCLUSION .......................................................................................... 36

## TABLE OF AUTHORITIES

**CASES**                                                        **PAGE(S)**

*Asssociacion de Exportadores e Industriales de
Aceitunas de Mesa v. United States,*
102 F.4th 1252, 1259 (Fed. Cir. 2024) ............................................ 17, 29

*Cleo Inc. v. United States,*
501 F.3d 1291 (Fed. Cir. 2007) ............................................... 15

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) ................................................................ 15

*Habas Sinai ve Tibbi Gazlar istihsal Endustrisi
A.S. v. United States,*
625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009)……………….....…………20

*Eregli Demir v. Celik Fabrikalari T.A.S v. United States,*
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018)........................................22

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996) ............................................ 14, 17, 18, 20

*Goldlink Indus. Co. v. United* States,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)........................................15

*Gundy v. United States,*
588 U.S. 128, 139 S. Ct. 2116, 204 L.Ed.2d 522 (2019) ......................17

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
33 CIT 1721 (November 23, 2009)................................................ 21, 22

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
361 F. Supp. 3d 1316 (Ct. Int'l Trade 2019)............................. 25, 34, 35

*Lichter v. United States,*
334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) ..............................17

*Loper Bright Enterprises v. Raimondo,*
603 U.S. ___ (2024) ................................................................28

*Micron Tech., Inc. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) ............................................................ 15

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) ...................................................... 14, 15

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
   783 F. Supp. 2d 1230 (2011) .......................................................... 16, 21

*SeAH Steel Corp. v. United States*,
   704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) .................................... 21, 22

*Sigma Corp. v. United States*,
   117 F.3d 1041 (Fed. Cir. 1997) ............................................................ 17

*SolarWorld Americas, Inc. v. United States*,
   910 F.3d 1216 (Fed. Cir. 2018) ................................................ 24, 25, 35

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................ 14

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021) .......................................... 9

## STATUTES

19 U.S.C. § 1677 .................................................................... 3, 4, 16, 27

28 USC 2637(d) .......................................................................... 31

## ADMINISTRATIVE DECISIONS

*Citric Acid and Certain Citrate Salts from Belgium: Final Results of
Antidumping Duty Administrative Review; 2021–2022*,
   88 Fed. Reg. 90,167 (Dep't of Commerce Dec. 29, 2023) ..............*Passim*

*Citric Acid and Certain Citrate Salts From Belgium,
Colombia and Thailand: Antidumping Duty Orders*,
   83 Fed. Reg. 35,214 (July 25, 2018) ...................................................... 4

*Citric Acid and Certain Citrate Salts from Belgium:  Preliminary
Results of Antidumping Duty Administrative Review; 2021-2022*,
   88 Fed. Reg. 49,442 (July 31, 2023) (P.R. 68) ...................................... 7

iv

*Initiation of Antidumping and Countervailing*
  *Duty Administrative Reviews*,
  87 Fed. Reg. 54,463 (Dep't of Commerce Sept. 6, 2022) ........................ 4

*Polyester Textured Yarn from Thailand:  Final Affirmative*
  *Determination of Sales at Less Than Fair Value*,
  86 Fed. Reg. 58,883 (Dep't of Commerce Oct. 25, 2021) ............. *Passim*

*Steel Concrete Reinforcing Bar From the Republic of Turkey:*
  *Final Results of Antidumping Duty Administrative Review and Final*
  *Determination of No Shipments; 2018-2019*,
  86 Fed. Reg. 28,574 (Dep't of Commerce May 27, 2021) ..................... 11

*Steel Plate in Coils from Belgium: Final Results of Antidumping Duty*
  *Administrative Review*,
  73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) ......... 22, 23, 33

*Steel Reinforcing Concrete Bar from the Republic of Turkey: Final*
  *Determination of Sales at Less Than Fair Value*,
  82 Fed. Reg. 23,192 (Dep't of Commerce May 22, 2017) .................... 20

# UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| ———————————————————— ) | |
| CITRIBEL NV, ) | |
| ) | |
|        Plaintiff, ) | |
| ) | |
|     v. ) | Court No. 24-00010 |
| ) | |
| UNITED STATES, ) | |
| ) | PUBLIC DOCUMENT |
|        Defendant ) | |
| ) | |
|        and ) | |
| ) | |
| ARCHER DANIELS MIDLAND ) | |
| COMPANY, CARGILL, INCORPORATED, ) | |
| AND PRIMARY PRODUCTS ) | |
| INGREDIENTS AMERICAS LLC, ) | |
| ) | |
|        Defendant-Intervenors. ) | |
| ———————————————————— ) | |

## DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Citribel NV (Citribel).  Pl. Br., ECF No. 28-2.

Citribel challenges one aspect of the Department of Commerce's final results in the fourth administrative review of the antidumping duty order covering citric acid and certain citrate salts from Belgium. Specifically, Citribel challenges Commerce's use of its standard cost

analysis in lieu of its alternative quarterly cost methodology to calculate Citribel's costs of production.

As demonstrated below, Commerce's determination is supported by substantial evidence and otherwise in accordance with law. Accordingly, we respectfully request that the Court deny Citribel's motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

## I.    The Administrative Determination Under Review

The administrative determination under review is *Citric Acid and Certain Citrate Salts from Belgium: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 90,167 (Dep't of Commerce Dec. 29, 2023) (final results), Appx1321, and the accompanying Issues and Decision Memorandum (IDM), Appx1279. The period of review is July 1, 2021 through June 30, 2022.

## II.    The Issues Presented for Review

1.    Whether Commerce's determination to apply its standard methodology in calculating Citribel's costs of production is supported by substantial evidence and otherwise in accordance with law.

2.      Whether Commerce reasonably determined not to deviate from its normal practice of using annual average conversion costs to use quarterly costs when evaluating the appropriate cost analysis to employ.

**STATEMENT OF FACTS**

## I.   Background

Subject merchandise is "dumped" into the United States if it is sold, or likely to be sold, at less than fair value.  19 U.S.C. § 1677(34).  In determining whether subject merchandise is being, or is likely to be, sold at less than fair value, Commerce determines a weighted average dumping margin which includes an analysis of the amount by which the normal value exceeds the export price or constructed export price.  *See* 19 U.S.C. §§1677(35)(A), (B).

Commerce calculates the normal value of the subject merchandise based on home market sales that are made in the ordinary course of trade.  19 U.S.C. § 1677b(a)(1)(B)(i).  Therefore, Commerce disregards sales at prices that are less than the cost of production because those sales are not made within the ordinary course of trade.  19 U.S.C. §§ 1677b(b)(1); 1677(15)(A).  The cost of production is defined as an

3

amount equal to the sum of the "cost of materials and fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A).  In order to make fair comparisons between U.S. sales and normal value, and between home market sales and costs, Commerce must determine the appropriate time period(s) for its weighted-average cost calculations.

## II.  Initiation Of Administrative Review

On July 25, 2018, Commerce published the antidumping duty order covering citric acid and certain citrate salts from Belgium.  *Citric Acid and Certain Citrate Salts From Belgium, Colombia and Thailand: Antidumping Duty Orders*, 83 Fed. Reg. 35,214 (July 25, 2018).  On September 6, 2022, Commerce initiated the fourth administrative review of the order on Belgium with respect to exporter Citribel. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54,463 (Dep't of Commerce Sept. 6, 2022). Appx4289.

On September 15, 2022, Commerce issued an initial questionnaire to Citribel.  Commerce's Letter, "Request for Information," dated Sept. 15, 2022.  Appx4304.  Citribel responded between October 2022 and November 2022.  *See* Citribel's Letters, "Citribel N.V. Section A Questionnaire Response," dated October 11, 2022, Appx1325; "Citribel N.V. Sections B and C Questionnaire Response," dated October 31, 2022, Appx4570; "Citribel N.V. Section D Questionnaire Response," dated November 7, 2022, Appx1688.

Section D of Commerce's questionnaire requests information about the cost of production of subject merchandise sold in foreign markets and the constructed value of subject merchandise.  Appx4410. Commerce uses these costs to calculate normal value.  In its response to Section D of Commerce's questionnaire, Citribel reported its conversion costs, namely with respect to labor and certain overhead costs including energy, on a quarterly basis.  Appx1693-1694.  As this did not comport with Commerce's instructions, Commerce issued a supplemental questionnaire requesting that Citribel revise and resubmit information it filed in its response to Section D of the questionnaire using conversion costs calculated on an annual basis.  *See* Commerce's Letter,

"Supplemental Questionnaire," dated December 2, 2022 at 5.
Appx4825. Citribel responded by indicating that it "reported its cost of
production on a quarterly basis because 'both the cost of manufacturing
("COM") and the net prices of the subject merchandise have changed
drastically' during the {period of review}." *See* Citribel's Letter,
"Citribel N.V. Section D Supplemental Response," dated December 12,
2022 at 1-5. Appx1889-1893.

On February 1, 2023, Commerce issued a second supplemental
questionnaire pertaining to Citribel's Section D response. *See*
Commerce's Letter, "Second Supplemental Questionnaire," dated
February 1, 2023 at 15-22. Appx1966-1973. Citribel responded by
acknowledging Commerce's preference for using normalized conversion
costs but arguing that Commerce should use quarterly conversion costs
instead, as Citribel alleged that Belgium experienced significant cost
changes during the period of review that "were much more than
monthly fluctuations requiring 'normalization.'" *See* Citribel's Letter,
"Citribel N.V. Second Supplemental Questionnaire Response for
Sections A-D," dated February 22, 2023 at 2SD-2. Appx2007.

6

Commerce issued a third supplemental questionnaire requesting further information regarding certain conversion costs, including with respect to Citribel's energy costs. *See* Commerce's Letter, "Third Supplemental Questionnaire," dated March 23, 2023 at 7-8. Appx2452-2453. Citribel responded by providing more information with regards to its energy costs and continuing to advocate for Commerce to use its alternative quarterly cost methodology owing to an asserted "significant change" in costs experienced during the review period. *See* Citribel's Letter, "Citribel N.V. Third Supplemental Questionnaire Response for Sections A-D," dated April 5, 2023 at 6-8. Appx2466-2468.

## III.  Preliminary Results

On July 31, 2023, Commerce published the preliminary results of its review. *Citric Acid and Certain Citrate Salts from Belgium: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 49,442 (July 31, 2023), Appx1277, and accompanying Preliminary Decision Memorandum (PDM), Appx1267. Commerce preliminarily determined, after examining Citribel's cost data, that recourse to its alternative quarterly cost methodology was not warranted, and therefore applied its standard methodology of using

annual weighted-average costs based on Citribel's reported data. PDM
at 12. Appx1276c.

Commerce preliminarily found that the record evidence showed
that the changes Citribel reported experiencing to its costs of
manufacturing during the period of review were primarily attributable
to the price increases of energy and inflation, but that these changes fell
below the 25 percent threshold for purposes of its alternative quarterly
cost methodology. *See* Preliminary Analysis Memorandum at 2,
Appx1021 (citing Citribel's Letter, "Citribel N.V. Section D
Supplemental Questionnaire Response," dated December 12, 2022). *See*
Appx1889-1893. Commerce explained that, in determining whether to
deviate from its normal methodology of calculating an annual weighted-
average cost for direct materials, it evaluates the significance of cost
changes, then assesses linkages between costs and sales information.
PDM at 12. Appx1276c. Pursuant to its alternative quarterly cost
methodology, Commerce evaluates changes to a given respondent's
reported quarterly direct material costs with annualized conversion
costs. *See* Preliminary Analysis Memorandum at 2. Appx1021.
Commerce explained that it does not examine conversion costs on a

quarterly basis under either its normal or alternative cost methodologies.  *Id.*

To evaluate the significance of cost changes, Commerce examines changes in the annualized weighted costs of manufacturing between the high and low quarters of the review period.  *Id.*  Commerce analyzed the effect of these changes on the total cost of manufacturing for the subject merchandise in the proceedings below, and found the percentage difference between the highest and lowest quarterly costs of manufacturing of every CONNUM of subject merchandise sold during the review period in either or both the home market and U.S. market did not exceed 25 percent for any CONNUM for the 12-month period— the threshold for Commerce to deviate from its normal methodology of calculating an annual weighted average cost with its alternative quarterly cost methodology.[1]  *Id.*

---

[1]  "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product.  *See Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021). A particular CONNUM roughly corresponds to a particular product defined "in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding."  *Id.*

## IV.   Case Briefs

On August 30, 2023, Citribel submitted its administrative case brief, arguing that Commerce should have used quarterly conversion costs to determine whether to resort to its alternative quarterly cost methodology.  Citribel's Letter, "Citribel N.V. Case Brief," dated August 30, 2023 (Citribel Case Brief).  Appx4220.  Citribel argued, relying on its impugned quarterly conversion cost calculations, that Commerce failed to recognize that Citribel's manufacturing costs changed by more than 25 percent, and that analyzing conversion costs on an annualized basis ignores the macroeconomic effects that Citribel assertedly experienced.  *Id.* at 3-11.  Appx4228-4236.  Citribel contended that Commerce's methodology thus created a distortion.  *Id.*

In their rebuttal case brief, petitioners argued that use of quarterly conversion costs to determine whether to use the alternative quarterly cost methodology is contrary to Commerce's practice of relying on annualized conversion costs.  *See* Petitioners' Letter, "Petitioners' Rebuttal Case Brief," dated September 6, 2023.  Appx4246.  Petitioners contended that because the cost changes failed to meet the 25 percent threshold using Commerce's standard cost analysis and the rate of

Belgian inflation during the period of review was insufficient to qualify for Commerce's alternative high-inflation methodology, Commerce correctly followed its normal practice to correctly employ its standard cost methodology.  *See id.* at 1-8.[2]  Appx4246-4253.

## V.    Final Results

In its final results, Commerce continued to rely on its standard cost methodology because it determined that Citribel failed to demonstrate that it met the conditions necessary for use of the alternative quarterly cost methodology.  *See generally* IDM at 3-12. Appx1281-1290.  Commerce relied on its normal practice to evaluate whether to use an alternative quarterly cost methodology, taking into account quarterly direct materials costs and annualized conversion costs.  *Id.*

---

[2]  Commerce examines inflation in subject markets to determine whether to apply its high-inflation methodology, which adjusts for increases in prices and all cost components. *See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 28,574 (Dep't of Commerce May 27, 2021), and accompanying IDM at Comment 4.  Commerce's quarterly cost methodology, in contrast, adjusts only for changes in the cost of key raw material inputs. *Id.*

Commerce explained that Citribel did not cite to any past case or practice in which Commerce evaluated a company's conversion costs on a quarterly basis instead of an annual basis or where Commerce relied upon reported quarterly cost information where that information otherwise did not satisfy the criteria to use the alternative quarterly cost methodology. *Id.* at 10-11. Appx1288-1289. Moreover, Commerce found that Citribel had not demonstrated that its standard cost methodology leads to a distortive or unreasonable result, and had not provided sufficient reason, supported by any pertinent authority, for Commerce to deviate from its normal practice. *Id.* Relying on its standard cost methodology, Commerce calculated an antidumping duty rate of 9.13 percent for Citribel. 88 Fed. Reg. 90,167. Appx1321.

## SUMMARY OF THE ARGUMENT

This Court should sustain the final results. Substantial evidence supports Commerce's use of its standard cost methodology to calculate dumping margins in its review of the antidumping order on Belgium. Commerce's normal practice is well settled in this respect, and Commerce provided a detailed and reasoned explanation for not deviating from its practice to rely on quarterly conversion costs in lieu

of annualized costs. Citribel's arguments do not demonstrate that
Commerce's determination was not supported by substantial evidence
or otherwise not in accordance with law. At heart, Citribel does not
challenge the facts underlying Commerce's recourse to its standard cost
methodology, but rather wants the Court to direct Commerce on
remand to use a different methodology. Citribel has neither
demonstrated that Commerce's standard cost methodology is flawed,
nor shown that Commerce's practice of using annualized costs to
determine whether recourse to its alternative quarterly cost
methodology is unreasonable. That a different methodology might have
supported a different result does not, by itself, render Commerce's
practice unreasonable, let alone unlawful.

Because, when using Commerce's standard practice, the changes
in costs reported by Citribel did not result in changes in the cost of
manufacturing that meet the established 25 percent threshold for any
CONNUMs of sales to the United States and any CONNUMs in the
comparison market for each quarter of the 12-month review period,
Commerce relied on its standard methodology using, in this case,
Citribel's annual weighted average costs. Citribel does not dispute that

its cost data fails to meet Commerce's requirements for using its quarterly cost methodology. Nor does Citribel explain why Commerce should treat it differently from similarly situated companies for which Commerce evaluated conversion costs on an annualized basis. Citribel's contention that record evidence demonstrates significant cost changes during the period of review, and thus, the use of the alternative, quarterly cost reporting methodology is unwarranted, and based on a flawed analysis. Therefore, Commerce, consistent with precedent and practice, correctly evaluated the reported change in Citribel's costs of manufacturing and correctly determined that the alternative quarterly cost methodology was not warranted.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion made by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (*Fujitsu*) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive

14

unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" means "more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997)).

Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The "unsupported by substantial evidence" standard is not met "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for Commerce's in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United* States, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

## II.    Commerce Appropriately Determined To Use Its Standard Annual Cost Methodology

### A.  Commerce's Standard Annual Cost Methodology

As we explained above, the statute defines the cost of production as an amount equal to the sum of the "cost of materials and fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A).  The statute does not define "period" any further.  The Court has stated, in this regard, that "{t}he statute does not define the time period over which cost of production is to be calculated and over which respondent's various costs must therefore be averaged.  Consequently, Commerce must select an appropriate time period for averaging the costs involved." *See Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1234 (2011) (*Pastificio*), *aff'd* 469 F. App'x 901 (Fed. Cir. 2012) (affirming the Court's finding that "Commerce must select an appropriate time period for averaging the costs involved.").  Commerce's determination to select annual conversion costs in this case was appropriate.

16

Moreover, the term "period" as it applies in the statute is general. The Federal Circuit has previously explained that the use by Congress of general terms indicates "that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce. "Congress ... may confer substantial discretion on executive agencies to implement and enforce the laws." *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) (*ASEMESA*) (citing *Gundy v. United States*, 588 U.S. 128, 139 S. Ct. 2116, 2130, 204 L.Ed.2d 522 (2019)). Congress's use of the term "period," without further qualification regarding whether it is to be evaluated on an annual or quarterly basis, accordingly "reflects "an expression of its well-considered judgment as to the degree of administrative authority which it was necessary to grant."" *ASEMESA*, 102 F.4th 1260 (citing *Lichter v. United States*, 334 U.S. 742, 784, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948)).

Finally, the Federal Circuit has recognized Commerce's "broad authority to ... devise procedures to carry out the statutory mandate." *See Sigma Corp. v. United States*, 117 F.3d 1041, 1405 (Fed. Cir. 1997); *see also Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing

duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

In sum, Congress has not directed that Commerce use a particular time period when calculating costs of production and therefore has left it to Commerce's discretion to determine the appropriate methodology. Commerce has done so, and its practice here is well-settled and well-reasoned.

In determining whether to depart from its standard cost methodology, which evaluates direct material costs on an annualized basis, Commerce considers conversion costs on an annualized basis in its analysis. It does so because these types of costs, which can include bonuses, insurance, depreciation, energy, and other expenses, are incurred erratically throughout a given year, such that they may be recorded at different rates from month to month; the use of an annual average normalizes these costs over the entire year, leading to a more accurate dumping margin. This is in contrast to the use of quarterly costs, which may be appropriate where significant changes in these costs occurred in the underlying review period that triggered a more

rapid price change response.  Commerce's determination to evaluate conversion costs on an annual basis is thus committed to its discretion, and Citribel fails to demonstrate that it is unreasonable.

Commerce's normal practice of using annualized costs to determine, as a threshold matter, whether to deviate from its normal methodology of calculating an annual weighted-average cost is in accordance with law and supported by substantial evidence. Commerce's methodology has been consistently applied for at least a decade and is rooted in International Financial Reporting Standards (IFRS), which provides guidance for firms reporting the use of currency linked to markets undergoing significant and hyperinflationary economic conditions.

Citribel challenges the methodology Commerce used to determine the appropriate time period for averaging its costs, *i.e.*, whether to apply its standard cost methodology or its alternative quarterly cost methodology for determining which sales of subject merchandise will be used to compare U.S. and home market sales in dumping margin calculations. *See* Pl. Br. at 16-20.  Commerce's normal practice, in this respect, is to calculate the weighted-average cost on an annual basis.

IDM at 7-8.  Appx1285-1286.  The Federal Circuit has recognized that the use of a single cost period generally "smooths out distortions" within a given review period.  *Fujitsu*, 88 F.3d at 1038–39 (Fed. Cir. 1996). However, Commerce recognizes that distortions may result from this methodology if a respondent experiences significant cost changes during the period of review, possibly warranting the use of an alternative cost methodology.  *See Habas Sinai ve Tibbi Gazlar istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1344 (Ct. Int'l Trade 2009); *Steel Reinforcing Concrete Bar from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 23,192 (Dep't of Commerce May 22, 2017) (*Rebar from Turkey*), and accompanying IDM at Comment 2; *see generally Fujitsu*, 88 F.3d at 1038-39 (upholding Commerce's analysis with respect to determining whether the use of the standard annual weighted-average costs of production methodology is appropriate for assigning costs to a respondent).  Where application of Commerce's normal practice demonstrates significant changes in cost, Commerce will apply its alternative quarterly cost methodology to calculate dumping margins.

## B. Commerce's Use Of The Standard Annual Cost Methodology Is Supported By Substantial Evidence

Commerce's determination to use its standard annual cost methodology is supported by substantial evidence. Specifically, the record evidence demonstrates that there was not a significant (*i.e.*, greater than 25 percent) change in costs of manufacturing between Citribel's highest and lowest quarters during the period of review; therefore, the alternative, quarterly cost methodology sought by Citribel was not warranted. Commerce may depart from its standard cost methodology when it has found "*significant* cost changes are evident {and} … sales can be accurately linked with the concurrent quarterly costs." *Pastificio*, 783 F. Supp. 2d at 1235-36 (emphasis added); *see SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1358 (Ct. Int'l Trade 2010) (*SeAH Steel*) (upholding Commerce's use of these two criteria for determining whether it is appropriate to use an alternative cost reporting methodology).

Commerce's practice for determining whether to use its alternative quarterly cost methodology has been sustained by the Court. *See, e.g.*, *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 33 CIT 1721 (November 23, 2009) (sustaining Final

Results of Redetermination Pursuant to Court Remand); *Eregli Demir v. Celik Fabrikalari T.A.S v. United States*, 308 F. Supp. 3d 1297, 1320 (Ct. Int'l Trade 2018).  As Commerce explained in the final results, the quarterly cost methodology is used for addressing significant price changes in the most significant raw materials used to produce the merchandise under consideration, as it recognizes that while general price levels in the country were relatively stable (*e.g.*, not high inflationary), market forces can still drive significant price changes for specific inputs.  IDM at 9 (citing *Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) (*Steel Plate from Belgium*), and accompanying IDM at Comment 4).  Appx1287.

Commerce defines a significant cost change in the cost of manufacturing for purposes of its antidumping duty margin calculations as a greater than 25 percent change in the cost of manufacturing between the high and low quarters of a given review period.  *See SeAH Steel*, 704 F. Supp. 2d at 1358.  The 25 percent threshold, which is not itself at issue in these proceedings, originates from generally accepted accounting standards promulgated in IFRS, s*ee*

*Steel Plate from Belgium* IDM at Comment 4, which provides guidelines
for enterprises reporting in the currency of a hyperinflationary
economy. Specifically, International Accounting Standard 29
establishes guidelines for determining when it is appropriate for an
entity to depart from normal IFRS accounting standards and adopt an
alternative method, because the existing method (*i.e.*, historical costing)
will result in distortions. *Id.* The threshold, of 25 percent, seeks to
ensure that Commerce deviates from its standard methodology "when
significantly changing input costs are clearly affecting its annual
average cost calculations." *See Steel Plate from Belgium* IDM at
Comment 4.

Here, Commerce provided a reasoned explanation, supported by
substantial evidence, for use of its standard methodology. Commerce
analyzed the change in costs over the period of review for all of the
home and U.S. market CONNUMs. IDM at 9-10. Appx1287-1288.
None of the CONNUMs tested showed a change in quarterly costs of
manufacturing that met the 25 percent threshold for evaluating
whether recourse to an alternative cost methodology was appropriate.
*Id.*; *see also* Citribel Preliminary Analysis Memorandum at Attachment

7, Appx1255-1258.  In looking at the change in cost of manufacturing in CONNUMs sold in the comparison market and the change in cost of manufacturing of the CONNUMs sold in the United States, Commerce found that the cost changes did not exceed 25 percent between high and low quarters for a majority of the control numbers examined.  IDM at 10.  Appx1288.  Therefore, these results did not satisfy Commerce's test to apply the alternative quarterly cost methodology.  Citribel does not demonstrate that the standard methodology was unreasonable nor led to distortive results.  *Id.*  Instead, it argued in favor of a different analysis, which deviates from Commerce's normal practice with respect to determining costs for dumping margin calculations.

Citribel contends that that Commerce's normal practice could not take into account the economic conditions it asserted to have occurred in Belgium during the review period, because Commerce's use of annual conversion costs in its analysis glossed over changes seen using quarterly conversion costs.  Pl. Br. at 14, 26-28.  The mere fact that Commerce may deviate from its practice, where it explains the reason for its deviation, does not provide "reason why Commerce must deviate from its practice where substantial evidence supports it{.}." *SolarWorld*

*Americas, Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018).

Stated another way, "the fact that Plaintiffs' alternative methodology

would have achieved a different result is insufficient to suggest that

Commerce's methodology…is unreasonable." *Habas Sinai ve Tibbi*

*Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1316,

1326 (Ct Int'l Trade 2019) (*Habas Sinai*).  Because Citribel's data on the

record did not satisfy Commerce's test for determining whether an

alternative cost methodology is appropriate, Commerce appropriately

applied its standard cost methodology.

In light of the above, Commerce's use of its standard cost

methodology is supported by substantial evidence and in accordance

with law.

## C. Commerce's Determination Not To Depart From Its Standard Cost Methodology Was Reasonable

Citribel does not dispute that, under Commerce's normal practice

for determining to use an alternative cost methodology, its cost data do

not meet Commerce's criteria warranting use of its quarterly cost

methodology.  Instead, it frames its appeal as a challenge to

Commerce's purportedly irrebuttable "presumption" regarding the use

of annualized conversion costs, which it contends was "neither logical

nor rational." *See* Pl. Br. at 13-17. As we explain below, Commerce's determination to use annual conversion costs in evaluating whether to use its alternative quarterly cost methodology, however, is a reasonable administration of the statute.

While it is clear that Citribel would have preferred that Commerce use quarterly conversion costs instead, doing so would have been inconsistent with Commerce's normal practice. Moreover, Commerce provided a reasoned explanation for its use of annual conversion. Citribel did not demonstrate before Commerce, nor does it show now, that Commerce's conversion costs analysis is unreasonable or leads to distortive results. Accordingly, the Court should sustain Commerce's use of annual conversion costs, pursuant its normal practice.

Commerce uses annual-average conversion costs for a 12-month period of review regardless of whether the normal annual average cost methodology or alternative quarterly cost methodology is used, because conversion costs, such as labor, energy and overhead, are normally incurred erratically throughout a given year and it would be distortive

in the dumping analysis to not average this cost. *See* IDM at 10 (citing *Yarn from Thailand* IDM at Comment 14). Appx1288.

For example, bonuses, insurance costs, depreciation, repairs and maintenance, energy costs, *etc.*, are types of conversion costs that may be recorded at different rates from month to month throughout a given year. Using an annual average for these costs normalizes them over the review period. Commerce fully explained its rationale in the final results, *see* IDM at 9-10. Appx1287-1288. Commerce explained in the IDM that it considers that annual average conversion costs (*e.g.*, fixed overhead along with labor and power) better reflect a normalized cost to use in its dumping analysis. *Id.*

Moreover, Citribel acknowledged Commerce's settled practice, without dispute, in its Supplemental Section D Response, *see* Citribel's Letter, "Citribel N.V. Section D Supplemental Response," dated December 12, 2022 at 1-2. Appx1889-1890.

Citribel contends that Commerce's use of annual conversion costs "does not reflect a reasonable interpretation of the statute." Pl. Br. at 16. Specifically, it argues that the statute is silent about what the "period" referred to in 19 U.S.C. § 1677b(b)(3) is, *id.* at 16 and, "{t}hus,

27

Commerce exercised its discretion to establish two criteria for applying its quarterly cost methodology." *Id.* Citribel contends that "statutory ambiguity is {…} not a reliable indicator of actual delegation of discretionary authority to agencies," *id.*, citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, at 21 (2024), necessitating that the Court opine regarding "whether the agency has acted within its statutory authority." *Id.*

Notably, Citribel did not raise or develop this argument below, which is generally a basis for this Court to find the argument waived. In any event, Citribel's statutory interpretation argument is unpersuasive. As explained above, Congress has granted authority and discretion to Commerce to select appropriate methodologies to implement the statute. Citribel does not contend that the term "period" as used in the statute cannot refer to an annual period in one context and a quarterly period in another. Rather, it challenges the methodology Commerce employed to determine whether to analyze Citribel's costs on an annual or on an alternative, quarterly basis. This is not a case of true statutory ambiguity; rather, this is a case where the statute gives Commerce considerable discretion, in exercising its

adjudicatory authority, to employ a certain methodology to determine the cost of production. *See ASEMESA*, 102 F.4th at 1259-61.

Citribel claims that Commerce erroneously used a presumption that conversion costs must be annualized. Pl. Br. at 17. What Citribel calls a "presumption" is no more than Commerce's normal practice for determining to use its alternative quarterly cost methodology. Moreover, Commerce's methodology is logical and rational and, in looking to smooth out distortions that may otherwise arise in price comparisons, ensures that Commerce best achieves an accurate dumping calculation. IDM at 9-10. Appx1287-1288.

Moreover, Commerce juxtaposed its treatment of conversion costs in its analysis with its treatment of direct material costs, which Commerce explained are generally unexpected and may trigger a more rapid price change response. *Id.* As Commerce explained, "the alternative quarterly cost reporting methodology …is used for addressing significant price changes in the most significant raw materials used to produce merchandise under consideration, as it recognizes that while general price levels in the country were relatively

stable (*e.g.*, not high inflationary), market forces can still drive significant price changes for specific inputs." IDM at 9. Appx1287.

Thus, as Commerce uses its alternative quarterly cost methodology to address changes in the most significant raw materials, and conversion costs are not raw material costs, Commerce's normalization of conversion costs over the period of review was reasonable. That reasoning is strengthened by the added rationale proffered by Commerce that, different from raw material costs, where "significant changes in direct material costs are unexpected and may trigger a more rapid price change response," IDM at 9-10, Appx1287-1288, conversion costs are normally incurred erratically throughout a given year. *Id.* Beyond framing its challenge to Commerce's practice as one focused on a purportedly rigid or irrebuttable presumption, Citribel does not demonstrate that Commerce's practice is not supported by substantial evidence or otherwise not in accordance with law.

### D. Citribel Presents Arguments That Were Not Raised In The Review Proceedings Below

Citribel makes several arguments in its motion for judgment on the agency record that it did not raise before Commerce. This Court

should find those arguments waived. *See* 28 USC 2637(d). Even if this Court were to excuse Citribel's failure to exhaust its remedies, Citribel's arguments are not persuasive and are unsupported by the record.

First, Citribel complains that "{u}ntil the Final Results, Commerce did not explain its rationale for using the annualized conversion costs." Pl. Br. at 22-25. Even if this were the case, this would not render Commerce's use of such costs unsupported by the record or not in accordance with the law. Indeed, the IDM is typically the place where Commerce elaborates upon its rationale and addresses parties' arguments. Nevertheless, the record demonstrates that Citribel was aware of the rationale for Commerce's practice of using annualized conversion costs in its analysis before the final results. Specifically, in its December 12, 2022 Supplemental Questionnaire Response, Citribel quoted language in *Yarn from Thailand* that explained why Commerce used normalized conversion costs. Section D Supplemental Response at 2. Appx1890. Moreover, Commerce's explanation in the final results included the same explanation that Citribel quoted in its Supplemental Questionnaire Response. IDM at 9-10. Appx1287-1288.

31

Second, Citribel contends that, having received no guidance from Commerce, it was deprived of a meaningful opportunity to make effective arguments against Commerce's practice of using annualized conversion costs.  Pl. Br. at 25.  Again, even if this were the case, this would not render Commerce's use of such costs unsupported by the record or not otherwise in accordance with law.  Nevertheless, Commerce's standard practice of treating conversion costs consistently across cases in a non-high inflationary context and analysis supporting such treatment is not a novel practice.  *See*, *e.g.*, *Yarn from Thailand* IDM at Comment 14; Citribel's Section D Supplemental Response at 2 (citing *Yarn from Thailand*), Appx1890.  Further, Citribel can hardly dispute its awareness of Commerce's standard practice because Citribel consistently urged Commerce not to use annualized conversion costs, demonstrating its understanding of Commerce's standard practice.  *See* Section D Supplemental Response at 2-4, Appx1890-1892; Citribel Case Brief at 3-10, Appx4228-4235.

Moreover, Commerce specifically asked Citribel questions that might lead Commerce to use alternative conversion costs in its cost methodology.  Specifically, Commerce asked a question in its

questionnaire about inflation in Belgium during the period of review, in recognition that during periods of high inflation, it may be necessary to use an alternative, monthly indexation methodology to account for the effects of high inflation when computing an annual weighted average cost. *See, e.g.,* IDM at 10-11, Appx1288-1289 (citing *Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008)); Citribel's Letter, Section A Questionnaire Response, dated October 11, 2022. Appx1350. Commerce asked Citribel, "{i}f in any month during the period of review the annual inflation rate in the foreign market was in excess of 25 percent …. (These instructions are provided to alert Commerce to high inflation rates that might require adjustments to costs.)" *See* Citribel Letter, *id.*

Citribel responded, "{n}ot applicable. Belgium did not experience an annual inflation rate in excess of 25 percent in any month during the POR." *Id.* Thus, Citribel acknowledged that the criteria for Commerce to apply this alternative, high inflation cost methodology was not met.

Thus, contrary to Citribel's contention about being deprived the opportunity to make its argument, Citribel in fact made arguments that

could have warranted the use of alternative conversion costs, and
Commerce expressly requested information that might have led it to
examine these costs on an alternative basis.  Accordingly, Citribel
exercised its opportunity to urge Commerce to use an alternative
methodology.  It simply did not persuade Commerce to depart from its
standard practice, a determination that is supported by substantial
evidence and for which Commerce provided a reasoned explanation.

To dispute Commerce's methodology for determining whether the
use of alternative quarterly costs is warranted, Citribel was required to
show, using evidence on the record, that the standard cost methodology
leads to a distortive result.  *See Habas Sinai*, 361 F. Supp. 3d at 1327.
Citribel did not do so.  Commerce accordingly determined that "Citribel
{had} not provided sufficient reason or case precedent for Commerce to
deviate from standard practice and case precedent and {had} not shown
how the established standard methodology is deficient or flawed."  IDM
at 15.  Appx1293.

Citribel's contention, that it provided Commerce with information
regarding the macroeconomic changes in Belgium resulting in increased
energy and labor cost, Pl. Br. at 14, 23, glosses over the context in which

this information was provided.  Moreover, this contention is insufficient to demonstrate any resulting distortion in Commerce's application of its standard methodology.

Having considered the arguments and information provided by Citribel, Commerce determined that the use of an alternative methodology was not warranted and, accordingly, applied its standard methodology.  That decision is supported by substantial evidence and in accordance with law.  This Court has previously explained, in this context, that "{t}he fact that an alternative methodology would have achieved a different result is insufficient to suggest that Commerce's methodology, consistently applied for at least a decade and rooted in International Financial Reporting Standards, is unreasonable." *Habas Sinai*, 361 F. Supp. 3d at 1327.  *See also SolarWorld*, 910 F.3d at 1226. Citribel sought to have Commerce use a methodology in circumstances where it has never been applied.  However, it offered no precedent to support it efforts.  Commerce has previously rejected similar efforts in analogous circumstances.  *See*, *e.g.*, *Polyester Textured Yarn from Thailand:  Final Affirmative Determination of Sales at Less Than Fair*

*Value*, 86 Fed. Reg. 58,883 (Dep't of Commerce Oct. 25, 2021) (*Yarn from Thailand*), and accompanying IDM at Comment 14.

Commerce's use of annualized conversion costs to determine which cost methodology to employ, and its subsequent determination to use its standard cost methodology, was supported by substantial evidence and otherwise in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the agency record, sustain Commerce's final results in its entirety, dismiss the complaint, and enter judgment in favor of the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

SHANNI ALON
Attorney
Office of the Chief
Counsel for Trade Enforcement &
Compliance
U.S. Department of Commerce

/s/ Ravi D. Soopramanien
RAVI D. SOOPRAMANIEN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin
Station
Washington, DC 20044
Telephone: (202) 616-0856
Facsimile: (202) 307-0972
Ravi.Soopramanien@usdoj.gov

October 4, 2024

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 6286 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>/s/ Ravi D. Soopramanien</u>