# UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| CITRIBEL NV, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 24-00010 |
| ) | |
| UNITED STATES, ) | |
| ) | Public Document |
| Defendant ) | |
| ) | |
| and ) | |
| ) | |
| ARCHER DANIELS MIDLAND ) | |
| COMPANY, CARGILL, INC., ) | |
| AND PRIMARY PRODUCTS ) | |
| INGREDIENTS AMERICAS LLC, ) | |
| ) | |
| Defendant-Intervenor.) | |
| _____ ) | |

## DEFENDANT'S SUPPLEMENTAL BRIEF

Pursuant to the Court's order dated May 20, 2025, ECF No.
55, defendant, the United States, respectfully submits this
supplemental brief addressing the two issues raised by the Court.

1.    To what extent {does} the Supreme Court's decision of statutory stare decisis in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) bear on caselaw referenced in the parties' prior briefing.

The short answer to the Court's question is:  Statutory stare decisis is not implicated.

In *Loper Bright*, the Supreme Court held that mere ambiguity in the statute is not a delegation of law interpreting power to the agency and that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.* at 412.  The Court therefore overruled *Chevron v. NRDC*, 467 U.S. 837 (1984) and its framework for deferring to an agency interpretation on a question of law.

The Court, however, was careful to institute a prospective rule, which did not "call into question prior cases that relied on the Chevron framework."  *Id.* at 412.  Therefore, extant precedent still controls an issue unless there is a consideration beyond a court's reliance on *Chevron* that would call the legitimacy of that precedent into question.  That is, "{m}ere reliance on Chevron

cannot constitute a special justification for overruling" a prior
decision. *Id.*

Loper Bright was referring to all cases decided under
*Chevron*, not just its own. "{T}he primary reason" statutory
precedent is overruled is that there has been "intervening
development of the law, through either the growth of judicial
doctrine or further action taken by Congress." *Patterson v.
McLean Credit Union*, 491 U.S. 164, 173 (1989). "Considerations
of stare decisis have special force in the area of statutory
interpretation{,}" *id.* at 172-73, because "interpretation decisions,
in whatever way reasoned, effectively become part of the statutory
scheme, subject (just like the rest) to congressional change."
*Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015).

Statutory *stare decisis* does not bear on the caselaw
referenced in the parties' briefing, or this Court's resolution of the
question of whether to sustain the Department of Commerce's
application of its standard methodology in calculating Citribel's
costs of production. In none of the cases cited by the parties did
the court defer to Commerce on a pure question of statutory

interpretation.  But even assuming that prior cases relied upon the *Chevron* framework to establish the meaning of a statute, there is no special justification for departing from this prior precedent.

There is no dispute that Congress did not define the "period" to be used or dictate the methodology Commerce is to use in calculating a respondent's cost of production.  *See* Citribel Br. at pp. 12; 16.  Thus, when faced with a challenge to Commerce's use of a specific time period for calculating a respondent's cost of production, this Court and the Court of Appeals for the Federal Circuit have consistently resolved the question by evaluating whether Commerce's methodology is reasonable as applied to the record facts of the specific challenge.

For example, in *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996), the Court of Appeals for the Federal Circuit examined Commerce's determination to use an annual weighted-average cost-of-production calculation in an antidumping duty review.  The court cited *Chevron* for the now-overruled proposition that courts "defer to the interpretation

Commerce has given its own governing statute."  88 F.3d at 1038.

Ultimately, however, the court did not apply *Chevron* deference in

its consideration of Commerce's application of 19 U.S.C.

§ 1677b(b)(3) to the facts of the case.

The court recognized that the antidumping duty statute,

itself, "reveals tremendous deference to the expertise of the

Secretary of Commerce in administering the antidumping law."

*Id.* at 1039 (citation omitted).  The court also recognized that this

deference is:

> distinct from that accorded the agency in interpreting
> the statutes it administers, because it is based on
> Commerce's technical expertise in identifying, selecting
> and applying methodologies to implement the dictates
> set forth in the governing statute, *as opposed to
> interpreting the meaning of the statute itself where
> ambiguous.*

*Id.* (emphasis added).  That is, the *Fujitsu* court found that

the statute itself confers discretion to Commerce.

The court went on to sustain Commerce's calculation of the

respondent's cost of production on an annual weighted basis,

rather than a quarterly basis, as supported by substantial

evidence.  *Id.*  The court found that Commerce had justified its use

of an annual method in light of the record facts, and concluded that it did not result in distortions.

*Fujitsu*'s observation that Congress left to Commerce, in its expertise, the responsibility to select the best method for calculating cost of production for a particular set of record facts remains good law. "*Loper Bright* did not do away with discretion." *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025). This is the type of discretion to agency decision-making that *Loper Bright* left undisturbed. 603 U.S. at 388; *see also Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259-60 (Fed. Cir. 2024); *BYD (HK) Co. Ltd. v. United States*, Ct. Int'l Trade No. 23-0221, slip op. 25-60 at pp. 29-31 (May 16, 2025).

The remaining authorities of this Court cited by the parties reflect this principle. The court has identified that Congress has left to Commerce the authority to determine the best method to accomplish the statutory directive. And the court has concluded that Commerce's actions in a specific case are either reasonable (or not) in light of facts and statutory purpose. Thus, while one

judge of the Court of International Trade is not bound by decisions of another judge on the court, *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989), these cases remain persuasive authority unaffected by *Loper Bright*.[1]

Plaintiff argues that *Habas Sinai ve Tibbi Gazlar lstihsal Endüstrisi A.S. v. United States*, 361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) is no longer good law in light of *Loper Bright*. Citribel Br. at p. 19-20.  In *Habas*, the Court sustained Commerce's use of annual costs (and rejection of Habas' request to use a quarterly methodology).  361 F. Supp. 3d at 1327.  The court recognized that the statute did not direct that Commerce use either an annual or quarterly methodology.  To be sure, the court made passing reference to the *Chevron* framework by stating that its role was to determine "whether Commerce's exercise of its gap-filling authority and its explanation are reasonable."  *Id.* (citing *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d at 1330

---

[1] This Court could, in any event, disregard Federal Circuit precedent in only two narrow circumstances: "if the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision."  *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005).

(Fed. Cir. 2017) (citing, in turn, *Chevron*, 467 U.S. at 843-44).  But ultimately, the court's analysis rested on its determination that the statute conferred discretionary authority on Commerce to determine the method for calculating the cost of production.

Similarly, in *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011), the court, in sustaining Commerce's use of annual cost-averaging methodology, cited *Chevron* in holding that Commerce's "gap-filling methodology . . . is not unreasonable and therefore not contrary to law." *Id.* at 1236 (citing *Chevron*, 467 U.S. at 843).  The court's conclusion, however, is entirely consistent with other decisions which have reached the same result relying upon a statutory "delegation of discretion," which is left unaffected by *Loper Bright*.

In sum, there is no relevant precedent cited by the parties that expressly relied upon a "*Chevron* step 2" analysis in determining the meaning of a statutory provision.  Thus, there are no cases in which *Loper Bright*'s instruction to apply statutory *stare decisis* would be the sole reason to follow precedent.

2.    Whether the Department of Commerce's policy of
normalizing conversion costs when computing the cost of
production under 19 U.S.C. 1677b(b)(3) is reasonable (i) generally;
and (ii) as applied in the determination challenged here.  In
addressing this question, the parties shall discuss whether
Plaintiff exhausted its administrative remedies with respect to
any argument against the reasonableness of the policy generally.
28 U.S.C. §2637(d).

### i.    Commerce's Conversion Cost Methodology

Commerce's policy of normalizing conversion costs when
computing the cost of production, both generally and applied in
the underlying proceeding, is reasonable.  Here, Commerce
applied its standard cost methodology, calculating Citribel's costs
of manufacturing, including conversions costs, on an annual basis,
consistent with its practice and as upheld by this Court.

To calculate a dumping margin, Commerce calculates the
normal value of the merchandise sold in the home market.  In
calculating normal value, Commerce will only consider those sales
in the comparison market that were made in the "ordinary course
of trade."  19 U.S.C. § 1677b.

The statute defines "ordinary course of trade" as the "means
the conditions and practices which, for a reasonable time prior to
the exportation of the subject merchandise, have been normal in

the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). The statute further provides that Commerce may consider sales to be outside the "ordinary course of trade" if it has "reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product." 19 U.S.C. § 1677b(b)(1).

Therefore, in determining normal value, Commerce disregards sales at prices that are less than the "cost of production" because those sales are not made within the "ordinary course of trade." 19 U.S.C. §§ 1677b(b)(1); 1677(15)(A). The statute defines the "cost of production" as an amount equal to the sum of the "cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that

foreign like product in the ordinary course of business…²"  19

U.S.C. § 1677b(b)(3)(A).

Lastly, as referenced above, to make fair comparisons

between U.S. sales and normal value, and between home market

sales and costs, Commerce must determine the appropriate time

period(s) for its weighted-average cost calculations.  "The statute

does not define the time period over which cost of production is to

be calculated and over which respondent's various costs must

therefore be averaged.  Consequently, Commerce must select an

appropriate time period for averaging the costs involved."

*Pastificio*, 783 F. Supp. 2d at 1234, *aff'd* 469 F. Appx 901 (Fed. Cir.

2012) (affirming the Court's finding that "Commerce must select

an appropriate time period for averaging the costs involved.").

Thus, Commerce developed a standard cost methodology

that evaluates production costs and sales prices on an *annualized*

---

²     "…an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question, and the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment."  These subsections of the "sum" described in § 1677b(b)(3) are not relevant to the discussion here.

basis.  Commerce has explained its rationale for calculating costs on an annualized basis:

> While production runs usually occur over a few months, most companies do not track costs directly to products.  Even if companies did track costs as such, because of accounting limitations, timing problems and month-to-month cost fluctuations, costs calculated over a longer period are more representative of the actual cost of production.  For this reason, {Commerce} has developed a consistent and predictable methodology to calculate cost on an annual average basis over the entire {period of review}.

*Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) (*Steel Plate from Belgium*), and accompanying IDM at 14.  The use of a single cost period generally "smooths out distortions" within a given review period. *Fujitsu*, 88 F.3d at 1038–39.

Moreover, this general practice of analyzing cost and sales data on an annualized basis has been upheld by this Court.  *See, e.g.*, *Eregli Demir v. Celik Fabrikalari T.A.S v. United States*, 308 F. Supp. 3d 1297, 1320 (Ct. Int'l Trade 2018).  Commerce has consistently applied this approach – relying on annualized cost and sales data – in several proceedings for over thirty years.  *See*

*e.g., Color Television Receivers from the Republic of Korea*, 55 Fed. Reg. 26,225, 26,228 (Dep't Commerce June 27, 1990) (final results of AD duty administrative review) (stating that use of quarterly data would cause aberrations due to short-term cost fluctuations)).

Commerce has also developed a practice for determining when to deviate from evaluating production costs on an annualized basis. *See, e.g., Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (Aug. 12, 2016), and accompanying Issues and Decision Memorandum at Comment 1. Commerce will depart from its normal practice of calculating production costs on an annualized basis and instead "employ[ ] shorter (usually quarterly) cost-averaging periods" when two conditions are met: "(1) consistent and significant cost variation during the period of review, and (2) evidence of linkage between the cost variation and changes in sales prices within the shorter averaging period." *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1358 (Ct. Int'l Trade 2010).

Specifically, Commerce defines a significant change in the cost of manufacturing for purposes of its antidumping duty margin calculations as a greater than 25 percent change in the cost of manufacturing between the high and low quarters of a given period of review. *See SeAH Steel*, 704 F. Supp. 2d at 1358-1360 ("{i}n this review, as in prior administrative reviews, the agency's determination of whether a cost change was significant was made by calculating the difference between the low quarterly average cost of manufacture and the high quarterly average cost of manufacture.").

For the second criterion, Commerce determines whether there is evidence linking the cost changes and the sales price for a given period of review. "{L}inkage …does not require direct traceability between a specific sale and its specific production cost, but rather relies on whether there are elements which would indicate a reasonably positive correlation between the underlying costs and the final sales prices levied by the company." *Steel Plate from Belgium* IDM at 18. If the two criteria are met,

Commerce will rely on an alternative cost reporting methodology instead of annualized costs.

### ii.   Commerce's Conversion Cost Methodology as Applied in the Underlying Proceeding was Reasonable

Here, as explained further in our brief, ECF No. 33, Commerce reasonably determined that Citribel's cost data did not warrant departing from the normal methodology of calculating costs on an annualized basis.  As Commerce stated, it "evaluated the change in Citribel's {cost of manufacturing} with respect to direct materials on a quarterly basis with annualized conversion costs, and determined that the alternative quarterly cost methodology was not warranted."  Appx1289.

More specifically, Commerce analyzed the cost changes during the period of review for all control numbers.  Appx1288. Commerce further "analyze{ed} the change in the {cost of manufacturing} of each of the five largest control numbers sold in the home market and the change in the {cost of manufacturing} of the five largest control numbers sold in the United States." Appx1287.  While Commerce determined that Citribel experienced some changes in the cost of manufacturing, such changes were

primarily attributable to price increases related to energy and inflation. Appx1021. Commerce also analyzed the data provided by Citribel, and determined that none of the control numbers demonstrated a change in the cost of manufacturing that met the 25 percent threshold. Appx1288. Accordingly, Commerce found that the Citribel's cost data did not demonstrate that significant changes existed during the period review. *Id.* Thus, Commerce reasoned that its annualized cost methodology would not lead to a distortive result. *Id.*

Because Citribel's cost data did not satisfy the first criterion of the analysis to determine whether to normalizing conversion costs, Commerce determined it was unnecessary to consider the second criterion, i.e., whether Citribel provided sufficient information to satisfy the linkage test. Appx1289-90. Thus, consistent with its general practice, Commerce reasonably relied on Citribel's annualized cost data and applied its standard cost methodology.

### iii.    Citribel Failed to Exhaust its Administrative Remedies.

Citribel claims now that "Commerce's presumption about conversion costs does not reflect a reasonable interpretation of the statute." Citribel Br. at 16. However, Citribel failed to raise this argument before Commerce, and thus failed to exhaust its administrative remedies with respect its argument that the policy of normalizing conversion costs was an unreasonable interpretation of the statute. *See* Appx4220-39; *see also* Gov. Br. at 30-36 (ECF No. 33).

Section 2637(d) of Title 28 requires the exhaustion of administrative remedies in any civil action brought before this Court. "Administrative exhaustion generally requires a party to present *all* arguments in its administrative case and rebuttal briefs before raising those issues before this court." *Weishan Hongda Aquatic Food Co. v. United States*, 273 F. Supp. 3d 1279, 1286 (Ct. Int'l Trade 2017) (emphasis in original). Moreover, "{b}oth the Federal Circuit and this court have held that failure to raise a specific argument in a case brief, even if the general issue is addressed, constitutes a failure to exhaust administrative

remedies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354, 1366 (Ct. Int'l Trade 2009).

In the underlying proceeding, Citribel did not argue that Commerce's general practice of normalizing conversion costs was unreasonable or contrary to law. *See* Appx4220-39. Instead, Citribel argued that Commerce failed to consider certain record evidence and, in doing so, failed to rely on Citribel's quarterly costs and match the sales within the same quarter. *See id.* Thus, Citribel's case brief argued that Commerce's analysis was flawed because it either ignored or misinterpreted certain record evidence – not because Commerce's practice, itself, was contrary to law.

Indeed, Citribel relied on Commerce's general practice to support its argument that Commerce should have instead relied on Citribel's quarterly costs;

> In prior cases, Commerce has articulated that quarterly cost averaging is appropriate in situations where a reliance on the normal cost averaging over the entire POR would be distortive due to significant cost and price changes. . . . In determining whether to deviate from the normal cost averaging methodology, Commerce had evaluated the case-specific record evidence by examining two primary criteria: (1) the change in the cost of manufacturing ("COM") recognized by the respondent during the POR must be deemed significant, and (2) the record evidence must

18

> indicate that sales during the shorter cost-averaging periods
> could be reasonably linked with the cost of production
> ("COP") during the same shorter cost-averaging periods.

Appx4228. Thus, Citribel did not claim that this practice of determining when to deviate from the normal cost averaging methodology was an unreasonable interpretation of the statute.

Instead, Citribel made five distinct arguments in its administrative case brief that claimed Commerce ignored certain record evidence or made errors in its calculations. *See* Appx4220-39. First, Citribel argued that Commerce erroneously determined that quarterly costs did not change by more than 25%. Appx4229. Second, Citribel claimed that Commerce disregarded half of Citribel's reported cost of manufacturing. Appx4230. Third, Citribel claimed that Commerce incorrectly relied on Citribel's annualized cost data and instead should have relied on quarterly conversion costs. Appx4231-35. Fourth, Citribel claimed that Commerce failed to address the second criterion for applying its quarterly cost methodology and determine whether Citribel's prices and costs are reasonably linked. Appx4235. Citribel claimed this failure resulted in a distortion in Commerce's margin

calculations.  Appx4236.  Lastly, Citribel claimed that Commerce

should have only matched sales within the same quarter.

Appx4237.

As Commerce stated in response to Citribel's administrative

case brief, "Citribel does not deny that its cost data fails to meet

Commerce's criteria to warrant use of an alternative quarterly

methodology based on analyzing quarterly direct material costs

and annual conversion costs."  Appx1288.  Instead, Citribel's

dispute is "that record evidence demonstrates significant cost

changes during the {period of review}, and thus, the use of the

alternative quarterly cost reporting methodology is warranted."

Appx1287.

Commerce, however, concluded that Citribel's argument was

based on a flawed analysis of its own data.  *Id.*  Specifically,

Commerce stated that "Citribel's analysis relies on different

conversion costs (i.e., quarterly labor and overhead costs

(including energy)) for each quarter of the POR, whereas our

normal practice is to rely on the same period-wide weighted-

average conversion costs for all quarters."  *Id.*  Therefore, Citribel

did not argue that Commerce's standard annual cost methodology was unlawful or unreasonable. Accordingly, Citribel failed to exhaust its administrative remedies with respect to the argument against the reasonableness of Commerce's policy generally.

Citribel makes no argument that any of the exceptions to the exhaustion doctrine apply. The "intervening change in the law" exception to the exhaustion requirement does not apply because "*Loper Bright* affects no material issue in this case." *Garg Tube Exp. LLP v. United States*, 740 F. Supp. 3d 1355, 1367 (Ct. Int'l Trade 2024) (enforcing exhaustion requirement).

Thus, this Court should consider the argument waived and also find that Commerce's use of annualized conversion costs was consistent with its standard cost methodology and in accordance with law.

## CONCLUSION

Commerce acted under the authority delegated by statute and calculated Citribel's cost of production through reasoned decision-making. For these reasons, and those provided in our response brief, we respectfully request that the Court sustain

Commerce's final results and enter judgment in favor of the

United States.

<div style="margin-left: 40%">

Respectfully Submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

</div>

OF COUNSEL:                      Commercial Litigation Branch
JESUS N. SAENZ                   Civil Division
Senior Attorney                  U.S. Department of Justice
Office of the Chief Counsel      P.O. Box 480, Ben Franklin Station
for Trade Enforcement & Compliance  Washington, DC 20044
Department of Commerce           Tele: (202) 616-2228
                                 Email: Tara.Hogan@usdoj.gov

June 10, 2025                     Attorneys for Defendant United States

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word

limitation set forth in the Court's May 20, 2025 order and contains

approximately 3,615 words. In preparing this certificate of

compliance, I have relied upon the word count function of the word

processing system used to prepare the brief.

<div style="margin-left: 40%">

/s/Tara K. Hogan

</div>