**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| CITRIBEL NV, | |
| *Plaintiff,* | |
| v. | |
| UNITED STATES, | |
| *Defendant,* | Court No. 24-00010 |
| and | **PUBLIC DOCUMENT** |
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC, | |
| *Defendant-Intervenors.* | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

Daniel J. Cannistra
Pierce J. Lee
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Citribel N.V.*

June 10, 2025

TABLE OF CONTENTS

**INTRODUCTION** ......................................................................................1

**SUMMARY OF ARGUMENT** .................................................................2

**ARGUMENT** ............................................................................................5

**I. PRIOR CASELAW IN LIGHT OF *LOPER BRIGHT*** ......................5

    *1. Habas* ................................................................................................5

    *2. SolarWorld* .......................................................................................9

    *3. Torrington* .....................................................................................10

**II. COMMERCE'S POLICY OF NORMALIZING CONVERSION COSTS IS UNREASONABLE** ...................................12

    1. The Policy is Unreasonable Generally .............................................13

    2. The Policy is Unreasonable as Applied in this Case ......................19

        i. Actual Conversion Costs Increased Significantly .......................19

        ii. Conversion Costs Were Tied Directly to Production ..................20

        iii. Conversion Costs Were Correlated to Prices.............................21

        iv. Evidence Addressed Conversion Cost Experience, Not Inflation .............21

        v. Commerce Failed to Analyze the Record or Explain Its Reasoning ........22

        vi. Methodology Undermined Statutory Purpose .............................23

        vii. Commerce's Misrepresentation Impaired Citribel's Ability to Respond.. 24

**III. PLAINTIFF EXHAUSTED ITS ADMINISTRATIVE REMEDIES**......................................................................................**24**

**CONCLUSION** ......................................................................................**28**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024)....................................................... 1, 2, 5, 6, 10, 11

*Marmen Inc. v. United States,*
    134 F.4th 1334 (Fed. Cir. 2025)................................................ 3, 16, 18

*SolarWorld Americas, Inc. v. United States,*
    910 F.3d 1216 (Fed. Cir. 2018) ........................................................2, 9

*Stupp Corp. v. United States,*
    5 F.4th 1341 (Fed. Cir. 2021)............................................... 3, 15, 16, 18

*Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v.*
    *United States*, 361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019)...........2,5-8

*Torrington Co. v. United States,*
    *68 F.3d 1347 (Fed. Cir. 1995)* ........................................................2, 9

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................ 4, 11

19 U.S.C. § 1677b(b)(3)................................................................. *passim*

## <u>INTRODUCTION</u>

Pursuant to the Court's Order dated May 20, 2025 (ECF No. 55), Plaintiff Citribel NV ("Citribel") respectfully submits this supplemental brief to address the following issues:

1. To what extent the Supreme Court's discussion of statutory *stare decisis* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), bears on caselaw referenced in the parties' prior briefing;

2. Whether the Department of Commerce's policy of normalizing conversion costs when computing the cost of production under 19 U.S.C. § 1677b(b)(3) is reasonable (i) generally; and (ii) as applied in the determination challenged here; and

3. Whether Plaintiff exhausted its administrative remedies with respect to any argument against the reasonableness of the policy generally.

## <u>SUMMARY OF ARGUMENT</u>

The Court's review of Commerce's cost methodology in this case must be guided by the statutory language of 19 U.S.C. § 1677b(b)(3). Although prior cases such as *Habas*, *SolarWorld*, and *Torrington* applied a deferential standard to agency determination, *Loper Bright* reminds us that the court's role is to exercise independent judgment in determining whether an agency's interpretation aligns with the statute.

That statute requires Commerce to calculate the cost of production—including both raw material and conversion costs—"during a period which would ordinarily permit the production" of the merchandise. The statute contemplates a cost calculation grounded in the producer's actual experience, not an average that masks meaningful cost changes. Commerce's policy of normalizing conversion costs across quarters, even when the record shows significant and production-linked variation, is inconsistent with this statutory command.

The record shows that Citribel's conversion costs increased significantly during the period of review. These increases were not distortive and reflective of the actual cost conditions that influenced pricing. Commerce acknowledged the increases but applied a default

2

normalization method without evaluating whether its assumptions held true. As in *Stupp*[1] and *Marmen*[2], the failure to test foundational assumptions rendered the agency's approach unreasonable.

Citribel preserved this issue before the agency. Although it did not cite § 1677b(b)(3) by number, it clearly argued that Commerce's treatment of conversion costs was inconsistent with the agency's own definition of cost of manufacturing, which includes both raw material and conversion costs. Citribel then demonstrated the unreasonableness of Commerce's methodology both generally and as applied.

The arguments raised in Citribel's administrative brief reflected the uncertainty in Commerce's Preliminary Results, which suggested that its normalization policy was subject to factual scrutiny. Commerce stated that it had "analyzed the effect" of Citribel's conversion cost increases on the company's total cost of manufacturing, rather than indicating that it categorically does not analyze such effects as a matter of policy. In light of this uncertainty, Citribel could not frame its legal

---

[1] *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021).

[2] *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025).

3

objections in precise terms. Nonetheless, it challenged the

unreasonableness of Commerce's methodology by showing that the

assumptions underlying the normalization policy do not hold in all

cases—particularly in this one.

## ARGUMENT

### I.  PRIOR CASELAW IN LIGHT OF *LOPER BRIGHT*

#### *1. Habas*

Although the Chevron framework was developed in the context of the Administrative Procedure Act (APA), its application has not been limited to APA-governed proceedings. In antidumping proceedings, courts have interpreted the "in accordance with law" requirement under 19 U.S.C. § 1516a(b)(1)(B)(i) using a framework consistent with Chevron. Under that framework, when the statute was found to be silent or ambiguous on a particular issue, courts considered whether Commerce's interpretation was a reasonable construction of the statute.

The Court in *Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019), followed that model. In evaluating Commerce's quarterly cost methodology, the Court identified the absence of a statutory definition for the relevant cost calculation period and recognized Commerce's discretion to address that silence. *See Habas*, at 1326. Citing *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1330 (Fed. Cir. 2017), which in turn

cited *Chevron*, the Court upheld Commerce's methodology based on its
reasonableness and consistency with prior practice. *Id.*

The Supreme Court's decision in *Loper Bright Enterprises v.
Raimondo*, 603 U.S. 369 (2024), marks a departure from that approach.
The Court held that courts must exercise independent judgment in
interpreting statutes, including those administered by federal agencies.
See *Loper Bright*, at 373. While *Loper Bright* addressed agency
interpretations of statutes in reviews under the APA, this principle
applies in antidumping proceedings to the extent that courts have been
using a deferential standard consistent with the Chevron framework.
*Loper Bright* confirms that a prior decision sustaining an agency's
methodology as reasonable under a deferential standard does not
preclude courts from independently determining whether the agency's
practice is consistent with the statutory requirements.

Moreover, *Habas* did not analyze whether that statute permits
Commerce to normalize conversion costs across quarters in the face of
evidence that such costs changed meaningfully and impacted pricing.
The issue in *Habas* was whether Commerce could include total cost of
manufacturing ("COM")—including conversion costs—in the

6

denominator of its 25% test for identifying significant cost changes. *See Habas*, 625 F. Supp. 2d at 1325. The plaintiff in *Habas Sinai* argued that including conversion costs diluted the percentage change in raw material costs. *Id.* The Court rejected that argument, finding that total COM better reflected all cost inputs relevant to pricing. *Id. at 1326*.

Critically, the record in *Habas* did not include evidence of significant quarter-to-quarter changes in conversion costs. The respondent did not request that Commerce consider actual conversion cost changes at all. The case did not involve any dispute about whether Commerce was ignoring actual, production-linked conversion cost changes. Instead, the respondent sought to isolate raw material cost changes for the purposes of determining whether the 25% threshold was met. *Id*. at 1325. That is fundamentally different from the present case, where the record shows significant quarter-to-quarter changes in conversion costs. The record supports there were actual changes—as opposed to mere distortions—in the conversion costs and those changes had an impact on Citribel's pricing decisions during the period of review. Yet Commerce, despite acknowledging the changes, excluded conversion cost changes in the numerator of its 25% test.

This case presents a distinct legal and factual question: whether Commerce may normalize conversion costs in the numerator of its test when the record shows meaningful changes. Section 1677b(b)(3)(A) requires Commerce to calculate "the cost of materials and of fabrication or other processing of any kind … during a period which would ordinarily permit the production" of the foreign like product. That language contemplates a cost calculation based on the actual production experience of the respondent—not an artificial average that masks actual changes in the costs. Freezing conversion costs across quarters, even when the record reflects non-distortive changes, risks contravening the statutory requirement.

Indeed, the reasoning in *Habas* supports Plaintiff's position. If it is reasonable for the denominator to reflect total COM because it captures all cost components that "impact pricing,"[3] would it not be equally reasonable—and perhaps required—for the numerator to reflect changes in those same components to ensure a consistent and meaningful application of the test?

_____

[3] *Habas*, 625 F. Supp. 2d at 1325.

## 2. *SolarWorld*

Defendant cites *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018), to argue that Commerce's adherence to established practice should not be disturbed merely because a different outcome might result under an alternative methodology. Def. Br. at 24. However, this case turned on factual considerations, not statutory interpretation.

*SolarWorld* involved Commerce's selection of a surrogate value in the non-market economy context and focused on the agency's discretion to choose among competing data sources. *See SolarWorld*, 910 F.3d 1225. The court noted that the term "best available information" is not defined by statute and therefore affords Commerce "broad discretion." *Id.* at 1222 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)). The court also noted that SolarWorld did not "argue that Commerce's stated practice is contrary to any statute or regulation." *Id.* at 1226. Under the context, the court saw "no reason why Commerce *must* deviate from its practice where substantial evidence supports its selected surrogate value." *Id.* (emphasis in original).

9

This case presents a distinct legal question: whether Commerce's policy of normalizing conversion costs aligns with the requirements of 19 U.S.C. § 1677b(b)(3), which defines cost of production to include raw material and conversion costs incurred "during a period which would ordinarily permit the production" of the merchandise "in the ordinary course of business. The statutory text contemplates a methodology that reflects actual cost fluctuations—including any actual conversion cost changes—when those changes affect pricing decisions. *Loper Bright* reminds us that reasonableness must be determined based on what the statute authorizes, not merely based on the agency's "broad discretion" or adherence to past practice.

### 3. *Torrington*

Defendant-Intervenor cites *Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)*, for the proposition that Commerce is the "master of the antidumping laws." But that statement, made nearly three decades ago, must be read in light of *Loper Bright. Torrington* reflected the Chevron framework, under which courts deferred to an agency's reasonable interpretation of ambiguous statutory text. *See Torrington*, at 1350 ("In the absence of clear direction from the statute,

we must ask the second question: whether the Commerce Department's regulation is based on a permissible interpretation of the statute."). *Loper Bright* has now overruled Chevron, clarifying that "agencies have no special competence in resolving statutory ambiguities. Courts do." *Id.* at 412.

Under *Loper Bright*, the court's role is to exercise independent judgment in determining whether an agency's interpretation aligns with the statute. The fact that Commerce has been delegated authority to administer the antidumping law does not entitle it to deference in interpreting ambiguous statutory language. Courts must now resolve such ambiguities themselves, without deferring to the agency's interpretation.

*Loper Bright* preserved prior holdings that genuinely turned on Chevron under principles of *stare decisis*. But this assurance of continuity applies only to the specific results of prior decisions, not the continued validity of the Chevron framework. Thus, mere citation to Chevron cannot insulate prior decisions from reevaluation. *Loper Bright* makes clear that continued adherence to agency interpretations must now rest on independent judicial assessment of the statute itself.

11

This distinction is critical in the present case. Whether Commerce's methodology of normalizing conversion costs comports with § 1677b(b)(3) is a legal question governed by the statutory text. Therefore, the Court must determine whether Commerce's methodology adheres to this statutory command—not merely whether the agency's practice is permissible under its delegated authority.

## II.    COMMERCE'S POLICY OF NORMALIZING CONVERSION COSTS IS UNREASONABLE

Commerce's antidumping determination will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints. However, Commerce's methodology must be grounded in the statute and justified by a reasoned explanation that reflects the actual facts of each case.

A practice that treats unlike situations alike or ignores material differences cannot be reasonable. Where Commerce relies on rigid frameworks or assumptions that do not hold under the record, its methodology ceases to serve the statutory purpose and becomes

arbitrary. The reasonableness of a methodology must be assessed not only in the abstract but also in how it operates under the specific facts of the case. Therefore, Commerce's practice of normalizing conversions costs in all cases regardless of case-specific facts and its application of the methodology were unreasonable and unlawful both generally and as applied in this case.

## 1. The Policy is Unreasonable Generally

Commerce's policy of normalizing conversion costs through annual averaging, irrespective of whether quarterly data indicate actual conversion cost changes, is not reasonable under 19 U.S.C. § 1677b(b)(3). That statute instructs Commerce to calculate "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production" of that product. The statute clearly defines the cost of production to include both raw material and conversion costs, and requires Commerce to align those costs with the actual period in which production occurred—not to apply an abstract average that masks cost variability over different production periods.

The statute does not suggest that the standard for selecting the appropriate "period" applies differently to the cost of materials and the cost of fabrication. The statute clearly defines the cost of production to include both raw material and conversion costs; and outlines the same standard for selecting a period that reflects the producer's actual cost experience for both components.

The statutory reference to "a period which would ordinarily permit the production" suggests a time frame reflecting actual production conditions—one that makes it possible to evaluate whether specific sales were made below the cost of production under those conditions. Therefore, the phrase contemplates a cost calculation that is reflective of the commercial realities of the producer, not one that is divorced from the producer's actual cost experience.

Commerce's policy of normalizing conversion costs through annual averaging *in all cases* violates the statute's mandate to select a period reflecting the producer's actual cost experience. Moreover, such averaging can produce materially inaccurate results. For example, if conversion costs increase significantly over a short span—such as due to inflationary shocks or supply disruptions—using an annual average can

mask these changes and improperly label earlier-quarter sales as below cost. As such, when there are actual conversion cost changes, Commerce's policy can significantly distort the cost comparison and undermine the agency's statutory obligation to test whether sales were made below costs.

The Federal Circuit has repeatedly emphasized that Commerce must engage with record facts, not apply formulas in a vacuum. In *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), the court invalidated Commerce's application of the Cohen's d test because the agency failed to assess whether the assumptions underlying the test held true. *See Stupp*, at 1357 ("Commerce's application of the Cohen's *d* test to data that do not satisfy the assumptions on which the test is based may undermine the usefulness of the interpretive cutoffs."). The Court stressed that a methodology cannot be applied reflexively, especially where its foundational assumptions may not be valid in the specific case. *Id.* ("{T}here are significant concerns relating to Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances.").

15

The Federal Circuit reached the same conclusion in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025). There, Commerce applied the Cohen's d test as part of its differential pricing analysis without determining whether the data met the test's underlying statistical assumptions. *See Marmen* at 1346. Commerce claimed that because it used the entire population of data, it need not assess these assumptions. *Id*. The court rejected the argument, holding that the validity of the Cohen's d coefficient depends on those assumptions regardless of whether the data is a sample or a population. *Id*. The court further held that Commerce's assertion that the Cohen's d test is only a first step in a broader analysis does not excuse the agency from confirming the test's applicability, stating that a flawed result at step one cannot be salvaged through subsequent stages. *Id*.

*Stupp* and *Marmen* both reinforce the same principle: Commerce cannot treat methodologies as if they are immune from factual scrutiny. That principle applies here. Commerce defends its normalization policy by asserting that conversion costs—such as labor, energy, depreciation, and maintenance—are *normally* incurred erratically throughout a given year and are recorded at different rates from month to month,

16

rendering period-specific figures unreliable. *See* Final IDM, at 9–10. Appx1287- Appx1288. But Commerce cannot simply assume that all fluctuations in conversion costs are artificial or distortive. Variations over shorter periods may reflect actual changes in input costs that affect the producer's pricing decisions. A company's accounting treatment may accurately capture such changes without introducing distortive spikes. Automatically smoothing these fluctuations presumes distortion without examining whether the variation is real, risking an inaccurate review of the company's cost experience.

To be clear, Plaintiff does not dispute that Commerce's policy may be reasonable where its foundational assumptions actually apply. In some cases, conversion costs may indeed be incurred erratically or recorded unevenly throughout the year. In such scenarios, an annual average may serve to filter out temporary distortions and yield a more accurate picture of overall cost trends. The statute permits methodological flexibility in those cases because normalization can support rather than undermine the statutory purpose.

However, the reasonableness of a default policy depends on its responsiveness to record evidence. Commerce's policy does not account

17

for the possibility that its assumptions might not apply. And where the record affirmatively shows that quarterly fluctuations in a producer's conversion costs reflect actual changes in costs—rather than artificial or erratic variation requiring normalization—the continued use of annual averages no longer serves the statutory purpose. It distorts rather than clarifies the cost trends that the statutory framework is meant to capture.

Commerce's approach is particularly problematic because it does not provide a mechanism to test whether its assumptions hold true. It presumes distortive volatility where the record might show consistent cost trends. That presumption introduces risk of error and bias— precisely the kind of failure the courts condemned in *Stupp* and *Marmen*. Commerce cannot reasonably adopt a default method without establishing a standard for factual examination or providing a mechanism to make adjustments based on case-specific evidence.

The statute does not grant Commerce unlimited discretion. The use of annual conversion costs may be acceptable in some cases, but only when justified by the record. A policy that fails to account for factual deviations from its assumptions cannot be reasonable. When the

18

record supports significant actual changes in conversion costs affecting pricing decisions, Commerce must acknowledge that evidence and adapt its methodology accordingly.

## 2. The Policy is Unreasonable as Applied in this Case

The record in this case provides compelling reasons to find that Commerce's methodology produced an unreasonable and distortive result when applied to Citribel. The evidence submitted by Citribel reflected its actual cost experience that differed significantly from the assumptions underlying Commerce's standard normalization policy. Nonetheless, Commerce failed to meaningfully engage with that record, instead applying its normalization approach in a manner that disregarded both the statutory language and the factual circumstances of the case.

### i. Actual Conversion Costs Increased Significantly

Commerce's application of its normalization policy to Citribel was particularly unreasonable because it disregarded well-documented, sustained, and production-linked increases in Citribel's quarterly conversion costs during the period of review. Citribel submitted substantial, unrebutted evidence—including its quarterly financial

19

statements showing that its conversions costs such as natural gas and electricity costs rose sharply throughout the POR. *See* Pl.'s Br. at 27.

These increases were not artificial accounting distortions resulting from conversion costs being incurred erratically or recorded at different rates from month to month. Rather, they reflected significant changes in Citribel's conversion costs that directly influenced its pricing decisions. The fluctuations were not characteristic of how such costs are typically incurred or recorded. Instead, they were indicative of Citribel's actual cost experience during the period of review, influenced by extraordinary market conditions and company-specific circumstances.

### ii. Conversion Costs Were Tied Directly to Production

Citribel explained that many of its conversion costs such as energy inputs are directly proportional to the volume of citric acid produced. *See* Pl.'s Reply Br. at 7. The company described its fermentation and crystallization stages, which require constant steam generation. Because the production process depends on stable thermal input, energy usage is directly linked to production output. Thus, as input prices rose, the unit cost of production increased in real time.

### iii.  Conversion Costs Were Correlated to Prices

To underscore the real-world relevance of these costs, Citribel submitted a comparison of its quarterly costs and prices based on the company's quarterly financial statements. *See* Pl.'s Reply Br. at 9. The data showed a close correlation between Citribel's quarterly costs and prices. This confirmed that Citribel's pricing behavior reflected its actual cost changes, including conversion costs—undermining Commerce's assumption that variations in conversion costs are always distortive fluctuations and unrelated to pricing decisions.

### iv.  Evidence Addressed Conversion Cost Experience, Not Inflation

Defendant-Intervenors attempted to frame Citribel's arguments as resting on general inflation. *See* Intvrs. Br. at 11. But Citribel repeatedly clarified that it was not invoking a high-inflation methodology. *See* Pl.'s Reply Br. at 14-15. Instead, it presented cost data showing a company-level cost experience that is inconsistent with Commerce's assumption that conversion costs are too erratic to be used on a quarterly basis. Inflation was cited only to provide context for the specific cost trends that Citribel documented.

Thus, Citribel did not argue that inflation alone justified an adjustment to Commerce's methodology. Rather, it demonstrated that Commerce's own rationale for rejecting quarterly conversion costs—i.e., that such conversion costs are incurred erratically and require smoothing—did not apply to Citribel's actual cost experience during the period of review.

### v.  Commerce Failed to Analyze the Record or Explain Its Reasoning

Despite acknowledging in the Preliminary Analysis Memorandum that conversion costs had increased significantly, Commerce never evaluated the nature of those changes. *See* Prelim Analysis Memo, at 2. Appx1021. It claimed to have "analyzed the effect" of these increases, but no such analysis appears in the record. *Id.* Instead, Commerce used annualized conversion costs from the outset and never applied a 25% test using actual quarterly COM reflecting the conversion cost changes. *Id.* at Attachment 7. Appx1255-Appx1258.

In the Final Results, Commerce reiterated boilerplate justifications from unrelated proceedings, citing cases like *Yarn from Thailand* and *Hot-Rolled Steel from Korea. See* Final IDM, at 10-11.

Appx1287- Appx1288. But it did not engage with Citribel's specific evidence or address whether its normalization policy was consistent with the company's cost experience. Commerce's "cookie-cutter" application of the methodology without any consideration of case-specific facts renders the determination arbitrary.

### vi.  Methodology Undermined Statutory Purpose

The point of Commerce's cost test is to determine whether sales were made below the actual cost of production. By applying a smoothing function that erases quarter-to-quarter variation—even when that variation is real and production-based—Commerce substituted artificial averages for actual costs. As a result, it labeled profitable early-quarter sales as "below cost" based on full-period average costs, distorting the margin calculation. *See* Pl.'s Reply Br. at 10-11. This outcome defeats the purpose of the statutory provision, which is to prevent sales made at a loss from distorting price comparisons—not to penalize companies for failing to foresee cost increases.

### vii. Commerce's Misrepresentation Impaired Citribel's Ability to Respond

Commerce's misstatement in the Preliminary Analysis Memorandum compounded these errors. By claiming to have analyzed the effect of conversion cost increases, Commerce gave the appearance of a reasoned and data-driven analysis. In truth, it applied a default methodology that excluded conversion cost changes from the numerator of the test without considering whether that exclusion was justified on the record. This misrepresentation impaired Citribel's ability to respond meaningfully until Commerce issued its Final Results.

## III.  PLAINTIFF EXHAUSTED ITS ADMINISTRATIVE REMEDIES

Although Citribel did not cite 19 U.S.C. § 1677b(b)(3) by number in its administrative case brief or frame its argument as one of "statutory interpretation," the substance of its argument clearly raised the issue. Citribel specifically challenged Commerce's treatment of conversion costs as inconsistent with the proper understanding of the cost of manufacturing (COM), which Commerce itself defines to include both raw material and conversion costs. *See* Citribel's Admin. Case Br. at 5-6. Appx4230- Appx4231. Citribel explained that by using quarterly

24

raw material costs but ignoring corresponding changes in conversion costs, Commerce's methodology distorted the actual cost of production. *Id.*

In its administrative case brief, Citribel challenged Commerce's methodology both in general and as applied. Citribel contended that Commerce's failure to analyze conversion cost changes was generally unreasonable given the agency's own definition of COM, which includes both raw material and conversion costs. Id. at 6-7. Appx4231-Appx4232. Citribel further argued that this failure was especially unreasonable in light of the case-specific circumstances, including the magnitude of the conversion cost changes, which were too substantial to be treated as erratic expenses subject to normalization. *Id.* at 6-7, 9. Appx4231- Appx4232, Appx4234. Citribel clearly identified the analytical deficiencies in applying a uniform approach to conversion costs without evaluating whether the underlying assumptions are supported by the record. *Id.* at 11-12. Appx4236- Appx4237. These arguments directly implicate whether Commerce's chosen methodology reasonably implements the statutory mandate.

Critically, the administrative briefing occurred after Commerce issued its Preliminary Results but before the Final Results. In the Preliminary Analysis Memorandum, Commerce *acknowledged* that Citribel experienced significant conversion costs and stated that it had "analyzed the effect" of those increases on Citribel's total cost of manufacturing. *See* Analysis Memo, at 2. Appx1021. These statements were inconsistent with Commerce's policy of normalizing conversion costs in all cases and suggested that Commerce may have applied a modified methodology. Commerce's position was ambiguous because its narrative and the exhibit cited to support it pointed in different directions. *Id.* at 2 and Attachment 7, Appx1021, Appx1255-Appx1258. As a result, Citribel had no way of confirming whether Commerce intended to rely on its standard normalization practice or to deviate from it. In the Final Results, Commerce—for the first time—explicitly explained that it had applied its usual policy of annualizing conversion costs, based on a general assumption that such costs incur erratically. *See* Final IDM, at 10-11. Appx1287- Appx1288.

In this context, Citribel reasonably argued in its administrative case brief—submitted before the Final Results— that Commerce's

finding that Citribel's cost of manufacturing did not change by 25 percent was inconsistent with both Commerce's own statement that it had analyzed Citribel's conversion cost changes and the agency's definition of COM, which includes both raw material and conversion costs. The arguments raised by Citribel were reflective of the uncertainty in the explanations provided by Commerce.

The uncertainty in the Preliminary Results was whether Commerce's normalization policy was subject to factual scrutiny. The Preliminary Results indicated that it was because Commerce stated that it had "analyzed the effect" of Citribel's conversion cost increases on its total cost of manufacturing. If the policy was *not* subject to factual scrutiny, Commerce should have stated that it does not analyze the effect of conversion cost changes on the COM in any case as a matter of policy. Commerce only provided this clarification in the Final Results. Therefore, it would be unreasonable to penalize Citribel for not framing its objections in precise terms in anticipation of a rationale that Commerce had not disclosed.

Nonetheless, Citribel challenged the unreasonableness of Commerce's methodology by emphasizing that the assumptions

underlying the normalization policy do not hold in all cases. Specifically, Citribel asserted that its conversion cost changes were much more than distortive fluctuations requiring normalization and that Commerce should not disregard actual conversion cost changes. *See* Citribel's Admin. Case Br. at 8–9. Appx4234–Appx4235.

Throughout this court proceeding, Citribel maintained that the reasonableness of Commerce's normalization policy depends on its responsiveness to record evidence. In its case brief, Citribel challenged Commerce's "cookie cutter" use of its normalization method. Pl.'s Br. at 15. In its reply brief, Citribel iterated that a methodology based on foundational assumptions is unreasonable without a mechanism for testing the assumptions. Pl.'s Reply Br. at 9.

## **CONCLUSION**

For the foregoing reasons, Commerce's policy of normalizing conversion costs in inconsistent with 19 U.S.C. § 1677b(b)(3) and is unreasonable both generally and as applied to Citribel. Moreover, Citribel exhausted its administrative remedies. The Court should remand the case with instructions for Commerce to reconsider its cost methodology in light of the statute and the record evidence

28

Respectfully submitted,

*/s/ Pierce J. Lee*
Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 508-8780
Email: plee@crowell.com

*Counsel for Plaintiff Citribel N.V*

June 10, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Court's supplemental briefing order in that it contains 4,684 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

<u>*/s/ Pierce J. Lee*</u>
Pierce J. Lee