**Slip Op. 25-110**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

**Court No. 24-00010**

CITRIBEL NV,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

ARCHER DANIELS MIDLAND COMPANY; CARGILL, INCORPORATED; and PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

## OPINION

[The court remands for Commerce to reconsider its calculation of the costs of production.]

Dated: August 22, 2025

*Daniel J. Cannistra* and *Pierce J. Lee*, Crowell & Moring LLP, Washington, DC, on the briefs for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K.*

*Hogan*, Assistant Director; *Ravi D. Soopramanien,* Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the briefs for Defendant. Of counsel on the briefs was *Shanni Alon*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Stephen P. Vaughn* and *Daniel L. Schneiderman*, King & Spalding LLP, Washington, DC, on the briefs for Defendant-Intervenors.

*Baker*, Judge: In this case involving an administrative review of an antidumping order on citric acid made in Belgium, a producer from that country challenges the Commerce Department's calculation of its costs of production. For the reasons explained below, the court remands for reconsideration.[1]

I

To determine whether imported merchandise is dumped in this country, the Tariff Act of 1930, as amended, requires Commerce to make "a fair comparison" between the price charged by the foreign exporter to U.S. customers "and normal value." 19 U.S.C.

---

[1] In so doing, the court declines to redact certain confidential record material that it finds does not qualify as "business proprietary information" under the applicable Commerce regulation, 19 C.F.R. § 351.105(c). *See* 19 U.S.C. § 1516a(b)(2)(B) (providing that the court "shall . . . preserve[] in any action under this section" the "confidential or privileged status accorded to any documents, comments, or information," except that it "may disclose such material under such terms and conditions as it may order").

§ 1677b(a). "Normal value" is generally "the price a producer charges in its home market." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010); *see also* 19 U.S.C. § 1677b(a)(1)(B)(i) (defining normal value by reference to home-market sales "in the ordinary course of trade"). The Department determines an antidumping margin based on the difference between the U.S. customer price and the normal value. *See Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1194 (Fed. Cir. 2021).

In calculating normal value based on the home-market sales price, Commerce may disregard sales made for "less than the cost of production" when certain conditions are met. 19 U.S.C. § 1677b(b)(1). This exclusion can significantly raise the normal value because it eliminates lower-priced home-market transactions from the dataset, which results in an increased dumping margin. *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1357 (CIT 2010). "The 'sales below cost' provision of § 1677b(b) thus assumes an important role in many dumping determinations." *Id.*

The statute defines the cost of production as "the sum of" three distinct categories of expenditures. 19 U.S.C. § 1677b(b)(3). As relevant here, one of those is "the cost of materials and of fabrication or other processing of any kind . . . during a period which would ordinarily permit the production of that" commodity. *Id.* § 1677b(b)(3)(A). The Department must base its calculations on "the records of the exporter," so long as they "are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs" of production and

**Ct. No. 24-00010** **Page 4**

sale. *Id.* § 1677b(f)(1)(A). It must "consider all available evidence on the proper allocation of costs." *Id.*

## II

In 2018, Commerce imposed antidumping duties on citric acid from Belgium. 83 Fed. Reg. 35,214. In 2022, the Department opened an administrative review of this order as to Citribel NV, a producer and exporter, covering July 1, 2021, to June 30, 2022. 87 Fed. Reg. 54,463, 54,465.

One of the agency's tasks was to calculate normal value in Belgium. In that exercise, it sought to filter out Citribel's home-market sales that were at less than the cost of production. Appx1276c. It thus asked the company for information about its "cost of manufacturing," defined as "cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods." Appx4410.

In response, Citribel reported these expenses on a quarterly basis. *See* Appx1693–1694. The company acknowledged that Commerce ordinarily uses "normal cost averaging over the entire" period of review, Appx1693—referred to by the parties as "annualization" or "normalization." But "in situations where" doing this "would be distortive due to significant cost changes," the agency uses quarterly calculations.[2] *Id.*

---

[2] The company also identified the "two primary criteria" the Department employs to determine when to deviate from using annualized costs: "(1) the change in the [cost of manufacturing] is at least 25 percent between the high[]

(footnote continues on next page)

Citribel argued that because its cost of manufacturing "changed drastically" during the relevant period, the Department should accept the tendered figures. *Id.*

Commerce answered by directing the company to resubmit its "conversion" costs—defined as the cost of manufacturing except for raw material inputs, *see* ECF 28-2, at 7—on an annualized basis. Appx4825. Citribel acquiesced. Appx1932–1933. In doing so, it acknowledged that the Department prefers annualized conversion costs "regardless of whether" the agency uses its "normal annual average cost method or [its] alternative quarterly cost method." Appx1890 (quoting I&D Memo at Comment 14 accompanying 86 Fed. Reg. 58,883) (*Yarn from Thailand*). This is because such costs "are normally incurred erratically throughout a given year." *Id.* (quoting *Yarn from Thailand* I&D Memo at Comment 14). That is, "they may be recorded at different rates from month to month throughout a given year." *Id.* (quoting *Yarn from Thailand* I&D Memo at Comment 14).

Even so, Citribel asked the agency to use the quarterly conversion cost data that the company originally submitted. Appx1892. It pointed to various price increases, including a 50-percent rise in the price of natural gas—"one of the three most significant inputs for citric acid production." Appx1891.

---

period and the low[] period, and (2) there is a reasonably positive correlation between the [cost of manufacturing] and the sales price." *Id.*

The Department then requested yet more information, and Citribel in response once again acknowledged that Commerce "prefers [annualized] data" for conversion costs. Appx2007. It contended, however, that the agency should use the company's quarterly figures because the changes resulted not from expenses being "recorded at different rates but rather [from] significant increases in the price levels for all of those factors of production," Appx2008, including more-than-50-percent price increases for natural gas and electricity, Appx2006. Disregarding them "by 'normalizing' or averaging the costs over the entire [period of review] would result[] in a serious distortion in Commerce's margin calculation." Appx2008.

In its preliminary results, Commerce declined that request and applied its "standard methodology of using annual weighted-average costs based on Citribel's reported data." Appx1276c. In an accompanying memo, it explained that in determining whether to depart from that methodology, the agency considers

> (1) whether the change in the cost of manufacturing . . . recognized by the respondent during the [period of review] is . . . greater than 25 percent . . . from the high to the low quarter[]; and (2) whether the record evidence indicates that sales made during the shorter averaging periods were reasonably linked with the [cost of manufacturing] during the same shorter averaging periods.

Appx1021.

**Ct. No. 24-00010**                                                                                      **Page 7**

The Department acknowledged Citribel's evidence that the company "experienced significant changes in the total cost of manufacturing . . . during the [period of review] and that the change[s] in" conversion costs were "primarily attributable to the price increases of energy and inflation." *Id.* The agency asserted that it "analyzed the effect these cost increases had" between the quarters with the lowest and highest costs of manufacturing. *Id.* They did not meet the necessary 25-percent threshold under the first prong of Commerce's alternative approach, *id.*—which was based on *annualized* conversion cost data and quarterly raw material expenditures.[3] Therefore, it applied its "standard methodology of using annual costs based on the [company's] reported data." *Id.*

In its case brief, Citribel again argued that the Department should use the company's quarterly conversion figures for purposes of the alternative methodology. Appx4226. It pointed to macroeconomic effects that it contended distorted the annualized data. Appx4228–4236. Of particular note was that "[t]he

---

[3] It's not obvious from the agency memo that Commerce used these different calculations for the first prong of its alternative methodology test. In its final determination, however, the Department acknowledged that its test employs "annualized conversion costs" along with quarterly "direct material costs." Appx1287–1288; *see also Yarn from Thailand* I&D Memo at Comment 14 (explaining that regardless of whether the Department applies its normal or alternative methodology, it ordinarily uses annualized conversion costs). The effect of so annualizing them here was to eliminate any increases for purposes of the 25-percent threshold.

prices of natural gas and electricity increased by 50%." Appx4232. It also asserted that the change in cost of production during the period of review exceeded the 25-percent threshold when quarterly numbers were used. Appx4229–4230. It asserted that Commerce's annualization disregarded "the effect of changing conversion costs." ECF 28-2, at 10; Appx4230–4231.

The Department rejected these contentions in its final determination, explaining that "Citribel does not deny that its cost data fails to meet" the first prong of the alternative methodology's test. Appx1288. The company also did not carry its burden to show that the agency's policy of only using annualized conversion costs was distortive or unreasonable. *Id.* Thus, Commerce "continued to rely" on the annualized conversion figures for the final determination. Appx1285. Consequently, some of the company's home-market sales were not included for purposes of calculating normal value, which increased it and thus the ultimate dumping margin.

### III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), Citribel brought this suit under 19 U.S.C. § 1516a(a)(2). ECF 11, ¶ 4. Three domestic producers intervened on the side of the United States. The parties have fully briefed Plaintiff's motion for judgment on the agency record,[4] which is ripe for decision.

---

[4] They also submitted supplemental briefing requested by the court.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews determinations to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576

U.S. 743, 750 (2015). Reasoned decisionmaking requires the agency to "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

IV

Citribel first argues that the agency's use of annualized conversion costs "directly contradicts the statutory language" dictating the method of calculating the cost of production. ECF 28-2, at 18–19 (citing 19 U.S.C. §§ 1677b(b)(1), (b)(3)). It claims that this approach does "not account for any change in" those expenses, *id.* at 18, and thus contravenes the statute because that practice conflicts with the goal of obtaining "the most accurate dumping margins possible," *id.* at 19 (quoting *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 719 (CIT 2001)).

To begin with, it is not true as a mathematical matter that annualizing conversion costs disregards "*any* change." *Id.* at 18 (emphasis added). For purposes of calculating the *cost of production*, normalizing conversion costs across quarters still incorporates those expenses the same as inclusion of any other input in the formula as the statute requires.

Citribel, though, is correct that for purposes of Commerce's alternative methodology, averaging con-

Ct. No. 24-00010 Page 11

version costs across quarters effectively ignores increases in those expenses. As a result, only significant changes in raw material costs—which the agency computes on a quarterly basis—could affect the difference between the lowest and highest quarterly costs of manufacturing. *See id.* at 14. But that results from Commerce's choice to annualize conversion expenditures.

The company admits that the statute provides "no guidance about whether Commerce may use average costs for the entire period of review or shorter periods such as quarters." *Id.* at 12; *cf. Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1235 (CIT 2011) ("[T]he statute does not prescribe a specific time period over which cost of production must be calculated."). Instead, it delegates that authority to Commerce. Thus, the Department has the discretion to calculate conversion costs on an annualized basis, even if it uses a quarterly calculation scheme for raw material inputs.[5]

Precisely because of this statutory delegation, Citribel's invocation of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), is unavailing. That decision "did not throw out the administrative discretion baby with the *Chevron* deference bathwater." *BYD (H.K.) Co. v. United States*, Slip Op. 25-60, at 29, 2025 WL 1420318, at *11 (CIT 2025) (citing *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir.

---

[5] Of course, whether that discretion is exercised reasonably in any given case is another matter, as discussed below.

Ct. No. 24-00010                                                Page 12

2025) (Sutton, C.J.)), *appeal pending*, No. 25-1937 (Fed. Cir.).

Citribel next implies that it was blindsided by Commerce's request that the company resubmit its conversion costs in annualized form. *See* ECF 28-2, at 21–25. It complains that the Department didn't explain its reasons for that request until the final determination. *Id.* at 24. That "deprived [the company] of a meaningful opportunity to make effective arguments against" such an approach, which it erroneously characterizes as a presumption.[6] *Id.* at 25.

Citribel's claim that it was surprised to learn of Commerce's practice of always annualizing conversion costs asks the court to suspend disbelief. When the company grudgingly resubmitted its data for these expenses in annualized form as directed, it acknowledged that format was the Department's preference "*regardless of whether*" the latter uses its "normal annual average cost method or [its] alternative quarterly

---

[6] A presumption is "[a] legal inference or assumption that a fact exists because of the known or proven existence of some other fact or group of facts." *Presumption*, Black's Law Dictionary (12th ed. 2024). Its essential characteristic is that it "shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption." *Id.* Here, by contrast, the agency shifts no burden and requires no extra production or persuasion. Instead, there is just the Department's policy and the justifications therefor. Thus, the question, as in all cases brought under 19 U.S.C. § 1516a(a)(2), is simply whether Commerce's determination is supported by substantial evidence and otherwise reasonably explained in light of the record and the parties' contentions.

cost method." Appx1890 (emphasis added) (quoting *Yarn from Thailand* I&D Memo at Comment 14). Contrary to its argument, Citribel had "a meaningful opportunity to make effective arguments" against the agency's policy of using annualized conversion costs. *See* ECF 28-2, at 25.

Finally, the company contends that the Department failed to substantively address its argument that annualizing conversion costs on these facts yielded a distortive result. *See id.* at 26–30.[7] It points to record evidence that it says shows an actual increase in conversion costs rather than reporting fluctuations that the Department's annualization policy assumes. ECF 28-2, at 26–28; *see also* ECF 58, at 14–21 (supplemental briefing); *cf.* Appx1287 (the agency's final determination explaining that "conversion costs, such as labor, energy, and overhead, are *normally* incurred erratically throughout a given year" and "using an annual average for these costs normalizes [them] over the entire year") (emphasis added). Citribel's point is that its evidence showed that *this* period of review—punctuated as it was by the geopolitical and economic earthquake of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices, Appx1911—was anything *but* normal, at least for certain of its expenses.

---

[7] Citribel "does not dispute that Commerce's policy" of always annualizing conversion costs "may be reasonable where its foundational assumptions actually apply." ECF 58, at 17.

Echoing Commerce, the government argues that "Citribel was required to show, using evidence on the record, that the standard cost methodology leads to a distortive result." ECF 33, at 34 (citing *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 361 F. Supp. 3d 1314, 1327 (CIT 2019)). It claims "Citribel did not do so." *Id.*

The problem for the government is that the company put on considerable evidence and argued at length why annualization of its conversion costs on these facts "leads to a distortive or unreasonable result in the cost test and/or margin analysis." Appx1288. Commerce's response, however, was limited to a single conclusory sentence: "Citribel's argument fails to show that the standard methodology was 'unreasonable' and failed to provide such record evidence." *Id.* How and why the Department reached this conclusion is a mystery.[8] *Cf. State Farm*, 463 U.S. at 43 (an agency must "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made"); *see also* 19 U.S.C. § 1677b(f)(1)(A) (requiring the agency to "consider *all* available evidence on the proper allocation of costs") (emphasis added).

---

[8] The agency's memo accompanying its preliminary determination similarly dodged engaging with Citribel's contention that using annualized conversion data on this record produced distortive results. There, it claimed—with no further elaboration—that it "analyzed the effect" of the company's conversion cost increases, Appx1021, which was not responsive.

Commerce's practice of always annualizing conversion costs is merely a means to the end of avoiding distorted cost calculations, not an end in itself that overrides the statute's directive to "achieve a fair comparison" between normal value and export price. 19 U.S.C. § 1677b(a).[9] Here, Citribel has made the case, including by pointing to record evidence, that following this approach on these peculiar facts is distortive because of the extraordinary rise in at least certain conversion costs (e.g., natural gas and electricity) during the period of review. The Department dismissed that contention without any analysis or discussion of the company's evidence. *Cf.* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1292 (1975) ("The necessity for justification is a powerful preventive of wrong decisions."). On remand, the agency must consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results.[10]

---

[9] This goal is itself an important check Congress has implemented to ensure the agency obtains "the most accurate dumping margins possible." *Shandong Huarong*, 159 F. Supp. 2d at 719.

[10] Perhaps Citribel incurred some or most of its conversion costs erratically, as the Department's practice assumes. But that is no reason to annualize other such costs that the company demonstrates were not so incurred and where normalization would produce distorted results.

**Ct. No. 24-00010** **Page 16**

\* \* \*

The court grants Citribel's motion for judgment on the agency record (ECF 28) and remands for further proceedings consistent with this opinion.

Dated: August 22, 2025         /s/ *M. Miller Baker*
       New York, NY         Judge