A-423-813
Remand
Slip Op. 25-110
POR: 7/1/2021 – 06/31/2022
**Public Version**
E&C/OIII: DC

*Citribel NV v. United States*
**Court No. 24-00010, Slip Op. 25-110 (CIT August 22, 2025)**
**Citric Acid and Certain Citrate Salts from Belgium**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court), in *Citribel NV v. United States*, Court No. 24-00010, Slip Op. 25-110 (CIT

August 28, 2025) (*Remand Order*).  These final results of redetermination concern the final

results of the 2021-2022 administrative review of the antidumping duty (AD) order on citric acid

and certain citrate salts (citric acid) from Belgium, covering the July 1, 2021, to June 30, 2022,

period of review (POR).[1]  In its *Remand Order*, the Court directed Commerce to reconsider the

record with respect to Citribel NV's (Citribel) claims regarding the impact of macroeconomic

and geopolitical events during the period on certain conversion costs (*e.g.*, natural gas and

electricity), and to determine whether, as Citribel asserts, the use of "annualized." *i.e.*, period-

wide, averages for some or all conversion costs led to distortive results in the analysis used to

determine whether to implement an alternative to the standard period cost methodology.[2]  As

discussed below, Commerce has further considered the record regarding Citribel's claims with

respect to changes in the costs of natural gas and electricity during the POR, as directed by the

---

[1] *See Citric Acid and Certain Citrate Salts from Belgium:  Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 FR 90167 (December 29, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 15-16.

Court.[3]  Upon review of the record, we continue to determine that there is insufficient

information to support Citribel's claims that Commerce's decision in the *Final Results* with

respect to the quarterly cost test was distortive, nor that the use of quarterly averaged costs for

conversion costs in the dumping analysis is compelled based on the record.[4]  Nevertheless, in

order to fully address the Court's concerns—which specifically identified electricity and natural

gas costs as ripe for reconsideration—we have revised the analysis of the changes in cost of

manufacture (COM) from the *Final Results* to include quarterly average costs for natural gas and

electricity rather than the period-wide averages used in the *Final Results*, but continue to use

period-wide averages for the remaining conversion costs (*i.e.*, the remaining variable overhead

costs along with labor and fixed overhead costs).  This revised analysis finds that the changes in

COM between the high and low quarters during the period of review do not pass the 25 percent

significance threshold to support deviation from the use of standard period-wide weighted-

average costs of production in the margin calculations.[5]  Thus, there is no change to Citribel's

calculated weighted-average dumping margin from the *Final Results*.

## II.    BACKGROUND

Commerce's normal practice under section 773(b)(3) of the Tariff Act of 1930, as

amended (the Act), is to calculate a period-wide weighted-average costs of production for each

"CONNUM" (*i.e.*, product control number) produced during the POR.  However, recognizing

that possible distortions may result from the application of period-wide cost averages during a

time of significant cost changes, Commerce established an alternative cost methodology based

on using quarterly cost-averaging periods rather than period-wide cost-averaging periods for

addressing significant price changes in the material inputs used to produce the merchandise

---

[3] *See Remand Order* at 15-16.
[4] *See Final Results* IDM at Comment 1.
[5] *See* Attachment.

under consideration.[6]  This alternative cost methodology acknowledges that market forces can still drive significant price changes for specific inputs, even where general price levels in the country are relatively stable (*e.g.*, no high inflation).

Commerce has established a predictable and consistent practice for determining whether to deviate from the standard cost methodology of calculating period-wide (*i.e.*, "annualized") weighted-average costs of production.[7]  Specifically, to use an alternative cost methodology based on quarterly cost-averaging periods, Commerce must find based on record evidence that the respondent's production costs meet two criteria:  (1) the change in the COM during the POR was significant; and (2) the sale prices made during the shorter cost-averaging periods could be reasonably linked with the COM during the same shorter cost-averaging periods.[8]

Commerce has explained that the first criterion (*i.e.*, changes in COM) must be met before evaluating the linkage between COM and sale price information.[9]  For this purpose, a significant change in COM is defined as a greater than 25 percent change in COM between the high and low quarters during the POR.[10]  This 25 percent threshold is high enough to ensure that

---

[6] *See Stainless Steel Plate in Coils from Belgium:  Final Results of Antidumping Duty Administrative Review*, 73 FR 75398 (December 11, 2008) (*Plate from Belgium*), and accompanying IDM at Comment 4.

[7] *See Citric Acid and Certain Citrate Salts from Belgium:  Preliminary Results of Antidumping Duty Administrative Review; 2021-2022,* 88 FR 49442 (July 31, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 12; *see also* Memorandum, "Citribel's Analysis Memorandum for the Preliminary Results of the Citric Acid and Certain Citrate Salts from Belgium Antidumping Duty Administrative Review; 2021-2022," dated July 24, 2023 (Citribel Preliminary Analysis Memorandum) at 2 (citing *Steel Reinforcing Concrete Bar from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 82 FR 23192 (May 22, 2017) (*Rebar from Türkiye*), and accompanying IDM at Comment 2).

[8] *See Rebar from Türkiye* IDM at Comment 2; *see also Certain Hot-Rolled Steel Flat Products from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 81 FR 53428 (August 12, 2016) (*Hot-Rolled Steel from Türkiye*), and accompanying IDM at Comment 6; and *Certain Welded Stainless Steel Pipes from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 74 FR 31242 (June 30, 2009), and accompanying IDM at Comment 1.

[9] *See Rebar from Türkiye* IDM at Comment 2; *see also Hot-Rolled Steel from Türkiye* IDM at Comment 6; and *Plate from Belgium* IDM at Comment 4 (stating "if {Commerce} finds cost changes to be significant in a given administrative review or investigation, {Commerce} subsequently evaluates whether there is evidence of linkage between the cost changes and the sales prices for the given POI/POR.")

[10] *See Rebar from Türkiye* IDM at Comment 2; *see also Hot-Rolled Steel from Türkiye* IDM at Comment 6; and *Plate from Belgium* IDM at Comment 4 ({Commerce's} threshold of 25 percent originates from generally accepted accounting standards promulgated in International Financial Reporting Standards (IFRS).  International Accounting Standard (IAS) 29 was developed to provide guidelines for enterprises reporting in the currency of a hyperinflationary economy so that the financial information provided is meaningful.  Essentially, IAS 29 establishes

Commerce does not move away from its normal practice without good cause and forgo the consistency offered by the use of a period-wide average cost, but allows for a change in methodology when significantly changing input costs are clearly affecting the period-wide average costs.[11]  For the purposes of analyzing whether the change in COM is greater than 25 percent, Commerce reviews the change in the COM of the five CONNUMs with the largest volume sold in the home market and the change in the COM of the five CONNUMs with the largest volume sold in the U.S. market.[12]  Commerce considers the change in COM to be significant when the majority of CONNUMs examined experienced a COM change in excess of 25 percent.[13]

The standard cost methodology is based on period-wide cost-averaging periods.  The rationale behind this practice is that the various components of production costs may vary over the span of the period, and normalizing these costs that are incurred over the entire period will provide a more representative result when compared with prices in the margin calculations. Nonetheless, for a given respondent in a given period of time, costs may change to such an extent that they may warrant the application of an alternative cost methodology when the costs of material inputs change significantly.

---

when it is appropriate for an entity to depart from normal IFRS accounting standards and adopt an alternative method, because the existing method (*i.e.*, historical costing) will result in distortions.

[11] *See Plate from Belgium* IDM at Comment 4; *see also Hot-Rolled Steel from Türkiye* IDM at Comment 6.

[12] *See Certain Welded Carbon Steel Pipes and Tubes from Turkey:  Notice of Final Results of Antidumping Duty Administrative Review*, 76 FR 76939 (December 9, 2011) (*CWP from Türkiye*), and accompanying IDM at n. 14; *see also Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Rescission of Administrative Review in Part*, 75 FR 10207 (March 5, 2010), and accompanying IDM at Comment 3; and *Certain Pasta from Italy:  Notice of Final Results of the Thirteenth Antidumping Duty Administrative Review*, 75 FR 81212 (December 27, 2010), and accompanying IDM at Comment 1.

[13] *See Rebar from Türkiye* IDM at Comment 2 (declining to apply a quarterly costing methodology when eight out of the ten highest volume control numbers did not meet the 25 percent threshold).  Compare with *Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review*, 75 FR 18788, 18791 (April 13, 2010) (applying the quarterly-costing methodology when "the percentage difference between the high and low quarterly COM clearly exceeded the 25 percent threshold for four of five control numbers sold in the home market and all five control numbers sold in the United States") unchanged in *Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty Administrative Review*, 75 FR 64696 (October 20, 2010).

For reporting the individual cost components of COM for the purposes of the alternative cost methodology, including the threshold "significance" analysis, Commerce's standard practice is to analyze COM constructed from quarterly average costs for direct material inputs, and with the conversion costs (*i.e.*, labor, variable overhead, and fixed overhead) based on the period-wide weighted-average costs.[14]  The rationale behind this practice is that the alternative cost methodology is used for addressing circumstances where there are significant price changes in the most significant material inputs during the period; whereas conversion costs, such as labor, variable overhead and fixed overhead, are normally incurred erratically throughout a given year.[15]  As explained in, *e.g.*, *Yarn from Thailand*, bonuses, insurance costs, depreciation, repairs and maintenance, energy costs, *etc.* may be recorded at different rates from month to month throughout a given year; however, using a period-wide average for these costs normalizes these costs over the entire POR.  Additionally, while significant changes in direct material costs are unexpected and may trigger a more rapid price change response, for conversion costs, it is normal for these costs to be incurred sporadically throughout the POR.  As such, we consider period-wide weighted-average conversion costs to better reflect a normalized cost to use in the dumping analysis, regardless of whether we use the standard cost methodology based on period-wide cost-averaging periods or the alternative cost methodology based on quarterly cost-averaging periods.[16]

In the underlying review, Citribel's initial cost questionnaire response included cost data with direct material components of COM reflecting quarterly averages and conversion costs

---

[14] *See, e.g., Stainless Steel Bar from India:  Final Results of Antidumping Duty Administrative Review*, 75 FR 54090 (September 3, 2010), and accompanying IDM at Comment 4.
[15] *See Polyester Textured Yarn from Thailand:  Final Affirmative Determination of Sales at Less Than Fair Value*, 88 FR 58883 (October 25, 2021) (*Yarn from Thailand*), and accompanying IDM at Comment 14.
[16] *Id.*; *see also, e.g., CWP from Türkiye* IDM at Comment 8.

reflecting semi-annual averages.[17]  Over the course of two supplemental questionnaires,

Commerce requested, and Citribel provided, additional cost data reflecting period-wide averages

for all costs, consistent with the standard methodology, along with cost datasets reflecting

alternative averaging methodologies.[18]  However, accompanying the requested revision to

period-wide conversion costs in reporting quarterly cost data, Citribel asserted the following:

> In 2022, most countries in Europe including Belgium started to experience
> significant inflation as the economic recovery from the Covid-19 pandemic has
> increased demand for energy and disrupted global supply chains. The inflation was
> worsened by the Russian invasion of Ukraine… Belgium experienced a significant
> increase in inflation during the POR.  The annualized inflation rate for all items
> increased from 1.4% to 10.5%.  For the energy sector, the inflation rate increased
> from 22.1% to 64.6%.  This drastic increase in prices inevitably had a significant
> impact on Citribel's conversion costs.  For example, the price of natural gas has
> increased by 50% from the second half of 2021 to the first half of 2022.  As
> indicated previously, natural gas is one of the three most significant inputs for citric
> acid production.   The price of electricity, which affects Citribel's overall
> operational costs, has also increased by more than 50%.  The drastic surge in energy
> prices in Europe was partly caused by the Russian invasion of Ukraine in early
> 2022.  During the POR, the labor costs have also increased significantly. The labor
> cost index, which measures the change in the price businesses pay for labor, has
> increased significantly in 2022.   All of these macroeconomic trends have
> contributed significantly to the increase in Citribel's conversion costs for citric
> acid... Additionally, the increase in the cost and price of the subject merchandise
> had a significant impact on Citribel's production level.  For the reasons described
> above, Commerce should use the quarterly cost data and analysis submitted by
> Citribel in its initial Section D response.[19]

---

[17] *See* Citribel's Letter, "Section D Questionnaire Response," dated November 7, 2022 (Citribel's DQR), at Exhibits
D-1 (Quarterly Cost Database with Quarterly Conversion Costs) and Exhibit D-17.1 (Quarterly COM Analysis with
Quarterly Conversion Costs).

[18] *See* Citribel's Letter, "Supplemental Section D Response," dated December 12, 2022 (Citribel's SDQR) at
Exhibits SD-6 (Quarterly Cost Database with POR-Average Conversion Costs) and SD-13 (Quarterly COM
Analysis with POR-Average Conversion Costs); and Citribel's Letter, "Second Supplemental Response," dated
February 22, 2023 (Citribel's 2SDQR) which included cost databases compiled using four different averaging
methodologies (annual, semiannual, quarterly with annual conversion, and quarterly with quarterly conversion) and
support for the averaging of each cost component in each methodology including (CONNUM-specific COM
information).

[19] *See* Citribel's SDQR at 2-4 and Exhibits SD-1.1 through SD-4 (containing two news articles regarding the
increasing inflation in the POR and the impact of the impending Russian invasion on European markets, Eurostat
official price reports reflecting Belgian price averages/indexes for consumer goods, electricity, natural gas, and labor
during the period).

In line with normal practice, Commerce did not conduct the "significance test" using the cost information submitted with quarterly averages of conversion costs during the preliminary stage of the review and instead employed its standard practice in evaluating the data otherwise submitted (with quarterly direct material cost averages and period-wide conversion cost averages). As a result, the *Preliminary Results* found that the changes in COM did not satisfy the 25 percent threshold and thus concluded that there was insufficient evidence to compel deviation from use of Citribel's period-wide average costs for purposes of the margin calculations.[20]

In the briefing stage of the underlying review, as well as in the litigation before the Court, Citribel argued that Commerce should reconsider this decision.[21] Citribel asserted that the use of an analysis of the change in Citribel's COM with quarterly averaging for direct materials costs but period-wide averages for conversion costs was arbitrary and distortive. Citribel reasoned that it established on the record that it incurred significant cost changes during the POR resulting from the increased energy demand driven by the post-pandemic economic recovery and supply chain shortages, which were further exacerbated by the Russian invasion of Ukraine, that impacted its conversion costs.[22] Citribel cited various precedent establishing that Commerce is obligated to use the alternative cost methodology where the record supports that it results in greater accuracy and fairness in the margin calculations, which it purports to do in the instant review.[23] Citribel asserted that Commerce's 25 percent test should examine not only changes in

---

[20] *See Citric Acid and Certain Citrate Salts from Belgium: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 49442 (July 31, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 12; *see also* Citribel Preliminary Analysis Memorandum at 2 (citing *Rebar from Türkiye* IDM at Comment 2).
[21] *See* Citribel's Letter, "Citribel N.V. Case Brief," dated August 30, 2023 (Citribel's Case Brief) at 8-9; *see also* Citribel's 56.2 Brief at 26-28, *Citribel NV v. United States*, 24-00010, (CIT July 24, 2024) (ECF No. 28).
[22] *See* Citribel's Case Brief at 8-9.
[23] *See Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 50100 (August 1, 2023) (*Rebar from Türkiye*), and accompanying PDM at 34) and Citribel's Case Brief at 11 and 12.

material input costs but also changes in conversion costs, and that failure to account for all cost elements of COM which impact pricing is distortive[24] and noted that Commerce is permitted to deviate from standard practice where its application results in distortive results which do not comport with the record otherwise established.[25]

In the *Final Results*, Commerce cited to relevant precedent establishing its standard practice and reasoning with respect to the use of period-wide average conversion costs to better reflect a normalized cost to use in its margin calculations, regardless of whether implementing the standard period-wide weighted-average cost method or the alternative quarterly weighted-average cost method.[26] We noted that, in order to dispute Commerce's methodology for determining whether the use of the alternative cost methodology is warranted, Citribel must show that the agency's methodology was unreasonable.[27] We determined that Citribel's argument failed to show that the standard cost methodology was "unreasonable" or "distortive" on any basis of the record, except to claim that the use of the alternative cost methodology which Commerce declined to use would have produced a different result.[28] We found that while the precedent cited by Citribel indeed established Commerce's discretion in maintaining the ability to deviate from standard cost methodology to avoid distortion and ensure accuracy and fairness, each of the cases cited by Citribel were either inapposite or reaffirmed the methodology and quarterly cost analysis utilized by Commerce in the instant review.[29] We concluded that, in sum, "Citribel did not cite any case in which a company's conversion costs were evaluated on a quarterly basis instead of an annualized basis or where Commerce relied upon reported quarterly

---

[24] *See* Citribel's Case Brief at 9.
[25] *Id.* at 11-14.
[26] *See Final Results* IDM at Comment 1 (page 9) (citing *Yarn from Thailand* IDM at Comment 14).
[27] *Id.* (page 10) (citing *Habas Sinai,* 361 F.Supp.3d at 1327, and *Whirlpool Corp. v. United States*, 37 CIT 1755 (December 26, 2013)).
[28] *Id.*
[29] *Id.* (page 10-11).

cost information where that information otherwise did not satisfy the criteria to consider employing the alternative quarterly cost methodology" and "Citribel does not sufficiently explain why Commerce should treat Citribel differently from similarly situated companies for which we evaluated conversion costs on an annualized basis."[30]  Thus, consistent with precedent and practice, we evaluated the change in Citribel's COM with respect to direct materials averaged on a quarterly basis and conversion costs averaged on a period-wide basis.  Subsequently, we determined that the alternative cost methodology based on quarterly cost-averaging periods was not warranted.

## III.   REMAND OPINION AND ORDER

In litigation, Citribel identified Commerce's decision to continue to use the period-wide weighted-average conversion costs in the significance test as ripe for judgment on the agency's record on the basis that the underlying determination was distortive and otherwise unsupported by the record.  The *Remand Order* made three findings with respect to the arguments briefed to the Court, one of which was remanded for further consideration.

First, the Court addressed Citribel's arguments that Commerce's use of period-wide conversion costs directly contradicts the statutory language dictating the method of calculating the cost of production under section 773(b)(1) and (3) of the Act, as this approach does not account for any change in those expenses, and thus contravenes the statute because that practice conflicts with the goal of obtaining the most accurate dumping margins possible.  The Court disagreed with Citribel, noting that the statute does not prescribe a specific time period over which cost of production must be calculated, and, thus, Commerce has the discretion to average conversion costs on a period-wide basis, even if it averages material inputs on a quarterly basis.[31]

---

[30] *Id.* (page 11).
[31] *See Remand Order* at 11 (citing *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F.Supp.2d 1230, 1235 (CIT 2011)).

The Court next addressed Citribel's argument that Commerce's request that the respondent resubmit its analysis demonstrating the change in the COM of each of the five CONNUMs with the largest volume sold in each market to reflect period-wide averages for conversion costs, without explaining the rationale for this request, meaningfully deprived the company of the opportunity to make effective arguments against that approach. The Court disagreed, noting that, contrary to its argument, Citribel indeed had a meaningful opportunity to make effective arguments against the agency's policy of using period-wide average conversion costs.[32]

Finally, the Court addressed Citribel's arguments that Commerce failed to substantively address its argument that period-wide average conversion costs yielded a distortive result contrary to the facts on the record, pointing to record evidence purporting to show an actual increase in conversion costs rather than reporting fluctuations that Commerce's annualization practice assumes when it uses period-wide averaging periods. The Court contrasts Commerce's conclusion that Citribel failed to support the argument that the standard cost methodology leads to a distortive result with the specific record evidence provided by Citribel that purports to show that "*this* period of review – punctuated as it was by the geopolitical and economic earthquake of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices – was anything *but* normal, at least for certain of its expenses."[33] The Court noted that Commerce's practice of using period-wide average conversion costs is merely a means to the end of avoiding distorted margin calculations, but not an end in itself that overrides the statute's directive to "achieve a fair comparison" between normal value and export price.[34] The Court concluded that the *Final Results* failed to contend with the "considerable evidence"

---

[32] *Id.* at 13.

[33] *Id.*

[34] *Id.* at 14 (citing section 773(a) of the Act; and *Shandong Huarong Gen. Corp. v. United States*, 159 F.Supp.2d 714, 719 (CIT 2001)).

Citribel provided in support of its argument that "following this approach on these peculiar facts is distortive because of the extraordinary rise in at least certain conversion costs (*e.g.*, natural gas and electricity) during the period of review," and impermissibly "dismissed {Citribel's arguments} without any analysis or discussion of the company's evidence."[35]  The Court thus remanded the *Final Results* and directed Commerce to consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results.[36]

## IV.    ANALYSIS

Citribel's conversion costs are reported into three broad cost categories:  direct labor costs (DIRLAB), fixed overhead costs (FOH), and variable overhead costs (VOH).[37]  The cost reporting further breaks down the reporting of VOH into three distinct categories:  VOH – Energy (consisting of distinct electricity and natural gas costs), VOH - Maintenance (consisting of separate building and materials maintenance cost subcategories), and VOH - Other (which includes the [        ] VOH cost item subcategory, Other Goods and Services (Common), and the [        ] VOH cost subcategory, subcontracting (Solution Products)).[38]  The Court remanded for Commerce to consider whether the record evidence provided regarding the "peculiar facts" regarding the "extraordinary rise" in conversion costs submitted to the record renders Commerce's determination to rely on period-wide averages of these costs in employing the threshold significance test to be distortive.[39]

The "peculiar facts" referenced by the Court which underly Citribel's arguments consist of references to significantly increased demand for energy and supply chain disruptions

---

[35] *Id.* at 15.
[36] *Id.*
[37] *See, e.g.*, Citribel's 2SDQR at Exhibits 2SD-4.4 and 2SD-24.
[38] *Id.* at Exhibit 2SD-24.
[39] *See Remand Order* at 15.

stemming from the post-pandemic economic recovery, which resulted in countries in Europe, including Belgium, to begin to experience significant inflation by the start of 2022, which was exacerbated by the Russian invasion of Ukraine in late February 2022 (particularly in the context of energy prices). To support its argument, Citribel submitted two news articles noting high rates of inflation in the Eurozone at the end of 2021 and the disruptive effects that the impending Russian invasion was inflicting on European energy markets on the eve of the invasion in February 2022.[40] As further support for the impact of these events in the Belgian market *writ large*, Citribel provides Eurostat price reports which substantiate the rise in the price of consumer goods, electricity, and natural gas from July 2021 through June 2022, as well as the labor index in Belgium in the same period.[41]

As an initial matter, though references to the evidence purportedly overlooked in Commerce's *Final Results* imply that the record is "considerable" in this regard, these references consist of a single news article regarding increasing inflation rates in the Eurozone and a single news article regarding increasing inflationary pressures that the pending invasion was putting on energy markets.[42] While this information is sufficient to establish the basic facts (that no party would contest) that inflationary pressures were increasing in Europe and the Russian invasion impacted energy prices, generally, the record support in this regard was by no means substantive

---

[40] *See* Citribel's SDQR at Exhibits SD-1.2 (U.S. News article, "Nations Using Euro See Record Inflation. What Does It Mean?," dated January 7, 2022, reflecting Eurozone average inflation of 4.9 and 5 percent in November and December 2021, respectively, and noting energy costs increasing 26 percent in 2021 over 2020) and SD-2.2 (Time article, "Energy Prices Surge Amid Ukraine Crisis," dated February 22, 2022, reflecting the additional pressures of the pending Russian invasion of Ukraine exerted on European energy markets, with natural gas prices rising approximately 13 percent).

[41] *Id.* at Exhibits SD-1.1 (Eurostat harmonized index of consumer prices, in support of general inflation in the Belgian market during the period), SD-2.1 (Eurostat natural gas price data reflecting an increase of the average Euro per KwH price of natural gas from .0325 in the second half of 2021 to 0.0485 in the first half of 2022 for Belgian non-household customers), SD-3 (Eurostat electricity price data reflecting an increase of the average Euro per KwH price of electricity from 0.1035 in the second half of 2021 to 0.1581 in the first half of 2022 for Belgian non-household customers), and SD-4 (Eurostat labor cost index data, reflecting Belgian labor cost index values in Q3 and Q4 of 2021 and Q1 and Q2 of 2022, reflecting the percentage change compared to same period in previous year and the index value increasing through the POR from 1.1 in Q3 2021, 2.2 in Q4 2021, 4.5 in Q1 2022, and 5.3 in Q2 of 2002).

[42] *Id.* at Exhibits SD-1.2 and SD-2.2.

in detailing the geopolitical and macroeconomic events referenced, nor in any way specific to the impacts of these events on producers in Belgium or Citribel's sector, much less comprehensive in providing a clear link between those events and the potential impacts on Citribel's specific conversion cost items (aside from mention of general impacts of inflationary pressures and specific effects on natural gas and electricity prices in the latter article).

The additional support regarding the impact of these larger macroeconomic and geopolitical events consists of official European Union EUROSTAT price data for broad-based consumer goods, natural gas, and energy price reports and labor indices for all member countries (with country-specific line items for each member country, including Belgium) in the period corroborates the uncontested fact that, indeed, the Belgian market was experiencing increased inflationary pressures in the period, which were exacerbated in the final quarter of the period, particularly in the energy markets, likely due to the Russian invasion of Ukraine.[43]  However, the mere existence of unexpected pressures in the greater market does not serve as sufficient evidence to conclude that Citribel's cost experience mirrored that of the greater market and that any cost increases experienced by Citribel were specifically and exclusively attributable to these factors.  This is not to deny that Citribel was impacted by the effects of the general economic environment within Belgium, including increased energy costs, which the record establishes existed in Belgium during the POR.  Nor does Commerce imply that an analysis of Citribel's cost information could not demonstrate evidence of these impacts.  However, we note merely that the record evidence at issue establishes only that greater macroeconomic and geopolitical events impacted the broader market.  Citribel's arguments take the existence of broad-market macroeconomic trends and contributing geopolitical events as *prima facie* evidence that the experience of the broader market necessarily reflects its own cost experience and applies with

---

[43] *Id.*

equivalent impact to each of its conversion costs.  Further, Citribel provides no discussion of the linkage between the events and the specific cost items reflected in Citribel's cost reconciliation, nor does Citribel provide a comparative analysis demonstrating how the period-wide averaging of Citribel's specific conversion cost elements is distortive of its cost experience during the POR or that the quarterly-averaging of Citribel's specific conversion cost elements appropriately accounts for the impacts of the greater macroeconomic and geopolitical events.  Additionally, Citribel provided no information or analysis which attempts to identify or quantify the impact of these events on individual conversion cost elements nor does Citribel attempt to distinguish increases attributable to these factors with increases attributable to the erratic nature in which these expenses are typically incurred throughout the period of review, which underlies Commerce's practice in preferring period-wide cost averaging periods.  Instead, Citribel merely relied on the existence of generalized inflation in the Belgian market exacerbated by the impact of Russia's invasion of Ukraine on energy prices on its own as a basis for its conclusion that the existing analysis is necessarily distortive.

Commerce acknowledges that the *Final Results* did not contain a discussion of the record evidence submitted by Citribel, which establishes the existence of macroeconomic and geopolitical events which impacted the broader market during the period, and thus the Court correctly faults the *Final Results* for failure to contend with this evidence directly in stating that "Citribel's argument fails to show that the standard methodology was 'unreasonable' and failed to provide such record evidence."  However, we respectfully submit that the broader conclusion remains intact:  Citribel failed to demonstrate how the standard cost methodology of using period-wide average conversion costs led to a distortive result.  Specifically, Citribel failed to provide any discussion or evidence regarding the impact of these macroeconomic and geopolitical events on the specific conversion costs in question, nor demonstrate how the

quarterly averaging remedied this distortive effect by demonstrably accounting for these factors. The onus is on the respondent to establish a sufficient basis to compel Commerce to deviate from the standard cost methodology and to demonstrate that the application thereof is distortive beyond the conclusion that the alternative cost methodology was not warranted. Upon redetermination, we have re-examined the evidence identified by the Court and maintain that Citribel did not meet its own burden of demonstrating how the underlying analysis was distortive of its own cost experience during the period.

Regardless, Commerce has reconsidered the record as directed by the Court with respect to the conversion costs reported. We note that the *Remand Order* specifically identifies the natural gas and electricity expenses ("geopolitical and economic earthquake of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices"… "extraordinary rise in at least certain conversion costs (*e.g.*, natural gas and electricity)"),[44] as most apt for reconsideration based on the record. As discussed above, the record evidence regarding the geopolitical and macroeconomic events reflects that the Russian invasion of Ukraine had a significant upward impact on prices in energy markets in Europe and the market average price reports demonstrate that natural gas prices rose approximately 50 percent during the POR.[45] However, a review of Citribel's own summary of quarterly cost reporting does not substantiate the presumption underlying Citribel's arguments that its energy cost experience comported with that of the Belgian market *writ large* during the period.[46]

Specifically, Citribel's reported total production quantities remained [

---

[44] *See Remand Order* at 13 and 15.
[45] *See* Citribel's SDQR at Exhibits SD-1.2, SD-2.1, and SD-2.2.
[46] *See* Citribel's 2SDQR at Exhibits 2SD-4.4 and 2SD-24.

].[47]  Citribel's associated gas and

electricity costs were also [


] but, notably,

[


], as would be the

expectation based on the underlying information provided regarding the impacts of the Russian

invasion of Ukraine on energy price increases during the POR.[48]  While the [

] is consistent with the information provided regarding

the impact of the Russian invasion, the [


], where

the cost impact of the invasion would be expected to be most acutely felt (as it occurred just prior

to the end of the third quarter), does not substantiate that Citribel's energy cost experience in the

period was consistent with the 50 percent natural gas and electricity cost increases experienced in

the Belgian market overall from the beginning to the end of the POR.[49]  Further, Citribel's

narrative that energy price impacts experienced in the European market during the period are

implicitly applicable to its cost experience and, thus, period-wide averages of its conversion

costs is distortive of its experience are further complicated by the fact that Citribel reports [

].[50]

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

Pursuant to the Court's *Remand Order*, we have reevaluated the record with regard to the conversion costs, specifically Citribel's costs for natural gas and electricity.[51]  We note that the underlying arguments and *the Remand Order* explicitly single out energy costs as particularly impacted by the underlying events, and the documentation provided regarding the impact of the Russian invasion reflects the most direct support for the impact of specific events on any single item of conversion costs.  Further, given the direct correlation between energy consumption and production discussed above, Citribel's consumption of energy may be specifically distinguished from other conversion costs for the purposes of this case-specific analysis.  Thus, in consideration of the Court's directive, we have re-evaluated and determined it appropriate to consider the natural gas and electricity costs as part of the material inputs, and have recalculated COM for each of the five control numbers with the largest volume of sales in the home and U.S. markets to use quarterly cost averages for the VOH – Energy cost component (in addition to the quarterly cost averages for direct materials considered in the *Final Results* analysis).[52]

Upon recalculation of the COM analysis reflecting VOH – Energy quarterly average costs, we have reexamined our analysis of the threshold significance prong of the quarterly cost test.  In doing so, we note that the results of this revised analysis demonstrate that the COM change between the high and low quarters is below the 25 percent threshold for the majority of CONNUMs and therefore continues to not support deviating from the standard cost methodology.[53]

In terms of the remaining conversion cost components – Direct Labor, VOH Maintenance, VOH Other, and Fixed Overhead , these types of expenses, as discussed above, are recorded at different rates from month to month throughout the period.  As explained in, *e.g.*,

---

[51] *See Remand Order* at 15-16.
[52] *See* Attachment 1.
[53] *Id*.

*Yarn from Thailand*, bonuses, insurance costs, depreciation, repairs and maintenance, energy costs, *etc.* may be recorded at different rates from month to month throughout a given period; however, using a period-wide average for these costs normalizes these costs over the entire POR. Additionally, while significant changes in direct material costs are unexpected and may trigger a more rapid price change response, for conversion costs, it is normal for these costs to be incurred sporadically throughout the POR. As such, we consider period-wide weighted-average conversion costs to better reflect a normalized cost of production to use in the dumping analysis, regardless of whether we use the standard cost methodology based on period-wide cost-averaging periods or the alternative cost methodology based on quarterly cost-averaging periods.[54] We reaffirm that Citribel's other conversion costs should continue to be reflected on a period-wide average basis.

Furthermore, the documentation which establishes the macroeconomic and geopolitical events which impacted costs in the larger market makes no direct reference to the impact of these events on the specific costs in question, save for the general inference that rising inflation necessarily impacts all costs in a market. The existence of inflation in a market may be accounted for based on a separate analysis (high inflation methodology), as discussed below. Whether the level of inflation in the market meets the established threshold to consider implementing the high inflation methodology is distinct and separate from the consideration of the quarterly cost methodology.

As noted in the *Final Results*, Commerce has established a distinct high inflation methodology, distinguished from the alternative cost methodology, which accounts for changes in all prices or costs as measured in an given inflation index when inflation exceeds 25 percent

---

[54] *Id.*; *see also, e.g.*, *CWP from Türkiye* IDM at Comment 8.

during the period in the exporting country.[55]  In fact, when there is high inflation in the exporting

country, Commerce modifies the quarterly cost test to account for high inflation such that the

comparison of quarterly COMs excludes the impact of inflation on a respondent's costs of

production.[56]  Citribel acknowledged in the underlying review that the POR Belgian inflation

rate was not sufficient to apply this methodology.[57]  Notably, Citribel did not request that

Commerce modify the thresholds for implementation of the high inflation methodology, instead

requesting only that Commerce consider inflation as a reason for Commerce to deviate from its

practice and to include conversion costs on a quarterly basis in its analysis to determine whether

to use the alternative cost methodology.  When Commerce finds that inflation is distorting its

dumping analysis, *i.e.*, when "high inflation" is present, the high inflation methodology does not

change the cost-averaging periods, but indexes the respondent's monthly costs to calculate

average cost of production which is then indexed to each month during the period, independent

of whether the standard cost methodology or the alternative cost methodology is applied.[58]

However, Citribel conflates these two situations, and effectively insisted that Commerce

consider changing the cost-averaging period because of inflation.

Setting aside that Citribel did not provide sufficient information to justify its request (as

discussed above), fails to recognize that Citribel's insistence on use of quarterly averaged

conversion costs does not merely reflect a request to modify the alternative cost methodology;

rather, it is tantamount to an insistence that Commerce redefine the scope of the alternative cost

methodology to expand it beyond its established purpose to address significant price changes in

---

[55] *See Final Results* IDM at Comment 1, pages 7 and 9-11.
[56] *See Raw Honey from Argentina:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22179 (April 14, 2022) (*Honey from Argentina*), and accompanying IDM at Comment 2.
[57] *See* Citribel's Section A Questionnaire Response, dated October 11, 2022, at 21.
[58] *See Honey from Argentina* IDM at 16 ("Separate from the determination of the appropriate cost averaging period, Commerce may need to account for high inflation.").

the direct material inputs used to produce subject merchandise.  Citribel provides no rationale to justify the contention that the mere existence of higher-than-expected levels of inflation in the greater market alone are sufficient basis to expand the scope of the alternative cost methodology beyond the bounds of its intended purpose to address circumstances where there are significant price changes in the materials used to produce subject merchandise, and the record contains no information or analysis which allows for further scrutiny regarding the impact of the macroeconomic and geopolitical events in question to Citribel's specific cost experience in the period.  Thus, we continue to find no basis to consider Citribel's quarterly averaging of the remaining conversion costs in the COM analysis with respect to the significance threshold of the quarterly cost analysis.

Although we have reaffirmed the reasoning for our longstanding practice that conversion costs, in general, are more accurately accounted for on a period-wide average basis, for purposes of fully complying with the Court's *Remand Order*,[59] we have discussed each of the remaining conversion cost elements, below:

*Fixed Overheads (FOH)* - There is no information on the record which establishes that an increase in the price of consumer goods, labor, or energy attributable to inflation in the greater market directly impacts Citribel's fixed overheads (which consists entirely of depreciation costs). Moreover, Citribel's quarterly cost summary reflects that this expense remained [

], which does not support the conclusion that this conversion cost was particularly impacted by macroeconomic trends or that use of the a period-wide average was distortive.[60]

---

[59] *See* Remand Order at 15-16.
[60] *See* Citribel's 2SDQR at Exhibit 2SD-24.

*Direct Labor (DIRLAB)* - While the record information provided substantiates that the Belgian labor cost index increased during the POR, the record does not provide further context to determine what a rise in the index from 1.1 in the first quarter of the POR to 5.3 in the final quarter for Belgium's industry means in terms of Citribel's specific labor cost experience, much less demonstrate whether the nature of the production process and structure of Citribel's labor contracts are such that the firm is particularly sensitive to labor trends in the greater market or protected against them so as to give the index probative value. Citribel's quarterly cost reporting shows that labor expenses were [



], which fails to establish a direct or implicit connection between the Belgian labor index and Citribel's labor cost experience and thus fails to support the assertion that the use of period-wide average labor costs was distortive.[61]

*Building and Materials Maintenance Variable Overheads (VOH – Maintenance)* – Maintenance overhead components reflect the conversion cost variables which experienced the [

], but do not reflect the [                                    ] which would otherwise be expected if solely attributable to the information on the record regarding higher-than-expected inflation ([



]).[62] In fact, this volatility thus supports that the use of

---

[61] *Id.*
[62] *Id.*

the period-wide averaging for VOH -Maintenance is appropriate and not distortive, as maintenance costs are typically incurred erratically on an as needed basis or scheduled during periods of lower usage and increased downtime; by their very nature, such costs are precisely the types of expenses which underly the logic of maintaining period-wide averages to smooth for the erratic incursion of such costs over the course of a period.

*Other Goods and Services/Subcontracting Variable Overheads* (VOH – Other):  Other variable overheads reflect a broad basket of various operational expenses, some presumably fixed over time and/or inured from market trends while others presumably sensitive to them. Citribel, however, makes no attempt to identify or distinguish specific increases to specific causal sources, instead effectively arguing that Commerce should simply presume that any increase in this broad basket of costs is solely attributable to the higher-than-expected level of inflation in the Belgian market *writ large* without any discussion of the specific cost elements. Moreover, Citribel's reported quarterly cost summary does not support the conclusion that these expenses were so impacted by steadily increasing inflation through the POR so as to render the period-wide average distortive.  Per unit quarterly cost averages were [

].[63]  Thus, regardless of the impacts of inflation experienced by the individual elements of this broad basket of expenses, the per unit "other" VOH costs were [

], and there is no evidence which establishes that the smoothing effect achieved by period-wide average cost (primarily impacting the [          ]) was

---

[63] *Id.*

22

distortive, as there is no information discussing the nature of the underlying costs, much less

establishing that costs in [                    ] were impacted by factors other than simply the

erratically incurred and recorded nature of such costs.

In sum, upon re-examination of the record evidence identified by the Court and

reconsideration consistent with the Court's *Remand Order*, Commerce continues to find that

period-wide averaging of the non-energy conversion costs continues to be supported by the

record and does not lead to distortive results.  Whereas we have recalculated the COM build-up

used to determine whether the quarterly cost change satisfies the 25 percent threshold to include

quarterly averages for VOH – Energy components of COM in order to fulsomely address the

Court's concerns, the change in total COM from high to low quarter of the POR does not pass

the 25 percent threshold for five of the seven CONNUMs with sales in either market, and thus

fails to demonstrate that an alternative cost methodology is appropriate in this review.[64]

## V.    INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on December 22, 2025, in which it

provided interested parties the opportunity to submit comment for consideration in these final

results of redetermination.[65]  Citribel and the petitioners[66] submitted timely comments on the

Draft Redetermination on January 9, 2026. [67]  The petitioner indicated support for the Draft

Redetermination, concluding that "Commerce correctly declined to apply the alternative

quarterly cost methodology… {n}o changes should be made in the Final Results of

Redetermination."[68]  In providing substantive comment in opposition to the findings in the Draft

---

[64] *See* Attachment 1.
[65] *See* Draft Results of Redetermination Pursuant to Court Remand, *Citribel NV v. United States*, Court No. 24-00010, Slip Op. 25-110 (CIT August 22, 2025), issued December 22, 2025 (Draft Redetermination)
[66] The petitioners in the underlying proceeding are: Archer Daniels Midland Company, Cargill, Incorporated, and Primary Products Ingredients Americas LLC, (collectively, the petitioners).
[67] *See* Citribel's Letter, "Citribel NV's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated January 9, 2026 (Citribel's Comments); and Petitioners' Letter, "Petitioners' Comments On Draft Results Of Redetermination," dated January 9, 2026 (Petitioners' Comments).
[68] *See* Petitioners' Comments at 5.

Redetermination, Citribel asserts that: (1) Commerce must determine whether Citribel experienced an actual increase in conversion costs, rather than mere reporting fluctuations; (2) Commerce failed to review record evidence showing actual increases in Citribel's conversion costs; (3) Commerce failed to examine the impact of declining production volume on per-unit conversion costs; and (4) Commerce must reopen the record if it examines conversion costs on an expense-specific basis.[69]

After considering these comments, we disagree with Citribel that the Draft Redetermination fails to address the issue remanded by the Court and do not find that the conclusions proposed are compelled by the record. Thus, we have made no changes to the Draft Redetermination. We summarize and address parties' comments below.

***Petitioners' Comments***

The following reflects the verbatim executive summary of arguments submitted by the petitioners. *See* Petitioners' Comments at 1-2. For further details, *see* Petitioners' Comments at 2-5.

> Commerce correctly determined not to apply a quarterly cost methodology. There is no dispute in this case that Commerce's established criteria for determining whether a quarterly cost methodology is appropriate involves evaluating quarterly changes in direct material costs (DIRMAT) only. Conversion costs, *i.e.*, direct labor (DIRLAB), variable overhead (VOH), and fixed overhead (FOH), are generally based on annual averages, regardless of whether Commerce uses the normal cost method or the alternative quarterly cost method. Petitioners agree with Commerce that Citribel failed to demonstrate that volatility in energy costs (a subcomponent of VOH) purportedly resulting from abnormal geopolitical events during the review period necessitated a departure from that methodology.

> Petitioners further agree that, even if the methodology were revised to capture both DIRMAT and energy costs on a quarterly basis, the threshold for applying quarterly costs still would not be met. Even looking at changes in quarterly VOH Energy (in addition to DIRMAT) costs, a majority of CONNUMs sold in the U.S. and home markets do not show the required cost change exceeding 25 percent.

> Finally, Petitioners agree that there is no reason to examine quarterly changes with respect to other cost components, such as DIRLAB, FOH, or other (nonenergy) subcomponents of VOH. Citribel has not shown that annualizing those particular

---

[69] *See*, generally, Citribel's Comments.

costs is distortive.  Moreover, the Court remanded for Commerce to reconsider potential distortion only with respect to "certain" costs – namely, the natural gas and electricity costs in VOH Energy.  Accordingly, no changes should be made in the Final Results.

**Commerce's Position:**  The petitioners note general agreement with the reasoning laid out in the Draft Redetermination and support Commerce's conclusion to continue to decline to apply the alternative quarterly cost methodology.  As discussed below, we disagree with Citribel's arguments that an alternative conclusion is compelled by the record and the Court's directive and have made no changes to the Draft Redetermination.  Therefore, given the petitioners' general agreement with the conclusions reached in the Draft Redetermination and absence of identification of any issue otherwise with the analysis provided therein, there are no substantive issues in Petitioners' Comments which require further consideration.

*Citribel's Comments*

Citribel identifies four distinct issues which are separately summarized and addressed below.  However, Citribel's first and second comments that the Court directed Commerce to reconsider whether the record shows that Citribel experienced an actual increase in conversion costs during the POR and that Commerce should review the evidence which reflects that Citribel experienced such cost increases (both of which fault the Draft Redetermination for imposing conditions not identified by the Court regarding Citribel's ability to attribute cost changes to specific events and demonstrate linkage between those events and individual cost elements remanded), effectively reflect a single primary argument.  As such, we have grouped these two comments as a single issue, Issue 1, below.

**Issue 1:    Whether Commerce Properly Considered The Record In Consideration Of The Court's Directive And Applied The Correct Standard Of Review**

*Comment 1:    Whether Commerce Must Determine Whether Citribel Experienced An Actual Increase In Conversion Costs, Rather Than Mere Reporting Fluctuations*

The following reflects the verbatim executive summary of arguments submitted by Citribel. *See* Citribel's Comments at 1-2. For further details, *see* Citribel's Comments at 7-10.

> The Court remanded this matter because Commerce failed to substantively address Citribel's argument that annualizing conversion costs yielded a distortive result on the facts of this review. The Court held that Commerce must consider Citribel's various conversion expenses and determine whether annualization of some or all of them produces distorted results. The Court emphasized that annualization of conversion costs is merely a means to avoid distortion, not an objective in itself, and that Commerce must consider whether annualization produced a distortive result in light of Citribel's actual cost experience.

> In the Draft Redetermination, Commerce continues to treat annualization as the default methodology. Rather than determining whether Citribel experienced an actual increase in conversion costs during the period of review, Commerce frames its analysis around whether Citribel attributed its cost experience to specific macroeconomic or geopolitical events, demonstrated linkage between those events and particular cost elements, or satisfied thresholds associated with Commerce's inflation methodologies. That approach does not address the inquiry directed by the Court on remand.

> The Court made clear that annualization is not presumptively controlling and must yield where record evidence shows that normalization itself produces distortion. By presuming the appropriateness of annualization and requiring Citribel to disprove that presumption through additional evidentiary showings not imposed by the Court, Commerce does not comply with the remand instructions.

*Comment 2:    Whether Commerce Failed To Review Record Evidence Showing Actual Increases In Citribel's Conversion Costs*

The following reflects the verbatim executive summary of arguments submitted by Citribel. *See* Citribel's Comments at 2-3. For further details, *see* Citribel's Comments at 10-12.

> The Court found that Citribel placed considerable evidence on the record demonstrating that annualization of conversion costs on these facts led to a distortive result, and that Commerce dismissed that evidence with a conclusory statement. The Draft Redetermination repeats that error.

> The record contains direct evidence showing that Citribel experienced actual increases in conversion costs during the period of review, including Citribel's quarterly and semiannual profit and loss statements. Those accounting records, together with production data, demonstrate significant per-unit cost increases

across multiple conversion cost categories, including direct labor, variable overhead, and fixed overhead, and not solely natural gas and electricity.

In the Draft Redetermination, Commerce focuses primarily on energy costs and continues to rely on period-wide averages for the remaining conversion costs. Commerce discounts Citribel's financial evidence by characterizing macroeconomic and geopolitical developments as insufficiently linked to specific cost items and by faulting Citribel for not attributing each cost increase to a discrete event. The Court did not require such attribution. The relevant inquiry is whether the record shows that Citribel experienced actual increases in conversion costs during the period of review, not whether Citribel traced those increases to particular external causes.

**Commerce's Position:** Citribel's comments interpret the single statement made by the Court in discussing the information for which Commerce failed to contend, "{Citribel} points to record evidence that it says shows an actual increase in conversion costs rather than reporting fluctuations that the Department's annualization policy assumes,"[70] as support for its own conclusion that evidence of an increase in conversion costs during the POR is a sufficient basis, on its own, to undermine the presumption that such increases may be attributable to fluctuations.[71] According to Citribel, emphasis Commerce otherwise placed on the record evidence regarding underlying macroeconomic and geopolitical events and Belgian-market statistics and their linkage to conversion costs in the Draft Redetermination presumes a standard of analysis not directed by the Court and, by focusing on this information, and not whether the record reflects an "actual" increase in conversion costs, the Draft Redetermination fails to comply with the *Remand Order*.[72]

---

[70] *See Remand Order* at 13.
[71] *See* Citribel's Comments at 7-10 ("{The} inquiry necessarily turns on whether the costs at issue merely fluctuated without any meaningful trend or instead actually increased during the period of reviews… By failing to assess whether Citribel's conversion costs increased in fact during the period of review, Commerce does not meaningfully address whether annualization serves its stated purpose of avoiding distortion."). *Id.* at 9.
[72] *Id.* at 10-12 ("The relevant inquiry is whether the record shows that Citribel experienced actual increases in conversion costs during the period of review, not whether Citribel traced those increases to particular external causes."). *Id.* at 11.

27

Commerce disagrees with Citribel's interpretation. The *Remand Order* does not direct Commerce to perform a requisite analysis to focus, primarily or exclusively, on "whether Citribel's conversion costs increased" as the sole determinative factor, and Commerce maintains that the focus on the record supporting the causal factors and their linkage to the conversion cost data in the context of considering whether the use of period-wide average conversion costs was distortive is fully consistent with the Court's directive. The Court does not identify specific evidence necessary for further consideration, Citribel's quarterly cost data or otherwise, to establish cost increases to be "actual"[73] such that the presumption of fluctuations or erratic incursion should not apply, much less remand to solely consider this evidence. Rather, the Court generally references record information that "{Citribel} says shows" an actual increase in conversion costs.[74] The Court was otherwise clear that the information remanded for further consideration concerned information which "showed that *this* period of review— punctuated as it was by the geopolitical and economic earthquake of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices, was anything *but* normal, at least for certain of its expenses."[75] The Court faulted Commerce for failing to fully consider where Citribel identified "record evidence, that following this approach on these peculiar facts is distortive because of the extraordinary rise in at least certain conversion costs (*e.g.*, natural gas and electricity) during the period of review,"[76] and noting that "Perhaps Citribel incurred some or most of its conversion costs erratically, as the Department's practice assumes. But that is no reason to normalize other such costs that the company demonstrates were not so

---

[73] This term is not defined by either Citribel or the Court. In context, Commerce interprets "actual" increase in cost to mean is an increase which, on its face or based on supporting information provided, indicates is not erratically incurred or for which information on the record otherwise indicates or suggests that the annual averaging thereof is distortive.

[74] *See Remand Order* at 13.

[75] *Id*.

[76] *Id.* at 15.

incurred and where normalization would produce distorted results."[77]  Thus, we do not find that the primary focus of the *Remand Order* was merely for Commerce to establish whether Citribel experienced an increase in conversion costs and consider this a sufficient basis on its own to conclude that such changes are "actual."[78]  Rather, the Court plainly identified the focus of necessary reconsideration to be information which specifically demonstrates that the presumption that conversion costs are incurred erratically should not apply to some or all such expenses and which speaks to the distortive nature of period-wide averaging, explicitly identifying the information establishing the geopolitical and macroeconomic events and accompanying price reports as applicable in this context.[79]  While this necessarily requires a consideration of whether the trends exhibited in the company's cost data comport with the information otherwise provided to establish that increases should not be attributable to normal fluctuations presumed by the standard practice (and application thereof distortive), the Court does not suggest that the mere existence of an increase (or decrease) in conversion costs are to be the sole concern of the redetermination, as Citribel contends.

---

[77] *Id.*

[78] Throughout its comments, Citribel identifies confirmation that its conversion cost components increased as sufficient to resolve the central issue of litigation.  If mere evidence of an increase at a point in the period were sufficient to resolve the inquiry, remand would not be necessary:  the record plainly supports the general observation that conversion costs increased or decreased, and no party contests this fact.  However, the mere fact that a cost may increase in one quarter of a period compared to a prior quarter is common and not unexpected.  Whether the record reflects cost increases or decreases, whether overall or on a per unit basis, has no inherent probative value to the central question that the Court did remand, *i.e.*, whether record evidence suggests that the period-wide averaging was distortive in the context of whether the information establishes that the presumption applied to conversion costs regarding erratic incursion should not be applied.  The Court's concern is not one of "if," but of "whether" and "why," and resolution of the issue must necessarily address more than a simple confirmation that costs have increased.  We address Citribel's arguments as presented, which fail to further define the term "actual," provide a theoretical basis to explain how evidence that a cost increase, standing alone, compels the conclusion that period-wide averaging of that cost is distortive, or identify a pattern or threshold amount of increase which would be probative.  However, because mere evidence of cost increases absent any other context cannot reasonably resolve the issue, we interpret Citribel's references to "increase in cost" in context to indicate that Citribel is identifying that an analysis of an amount of increase within the costs over the period suggest that the cost is not incurred erratically or subject to the fluctuations which the practice of period-wide averaging presumes, and further address the argument in this context.

[79] While not necessarily limited to this information, the *Remand Order* does not identify or otherwise imply other information on the record as ripe for consideration.  Notably, other than the emphasis on the increases in costs reflected in the cost data itself, Citribel does not point to other record information it identifies as relevant to the Court's concerns or its own arguments which the Draft Redetermination did not appropriately consider.

This is precisely the analysis that Commerce provided in the Draft Redetermination.[80] Citribel, however, dismisses the analysis of specific conversion cost trends based on the record, as establishing a not previously defined standard of analysis which continues to treat normalization as presumptively controlling unless rebutted by additional evidence that go beyond the inquiry the Court required on remand (*i.e.*, Citribel's ability to attribute cost changes to specific events and, demonstrate linkage between those events and individual cost elements).[81] Period-wide averaging of conversion costs indeed reflects the "default" practice for the reasons discussed at length in the *Final Results* and above. Notably, in both the *Final Results* and the instant remand segment, Citribel does not contest the reasonability of the conceptual basis for the presumption underlying Commerce's standard practice of using period-wide averaging for conversion costs or the application of the practice as the "default" in normal circumstances. Rather, Citribel argued that modification of this framework is appropriate *in this specific situation* due to purported distortions which arise from the application of the default presumption evidenced by *specific cost trends which arose from specific events* in this review period.[82] As

---

[80] *See* Draft Redetermination, provided verbatim in the "Analysis" section, above.

[81] *See* Citribel's Comments at 8.

[82] *See* Citribel's Case Brief at 6 ("The record shows that Citribel experienced significant changes in its total COM during the POR. Citribel has explained that these changes are attributable to inflation caused by post-pandemic economic recovery and Russian invasion of Ukraine. During the POR, the inflation rate in Belgium increased from 1.4% to 10.5. The prices of natural gas and electricity increased by 50%. The labor cost index increased from 1.1 to 5.3. Energy, labor, service and consumables are all conversion costs that are impacted by inflation. Inflation also decreases production level which increases fixed overheads." (Citations to the specific record evidence discussed in the Draft Redetermination omitted)). Citribel thus identifies consideration of the record evidence regarding macroeconomic and geopolitical events as essential to its request for Commerce to depart from its standard cost methodology. *See also*, *id.* at 9 ("The record demonstrates that Citribel's conversion costs have increased significantly during the POR. The changes were much more than monthly fluctuations requiring "normalization." While Commerce prefers 'normalized' data for conversion costs, it may not disregard significant cost changes due to macroeconomic conditions… Citribel demonstrated that significant inflationary economic conditions existed during the POR that impacted Citribel's total COM. The resulting changes in Citribel's COM were far too significant to be considered erratically incurring expenses requiring normalization."). This belies Citribel's claims that the information discussed in the Draft Redetermination as "background information explaining why the period of review was not characterized by ordinary or stable cost conditions" and not intended to "establish a causal attribution between discrete external events and specific conversion cost items" (Citribel's Comments at 11). Notably, nowhere in Citribel's Case Brief does it assert that the cost changes themselves, independent of consideration of macroeconomic factors, demonstrate that they are inherently not attributable to fluctuation or erratic incursion. At best, Citribel establishes that some portion of the increase may be attributable to inflation, but this does not itself rebut the presumption that some portion of the increase (and, in the particular context of the threshold

such, Citribel's reference to "additional evidentiary requirements not identified by the Court" is confounding, as this was the precise evidence Citribel cited as the basis for its own argument.[83] To even reach the question of whether modification to a default methodology is warranted given purported distortions which arise due to specific factors in a given situation, Commerce necessarily requires that substantial evidence be provided to establish that the underlying factors were present, that the distortions alleged were reasonably attributable to these factors, and that the distortions purported are actual and reflected in the respondent's books and records. These are not arbitrary additional requirements which exceed the framework of what the Court identifies in this specific review for this specific methodology, but rather the minimum requirements necessary for consideration of any request to deviate from standard practice and necessarily reflect the information identified by the Court for further consideration.

Regardless, Citribel identifies the record information which it believes Commerce has critically ignored and which it purports to demonstrate distortion, specifically, "quarterly and semiannual statements {and production records which} show that conversion costs increased across multiple cost categories, including direct labor, variable overhead, and fixed overhead, and not solely natural gas and electricity."[84] It is unclear how Citribel reaches this conclusion, considering that Commerce did, in fact, meaningfully engage with this precise information by providing an analysis of the cost information for each conversion cost element in the Draft Redetermination (as reflected in the "Analysis" section above), and Citribel provides no

---

TOTCOM test, the percentage difference between the month of highest and lowest cost) remains attributable to fluctuation. At no point, however, does Citribel propose an alternative which would allow for Commerce to account for the impact of inflation while maintaining its standard presumption, nor control for the different rates of inflation experienced between the high and low quarters.

[83] *See* Citribel's SDQR at 2-4 and Exhibits SD-1.1 through SD-4 (containing two news articles regarding the increasing inflation in the POR and the impact of the impending Russian invasion on European markets, Eurostat official price reports reflecting Belgian price averages/indexes for consumer goods, electricity, natural gas, and labor during the period).

[84] *See* Citribel's Comments at 10, citing to Citribel's SSDQR at Exhibits 2SD-1.1 to 2SD-5.

substantive rebuttal to the analysis or conclusions included therein.[85]  Citribel does not provide

further insight into specific deficiencies in the analysis provided in the Draft Redetermination

with respect to the specific information it deems critical, nor does it elaborate on the specific

trends of increase or decrease which substantiate that the existing framework is distortive.

Notably, Citribel does not identify any further evidence on the record not previously

identified or discussed which the Draft Redetermination failed to address (*e.g.*, no analysis of

cost trends exhibited by the quarterly cost data in support of its contention that period-wide

averaging of the costs is inherently distortive, discussion of sub-account detail on the record

which provides insight into specific transactions included in conversion cost categories which

demonstrate they are not erratically incurred, additional factual information regarding the greater

macroeconomic climate or cost pressures in Citribel's sector, *etc*.).  As addressed in the *Final

Results* and Draft Redetermination, Citribel cites no precedent where Commerce has found the

existence of increasing or decreasing conversion costs, trends of changes in costs, or overall

inflation as a sufficient basis to overturn the presumption that such costs are erratically incurred

and subject to fluctuation, contrasted with numerous examples Commerce referenced

establishing that the standard presumption is well-established and reasonable, including one

example (recent as of the time of the *Final Results*) where Commerce continued to implement

the presumption and standard cost methodology upon consideration of similar arguments to those

forwarded by Citribel in the instant review.[86]  Citribel identifies no evidence that reflects that its

cost circumstances in this review were materially different from those considered in *Yarn from

Thailand*, and provides no comparative analysis of its costs and changes thereto relative to trends

observable in more "normal" periods (such as prior reviews) which could be probative of claims

---

[85] *See* Draft Redetermination at 20-23, also provided above in the "Analysis" section.
[86] *See Yarn from Thailand* IDM at Comment 14.

regarding the peculiar circumstances of this POR.  Indeed, aside from the disruption in the

energy market which impacted the entire market (*i.e.*, the issues identified were not unique to the

respondent and it makes no claims that it was disproportionately impacted by the challenges

experienced by all firms) and inflation, which as Commerce explained above is otherwise

accounted for in its dumping analysis, the record contains no evidence or argument identifying

further events or abnormalities which uniquely impacted the company's cost experience in the

period to support that it was abnormal or peculiar so as to compel reconsideration of the

application of the standard cost methodology.[87]

  Citribel thus identifies no record information for which the Draft Redetermination failed

to address and dismisses the analysis of actual price data, which it deems critical, for its failure to

find that increases or decreases in price are exclusively determinative of distortion.  Citribel

purports that this conclusion is required as a matter of course, unaccompanied by any discussion

of how the existence of price changes (or, at best, trends of sustained change) provide insight

into the nature of the costs so as to resolve whether these changes may be attributable to erratic

incursion or normal fluctuation, as presumed, or reflect frequent expenses, normally incurred at

---

[87] Indeed, the Board of Directors Annual Report accompanying the completion of the 2021 Financial Statements (covering only the first half of the period, but [

].

the same rate, or which otherwise suggest that period-wide averaging thereof would be distortive.  This premise assumes the truth of Citribel's preferred conclusion:  period-wide averaging of conversion costs which increased or decreased during the period is distortive because the costs simply changed, which renders them distortive.  However, as stated previously, the existence of changes in costs alone has no probative value to the central issue of whether period-wide averaging of per unit conversion costs is distortive.  Even presuming some trend of changes in cost would be a sufficient standard to support this conclusion (which Commerce insists it should not, absent any further support from the record establishing the "regular" nature of underlying expenses), Citribel fails to identify how patterns of changes would be probative, generally, to the question of whether the averaging distorted the results of the test (which must consider the relative change in the context of the high and low quarters ultimately compared), nor how the patterns exhibited in this review, in fact, rebut the presumption of erratic incursion for these types of costs.

Citribel had the opportunity to demonstrate precisely how the trends reflected in its cost data plainly support the distortive nature of period-wide averaging in response to the Draft Redetermination, as it purports, but again, it did not avail itself of the opportunity to do so. Instead, Citribel insists that Commerce engage with information to determine whether it supports its own conclusion, inferring that this was the specific action directed by the Court.  Setting aside that Commerce has meaningfully contended with the evidence referenced by the Court, including an analysis of the conversion cost data, we disagree that it is further incumbent on Commerce to review Citribel's conversion cost data under a framework which presumes Citribel's conclusions to be correct (with which Commerce did not agree and the Court did not direct) to determine whether its conclusion is supported.  The Court directed Commerce to examine the record with respect to the "company's evidence" that suggests the period-wide averaging of conversion costs

was distortive or evidence of "costs that the company demonstrates were not so {erratically} incurred." Citribel cites no such evidence and identifies no specific conversion cost increase for which the pattern of increase in the period is self-evident as to compel the conclusion that the period-wide averaging thereof is unequivocally distortive. The remand proceeding is not a vehicle for Citribel to cure deficiencies in its underlying request, much less shift that burden onto the agency.

    As a result, there is no information on the record from which Commerce can determine whether an increase or decrease in a specific per unit conversion cost may be attributable to a normal fluctuation or an "actual" change. We again emphasize that the burden is on the party requesting application of an alternative practice or presumption underlying a default methodology to demonstrate that the standard practice is distortive and that the alternative proposed appropriately remedies said issue. As Citribel did not satisfy its burden to rebut the presumption, Commerce contends that no further analysis of the information (including even that discussed in the Draft Redetermination) is necessary to resolve the central issue on remand. Nevertheless, we note that an examination of the quarterly conversion cost data under the framework proposed by Citribel where a sustained pattern of increase during the period is sufficient to compel the conclusion that period-wide averaging of specific conversion cost components is distortive and quarterly costs should instead be used– does not materially impact the results As discussed in the Analysis section above, Commerce finds that Citribel's other conversion costs did not exhibit significant fluctuations from one quarter to another during the period, and there is no other record information which might support an argument that changes in Citribel's other conversion costs were impacted by outside factors relevant to consideration of application of the alternative cost methodology. However, it would not be unusual to see Citribel's other conversion costs exhibit fluctuations from one quarter to another during the POR

due to the nature of the expenses included in these types of costs, which should be absorbed by all of the quarters. For example, higher repairs and maintenance expenses that are incurred in quarter one should be absorbed by the production during all of the quarters of the period as they are not tied to the specific production and sales during quarter one.

In particular, there are no trends of changes which suggest that an application of the standard cost methodology in averaging period-wide non-energy VOH expenses was distortive. Rather, to the extent that the trends could be used to impute any such conclusion, they suggest that costs did not uniformly and progressively increase through the period, the difference between high and low quarter may reflect fluctuations not attributable to "actual" increase, and the normalization of outlying quarters is not inherently distortive. Therefore, regarding Citribel's own framework where the evidence of conversion cost increases alone is sufficient to impute whether or not the standard cost methodology would apply, there is no basis to conclude that the cost difference shown in one quarter of the period is not reflective of normal fluctuation or the erratically incurred nature of such expenses (which, for maintenance and common operating overheads are, by their nature, the most conceptually connected to the presumption).

**Issue 3:** **Whether Commerce Failed To Examine The Impact Of Declining Production Volume On Per-Unit Conversion Costs**

The following reflects the verbatim executive summary of arguments submitted by Citribel. *See* Citribel's Comments at 3-4. For further details, *see* Citribel's Comments at 12-14.

> Commerce's analysis of whether conversion costs increased during the period of review necessarily depends on an examination of per-unit costs. Conversion costs are incurred in relation to production volume, and changes in production volume directly affect per-unit conversion costs. Where production declines, per-unit conversion costs increase even if total amounts remain unchanged.

> The record shows that Citribel's production volume declined significantly in the latter part of the period of review, resulting in higher per-unit conversion costs. In response to Commerce's questionnaire, Citribel explained that reduced production volume led to higher per-unit labor, variable overhead, and fixed overhead costs. This statement reflects factual information regarding the relationship between conversion costs and production volume.

By not examining this factual evidence in assessing whether conversion costs increased during the period, Commerce did not fully address whether annualization masked actual cost increases reflected in the record. The Draft Redetermination therefore does not comply with the Court's instruction to evaluate whether annualization produced distortive results in light of Citribel's actual cost experience.

**Commerce's Position:** Citribel argues that Commerce did not consider that the record reflects that its production volume decreased in the latter half of the review period, which resulted in higher per-unit conversion costs, and Commerce did not fully address this production decrease in examining whether period-wide averaging masked "actual" conversion cost increases during the period.[88] However, the Draft Redetermination indeed considered production volume, plainly discussed production trends and noted a decrease in the latter portion of the period, which - as the denominator of the per unit cost averages – were fulsomely considered in its analysis of each conversion cost component provided in the Draft Redetermination, reflected in the "Analysis" section above. Citribel may disagree with the framework of Commerce's analysis and the conclusions drawn,[89] but it is simply incorrect to state that Commerce did not consider the production volume decrease in its Draft Redetermination.

Citribel argues that, just as Commerce did not appropriately address the role of increasing overall conversion costs (the numerator of per unit conversion costs), discussed above, it did not address the impact of decreasing production volume (the denominator) in considering whether period-wide averaging masked "actual" per unit cost increases.[90] As an initial matter, as discussed above, Citribel's argument here relies upon the same nebulous term "actual cost increases" and circular logic wherein the decrease in production output (like the increase to overall costs) is self-evident of distortion on the sole basis of the fact that they result in a higher

---

[88] *See* Citribel's Comments at 12-14.
[89] Though, notably, did not provide substantive rebuttal to the Draft Redetermination analysis of specific conversion cost components.
[90] *Id.*

per unit conversion cost. The unassailable mathematical fact that per unit costs will increase, even where fixed, when output declines does not reflect sufficient evidence in itself, to compel Commerce to disregard the presumption that the conversion costs, categorically, are generally incurred erratically throughout the period of review. Decline in production output, on its own and without any further context regarding the underlying reason for any decline, offers no probative value to resolve the central issue of distortion remanded by the Court. Indeed, where production output fluctuates in a subset of the period such that it reflects an outlier compared to the stability exhibited in the remainder of the period, and costs remain stable, this is precisely the scenario which conceptually supports the presumption that period-wide averaging is necessary to avoid distortions caused by ordinary fluctuation. As previously noted, the presumption identifies that, for example, repair and maintenance costs may be recorded at irregular intervals during the year, such as when production equipment is down and fixed costs, such as depreciation and (to a large extent) labor, also can vary erratically on a per-unit basis when the quarterly production volumes to which they are allocated change. In other words, it is illogical to expect that per unit conversion costs do not change, *i.e.*, fluctuate, over the course of a period of review.

As with the cost increases and decreases discussed above, the central issue is not whether production decreased, but whether the record substantiates that the changes in per unit costs was attributable to factors other than those identified as the basis for the presumption (*i.e.*, in the specific context of production output, that production decreases were attributable to abnormal circumstances in this review and not normal fluctuations and suggest against the application of the standard presumption). The record offers no such information. The articles regarding the macroeconomic and geopolitical factors during the POR do not reference impacts on production output generally in the Belgian market. Citribel cites no discussion or comparative analysis of its production levels by quarter in prior reviews to establish a baseline for what its "normal"

production levels are to demonstrate that the decrease referenced in the latter half of its review was unusual and inconsistent with normal expectations or fluctuations.  Citribel cites no evidence of labor issues, unexpected maintenance, canceled contracts, *etc.* which purport to establish abnormal circumstances and link them to a decrease in output.  Aside from a reference to a statement regarding the smaller scale of economy impacting the efficiency of labor and variable overheads in 2022, and a broad reference to its cost data which reflect this decline in production (which the analysis provided in the Draft Redetermination indeed considered), Citribel cites no record evidence for which Commerce failed to contend regarding the impact of decreased production at the end of the period, effectively contending that the decrease in production output reflected in its cost data is sufficient to substantiate that the presumption underlying the practice to use period-wide average conversion cost data is distortive.

As with the discussion of Citribel's arguments regarding cost increases in Issue 1, above, Citribel fails to identify a decrease in production output during the period is, on its own, probative to the question of whether period-wide averaging of per unit costs was inherently distortive, and we find Citribel's reasoning insufficient to compel further reconsideration. Nevertheless, we have reviewed the cost information to determine whether any evidence of change supports Citribel's claims regarding potential distortion.

While Citribel's overall production [

].[91]  [

---

[91] *See* 2SDQR at Exhibit 2SD-4.8 Cost Summary (Quarterly).

].[92]  The overall trend (in production overall and on a CONNUM-specific basis) simply reflects that production was stable for the first three quarters of the period and notably decreased in the fourth quarter, but with no information to support whether that period of decreased production was attributable to normal fluctuation or a direct result of peculiar circumstances in the review.  As noted in Issue 1 above, absent evidence or analysis otherwise supporting the inapplicability of the presumption, a decrease in production in a single outlying quarter is not probative of the central question of distortion.

**Issue 4:     Whether Commerce Must Reopen The Record If It Examines Conversion Costs On An Expense-Specific Basis**

The following reflects the verbatim executive summary of arguments submitted by Citribel. *See* Citribel's Comments at 4-5.  For further details, *see* Citribel's Comments at 14-16.

> While the Court permitted Commerce to consider whether annualization of some or all conversion costs produced distortive results, the manner in which Commerce conducts that inquiry must remain consistent with the framework under which the record was developed.  Prior to the Court's decision, Commerce's established practice was to treat conversion costs categorically, normalizing them based on their classification as conversion costs rather than examining individual cost components separately.

> In the underlying review, Citribel sought a categorical determination that conversion costs should not be normalized under the specific facts of this review. Citribel identified natural gas and electricity as examples because those expenses were among the most significantly affected during the period of review and illustrated why annualization could be distortive.  Citribel did not request that

---

[92] *Id.*

Commerce disaggregate conversion costs or apply different methodologies to different conversion cost components.

If Commerce elects, on remand, to depart from its prior categorical approach and instead examine individual conversion cost components separately, fundamental principles of administrative fairness require that Citribel be afforded a meaningful opportunity to participate. Commerce must clearly identify the information required to support an expense-specific analysis and reopen the record to permit submission of responsive information. Commerce cannot reasonably rely on a record developed under a categorical framework to sustain an expense-by-expense analysis without providing notice and an opportunity to respond.

**Commerce's Position:** As an initial matter, we agree with Citribel that Commerce's established practice in applying the quarterly cost methodology is to treat conversion costs categorically and normalize those costs by using period-wide averages rather than examining individual conversion cost components separately. Commerce maintains this practice, and affirms the general application of the presumption that conversion costs are incurred erratically throughout the period of review and that period-wide averaging is necessary to avoid distortions caused by ordinary fluctuation. The consideration of distinct conversion expenses in the analysis provided above is not reflective of a departure from Commerce's practice of treating these expenses categorically for the purposes of the quarterly cost methodology. Rather, the discussion of the record with respect to constituent conversion cost components and disaggregation of VOH-Energy costs is provided for the purposes of this redetermination to address the explicit directive of the Court.

Specifically, the Court directed Commerce to consider "record evidence that it says shows an actual increase in conversion costs rather than reporting fluctuations,"[93] "evidence {Citribel provided to the record which} showed that *this* period of review – punctuated as it was by the geopolitical and economic earthquake of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices, was anything *but*

---

[93] *See Remand Order* at 13.

normal, at least for certain of its expenses,"[94] and evidence the Court characterizes as "considerable" in support of arguments that "following this approach on these peculiar facts is distortive because of the extraordinary rise in at least certain conversion costs (*e.g.*, natural gas and electricity) during the period of review,"[95] and explicitly remanding because "{Commerce} dismissed that contention without any analysis or discussion of the company's evidence."[96] The Court does not contemplate, much less direct, the reopening of the record. The *Remand Order* plainly instructs Commerce to reexamine the existing record which it characterizes as "considerable" in terms of the information purportedly overlooked, suggesting that the Court considers the existing record sufficient and no reopening of the record necessary to resolve the fundamental issues raised.

The discussion of the record support in the context of specific conversion costs is directly responsive to the Court's directive. To the extent that reconsideration of this evidence resulted in revising the averaging of certain costs for purposes of the cost significance test with respect to any component of the conversion costs does not reflect a greater change to Commerce's practice or presumptions, but rather a fulsome attempt to address the Court's concerns. Specifically, the Court concludes by plainly stating that "the agency must consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results" further noting that "Perhaps Citribel incurred some or most of its conversion costs erratically, as the Department's practice assumes. But that is no reason to annualize other such costs that the company demonstrates were not so incurred and where normalization would produce distorted results."[97] Thus, the Court clearly identified as necessary a discussion of the record evidence regarding certain conversion costs and contemplated a result

---

[94] *Id.*
[95] *Id.* at 15.
[96] *Id.*
[97] *Id.* at 15, footnote 10.

wherein the component conversion costs would be disaggregated, evaluated based on the existing record evidence, and potentially averaged on a different basis. The Court did not imply that the existing record was insufficient for these purposes nor that re-opening the record may be necessary. The mere fact that re-evaluation of the record in consideration of the Court's concerns requires an examination of record evidence for specific components of the conversion costs and resulted in the disaggregation of the conversion costs treated categorically in Commerce's standard practice does not serve as sufficient justification to compel re-opening of the record not contemplated by the Court.

Citribel thus misconstrues Commerce's examination of individual conversion cost components as a departure from the prior categorical approach rather than what it plainly is, a response to the specific concerns highlighted and directed by the Court. Regardless, even if Citribel were correct that Commerce's approach in the Draft Redetermination reflected a departure from a prior approach in examining conversion costs categorically in favor of narrowing that decision to specific components not otherwise compelled by the *Remand Order*, it is unclear why this would justify reopening of the record in this specific context. Where Commerce applies a standard period-wide averaging presumption regarding a certain class of costs, generally, it does not necessarily follow that Commerce's focus in evaluating whether sufficient information has been provided to rebut the presumption must exclusively focus on whether the general presumption remains supported and is precluded from evaluating the applicability of that information to the component costs to which they are applicable and considering them independently based on this analysis when compelled to do so in response to the Court. Whereas Commerce's practice is indeed to treat these conversion costs categorically in its standard practice, evaluation of a request to disregard the underlying presumption to the entire category and applied categorically would necessarily examine whether the totality of

43

circumstances (*i.e.*, whether the balance of all information provided for each component category) suggested for the determination to disregard the presumption categorically upon the balance of evidence provided for all parts of the whole. Thus, regardless of whether the framework of the decision is applied individually or categorically, Commerce would necessarily evaluate whether sufficient evidence is provided to support the inapplicability or distortive nature of the presumption for each component expense. Therefore, Citribel's claim that the expectation that mere examples supporting a finding for the entire category would be sufficient, and that Commerce's reconsideration and application of its findings to individual components reflects a previously unknowable change in practice which violates the fundamental principles of administrative fairness is unconvincing.

Citribel's request that Commerce disregard its standard presumption regarding period-wide averaging of conversion costs, whether considered categorically or specifically, reflects a somewhat novel request, as evidenced by the dearth of analogous case precedent cited in its own arguments. This fact belies the suggestion that Commerce somehow moved the goalposts such that Citribel is obliged an additional opportunity to build the record in support of its request; such goalposts simply do not exist in the first place and, as stated throughout, it is incumbent on the requesting party, not Commerce, to build the record to unambiguously support the conclusion it desires, regardless of the framework applied in making that determination. That Commerce requires sufficient and compelling factual information be provided by the requesting party to rebut all relevant aspects of a categorical presumption is an obvious and fundamental standard and one which Citribel had a meaningful opportunity to address. As discussed above, the remand proceeding should not provide an opportunity for Citrabel to cure the deficiencies in its request, particularly where Citribel, and the Court, identify the existing record as "considerable" to sufficiently resolve the central issue on remand.

## VI.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we revisited our quarterly cost analysis for Citribel to determine whether to deviate from the standard cost methodology based on period-wide weighted-average costs of production, and resort to an alternative cost methodology based on quarterly weighted-average costs of production.  As a result, we revised our analysis to include quarterly average natural gas and electricity costs in the quarterly cost analysis, while continuing to rely on period-wide averages for all other conversion costs.  As discussed above, the result of the amended quarterly cost analysis, inclusive of natural gas and electricity costs on a quarterly basis, remains unchanged as the change in COM for the majority of CONNUMs sold in both markets fail to exceed the 25 percent threshold.  Accordingly, we continue to rely upon the standard cost methodology based on period-wide weighted-average costs of production, and Citribel's weighted-average dumping margin remains unchanged at 9.13 percent.


2/3/2026

X _Chris ʃ Abbott_

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

ATTACHMENT

Revised Analysis Regarding Change in COM

*Contains BPI – BPI Contained in Brackets Not Included in Public Version*

| CONNUM | PERIOD | PRODQTY | DIRMAT | BYPROD | DIRLAB | VOH Energy | VOH Maintenance & Other | VOH Other | FOH | TOTCOM | TOTCOM Change (High-Low/Low) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Quarterly | Quarterly | POR-Average | Quarterly | POR-Average | POR-Average | POR-Average | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**SOURCE:**

| | |
|---|---|
| Exhibit 2SD-1.2 COP Database (Quarterly) | Quarterly Per-Unit DIRMAT and By-Product |
| Exhibit 2SD-4.10 | POR Average of VOH Maintenance & Other and VOH Other |
| Revised Cost Summary Worksheet | Quarterly Per-Unit of VOH Energy |
| Exhibit 2SD-1.1. COP Database (POR Average) | POR Average Per-Unit of Labor and FOH |