**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| CITRIBEL N.V.,<br><br>       *Plaintiff,*<br><br>    v.<br><br>UNITED STATES,<br><br>       *Defendant,*<br><br>    and<br><br>ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC,<br><br>       *Defendant-Intervenors.* | Court No. 24-00010 |

**PLAINTIFF'S COMMENTS IN OPPOSITION TO FINAL RESULTS OF REDETERMINATION**

Daniel J. Cannistra
Pierce J. Lee
Weronika Bukowski
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Citribel N.V.*

May 26, 2026

TABLE OF CONTENTS

**INTRODUCTION** ................................................................................1

**SUMMARY OF ARGUMENT** ...........................................................1

**STANDARD OF REVIEW** .................................................................8

**ARGUMENT** .......................................................................................8

  **I. The Remand Redetermination is Inconsistent with the
  Court's Order.** ...............................................................................8

   1.  Commerce Failed to Consider Evidence Submitted by Citribel......9

   2.  Commerce's Focus on a "Causal Link" Is Improper .....................12

   3.  Citribel's Cost Data Shows an Actual Increase in Conversion Costs
    ......................................................................................................17

  **II.     Commerce's Expense-Specific Assessment Requires
  that it Re-Open the Record** ........................................................20

  **III.  Commerce Failed to Examine Evidence Regarding the
    Impact of Production Volume on Per-Unit Conversion
    Cost** .............................................................................................23

**CONCLUSION** ...................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AG der Dillinger Huttenwerke v. United States, 28 CIT 94,*
*106 (2004)* ........................................................................ 8

*Citribel N.V. v. United States,* Ct. No. 24-10, 2025 WL
2427193 (Ct. Int'l Trade Aug. 22, 2025)..................................... passim

*NMB Sing. Ltd. v. United States*, 28 CIT 1252, 1259-60
(2004) ........................................................................ 8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)........................................................ 8

19 U.S.C. § 1677b(a) ........................................................ 8, 9, 20

19 U.S.C. § 1677b(b) ........................................................ 1

19 U.S.C. § 1677b(b)(3)........................................................ 1

**Administrative Proceedings**

*Antidumping Methodologies for Proceedings that Involve*
*Significant Cost Changes Throughout the Period of*
*Investigation (POI)/Period of Review (POR) that May*
*Require Using Shorter Cost Averaging Periods; Request*
*for Comment*, 73 Fed. Reg. 26,364, 26,365 (May 9, 2008)................... 1

## INTRODUCTION

In accordance with Rule 56.2(h) of the Rules of the U.S. Court of International Trade, Plaintiff Citribel N.V. ("Citribel") submits these comments in opposition to the Final Results of Redetermination Pursuant to Court Remand filed by the Department of Commerce ("Commerce") on February 3, 2026. Appx1000–1045.

## SUMMARY OF ARGUMENT

Section 773(b)(1) of the Tariff Act of 1930, as amended, allows Commerce to disregard comparison-market sales made at less than the cost of production when determining normal value in certain enumerated circumstances. *See* 19 U.S.C. § 1677b(b).  In terms of the cost of production, the statute provides that it is calculated using a "period which would ordinarily permit the production" of the foreign like product." *Id.* § 1677b(b)(3).

The Department's standard methodology is to calculate period-wide weighted-average costs of production.[1] Yet, when there are significant cost changes during a period, application of a period-wide

---

[1] *See Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for Comment*, 73 Fed. Reg. 26,364, 26,365 (May 9, 2008).

1

weighted average may lead to distortions.  Therefore, Commerce uses quarterly cost-averaging periods in lieu of period-wide cost-averaging periods for addressing significant price changes in the material inputs. In determining whether to depart from its typical methodology and instead use quarterly cost-averaging periods, the Department considers:

> (1) whether the change in the cost of manufacturing ... recognized by the respondent during the {period of review} is ... greater than 25 percent ... from the high to the low quarter{ }; and (2) whether the record evidence indicates that sales made during the shorter averaging periods were reasonably linked with the {cost of manufacturing} during the same shorter averaging periods.

*Citribel N.V. v. United States*, Ct. No. 24-10, 2025 WL 2427193, at \*3 (Ct. Int'l Trade Aug. 22, 2025). However, when assessing whether the change in the cost of manufacturing is greater than 25 percent, Commerce normally calculates quarterly costs by combining its quarterly raw material costs and annualized conversion costs. Commerce's rationale for this methodology is that conversion costs are normally incurred "erratically" and may be recorded at different rates throughout a given year. *See id.* at \*2.

In the underlying review, Citribel attempted to rebut Commerce's presumption about conversion costs. Appx1029, 1101. In so arguing,

2

Citribel provided evidence supporting that its conversion costs significantly changed over the period of review. *Citribel* N.V., 2025 WL 2427193, at *6. Moreover, Citribel provided evidence of certain macroeconomic factors occurring over that time period as a plausible explanation for the cost change. *Id.* at *3. Nonetheless, Commerce ignored this evidence and applied its "standard methodology of using annual weighted-average costs based on Citribel's reported data" despite Citribel's arguments that the Department should use the quarterly conversion costs data it originally submitted. *Id.* at *2.

This Court found that Commerce's original determination was unsupported by substantial evidence and otherwise not in accordance with law and remanded with instructions to "consider Citribel's various conversion expenses and determine, whether . . . annualization of some or all of them produces distorted results." *Citribel N.V. v. United States*, Ct. No. 24-10, 2025 WL 2427193, at *6 (Ct. Int'l Trade Aug. 22, 2025). Specifically, this Court explained that Commerce failed to consider Citribel's arguments and evidence that it put forward and detailed that Citribel "put on considerable evidence and argued at length any annualization of its conversion costs . . . leads to a distortive or

3

unreasonable result." *Id.* at *6. The Court noted that, despite the considerable evidence Citribel placed on the record, the Department's response was "limited to a single conclusory sentence" and that "{h}ow and why the Department reached this conclusion is a mystery." *Id.* In sum, in its original decision, Commerce dismissed Citribel's arguments against following its practice of always annualizing conversion costs "without any analysis or discussion of Citribel's evidence." *Id.* The Court thus directed Commerce to "consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results." *Id.*

Following this Court's order, on February 3, 2026, Commerce issued its Remand Redetermination. Appx1000. In its Remand Redetermination, Commerce found that "there is insufficient information to support Citribel's claims that Commerce's decision in the *Final Results* with respect to the quarterly cost test was distortive, nor that the use of quarterly averaged costs for conversion costs in the dumping analysis is compelled based on the record." Appx1001. Notwithstanding this finding, Commerce, in order to "fully address the Court's concerns . . . revised the analysis of the changes in cost of

4

manufacture (COM) from the *Final Results* to include quarterly average costs for natural gas and electricity rather than the period-wide averages used in the Final Results, but continue{d} to use period-wide averages for the remaining conversion costs." *Id.* Thus, Commerce, for the first time in this proceeding, separated conversion costs into distinct categories for the purpose of assessing whether or not they are distortive if period-wide averages are used. *See id.*

The Remand Redetermination is unsupported by substantial evidence and otherwise contrary to law for the following reasons.

First, Commerce failed to comply with this Court's remand instructions. Importantly, in the Remand Redetermination, Commerce continued to treat annualization of conversion costs as the default methodology and assessed whether Citribel had sufficiently tied its cost experience to specific macroeconomic or geopolitical events. Appx1011–1012. This was the focus of Commerce's analysis instead of assessing whether Citribel's conversion costs increased over the period of review, as this Court ordered. *See id.*; *Citribel N.V.*, 2025 WL 2427193, at *6.

5

Second, Commerce's determination to assess conversion costs on an expense-specific basis was unsupported by substantial evidence. Commerce cannot, at this point in the proceedings, pick and choose on a cost-by-cost basis whether or not conversion costs are distortive. To the extent that Commerce wishes to do so, it must re-open the record and allow Citribel to provide information on an expense-specific basis. If Commerce elects, on remand, to depart from its prior categorical approach and instead examine individual conversion cost components separately, fundamental principles of administrative fairness require that Citribel be afforded a meaningful opportunity to participate. Commerce must clearly identify the information required to support an expense-specific analysis and reopen the record to permit submission of responsive information. Commerce cannot reasonably rely on a record developed under a categorical framework to sustain an expense-by-expense analysis without providing notice and an opportunity to respond.

Finally, Commerce's analysis of whether conversion costs increased during the period of review necessarily depends on an examination of per-unit costs. Conversion costs are incurred in relation

6

to production volume, and changes in production volume directly affect per-unit conversion costs. Where production declines, per-unit conversion costs increase even if total amounts remain unchanged.

The record shows that Citribel's production volume declined significantly in the latter part of the period of review, resulting in higher per-unit conversion costs. Appx1105–1106. In response to Commerce's questionnaire, Citribel explained that reduced production volume led to higher per-unit labor, variable overhead, and fixed overhead costs. Appx1106. This statement reflects factual information regarding the relationship between conversion costs and production volume.

By not examining this factual evidence in assessing whether conversion costs increased during the period, Commerce did not fully address whether annualization masked actual cost increases reflected in the record. The Draft Redetermination therefore does not comply with the Court's instruction to evaluate whether annualization produced distortive results in light of Citribel's actual cost experience

## STANDARD OF REVIEW

The Court reviews remand determinations for compliance with its remand order. *See NMB Sing. Ltd. v. United States*, 28 CIT 1252, 1259-60, 341 F. Supp. 2d 1327, 1333-34 (2004). Any factual findings on remand must be supported by substantial evidence, and the agency's legal determinations must be in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B); *see also, e.g., AG der Dillinger Huttenwerke v. United States*, 28 CIT 94, 106 (2004).

## ARGUMENT

### I. The Remand Redetermination is Inconsistent with the Court's Order.

As recognized by this Court, "the Tariff Act of 1930, as amended, requires Commerce to make 'a fair comparison' between the price charged by the foreign exporter to U.S. customers 'and normal value.'" *Citribel N.V. v. United States*, Ct. No. 24-10, 2025 WL 2427193, at *1 (Ct. Int'l Trade Aug. 22, 2025) (citing 19 U.S.C. § 1677b(a)). Thus, "Commerce's practice of always annualizing conversion costs is merely a means to the end of avoiding distorted cost calculations, not an end in itself that overrides the statute's directive to 'achieve a fair comparison' between normal value and export price." *Id.* at *6 (citing 19 U.S.C.

8

§ 1677b(a)).  When annualization of conversion costs is distortive,

Commerce falls short of this statutory mandate.

This Court's remand order explained that Commerce failed to

meaningfully address Citribel's arguments that record evidence shows

annualization of conversion costs was distortive for this period of

review. *Id.* at *5, 6. The Remand Redetermination fails to correct this

issue.  Indeed, in remanding to Commerce, this Court recognized that

Citribel "put on considerable evidence and argued at length why

annualization of conversion costs on these facts" would lead to a

distortive result. *Id.* at *6.  The Remand Results downplay this evidence

and impose a new causal requirement that Citribel did not have a

meaningful opportunity to respond to.

### 1.  Commerce Failed to Consider Evidence Submitted by Citribel

First, Commerce attempts to downplay the evidence that Citribel

provided in the underlying proceeding.  Commerce focuses heavily on

the fact that Citribel's evidence is limited to "two articles" discussing a

macroeconomic situation that occurred during the period of review. Appx1011.

However, as noted in Citribel's opening brief, Citribel placed the following information on the record to demonstrate a significant increase in Citribel's conversion costs, showing that annualized conversion costs would be distortive:

- Monthly bills of material.

- Semiannual and quarterly trial balances.

- Quarterly costs of manufacturing based on semi-annual and quarterly conversion costs. These costs demonstrated a significant increase in Citribel's conversion costs while normalizing monthly fluctuations.

- Monthly production quantities. The rising costs led to a smaller production volume, which resulted in higher per-unit conversion costs.

Citribel Opening Brief at 27 (July 12, 2024), ECF No. 28 (internal citations omitted). Additionally, Citribel provided the following examples illustrating its cost experience during the POR:

- Monthly breakdown of electricity and gas costs.

- The price of natural gas for Citribel has increased by 50% from the second half of 2021 to the first half of 2022. Natural gas is one of the three most significant inputs for citric acid production.

10

- The price of electricity for Citribel has increased by more than 50% from the second half of 2021 to the first half of 2022. Electricity affects Citribel's overall operational costs.

*Id.* at 26. Citribel also demonstrated that Commerce's use of the annualized conversion costs resulted in a distortive result in the cost test and margin analysis:

> In the Preliminary Results, Commerce unlawfully used Citribel's annual costs and created a serious distortion in its below-cost analysis (and therefore the margin calculations). {...}
>
> During the POR, Citribel's costs increased sharply. Citribel's prices in the earlier quarters reflect the actual costs in those quarters – not the average annual costs which were not even *known* to Citribel at the time. If Commerce uses Citribel's average annual costs, almost all of Citribel's home market sales in the earlier quarters will become "below-cost" sales even though they were made at prices above their actual costs at the time.

*Id.* at 27–28 (internal citations omitted). As plausible explanations for the significant changes in its cost experience during the period of review, Citribel provided the following circumstantial evidence:

- In 2022, most countries in Europe including Belgium started to experience significant inflation as the economic recovery from the Covid-19 pandemic increased demand for energy and disrupted global supply chains. The inflation was worsened by the Russian invasion of Ukraine.

- Belgium experienced a significant increase in inflation during the POR. The annualized inflation rate for all items

11

increased from 1.4% to 10.5%. For the energy sector, the inflation rate increased from 22.1% to 64.6%.

- The labor cost index for Belgium, which measures the change in the price businesses pay for labor, has increased by nearly five times during the POR.

*Id.* at 26 (internal citations omitted).

This Court noted in its Remand Order that Citribel "points to record evidence that says it shows an actual increase in conversion costs rather than reporting fluctuations that the Department's annualization policy assumes." *Citribel N.V.*, 2025 WL 2427193, at *5. The Remand fails to engage with this evidence; in particular, the point that Citribel's conversion costs have actually increased. Commerce instead states that an "increase in conversion costs . . . is not a sufficient basis" and focuses on whether or not Citribel has established a causal link between macroeconomic events and Citribel's costs. Appx1012–1014, 1026.

### 2. Commerce's Focus on a "Causal Link" Is Improper

Commerce attempts to sidestep this evidence in the Remand Redetermination by creating a new causation element to its analysis. Instead of focusing on Citribel's cost experience, as directed by the Court, Commerce focuses on the speculative causal link between that

cost experience and the macroeconomic factors that may have contributed to it.

The Remand Redetermination acknowledges that the information provided by Citribel "is sufficient to establish the basic facts (that no party would contest) that inflationary pressures were increasing in Europe and the Russian invasion impacted energy prices, generally." Appx1011.  However, Commerce then goes on to state that this information was not "in any way specific to the impacts of these events on producers in Belgium or Citribel's sector, much less comprehensive in providing a clear link between those events and the potential impacts on Citribel's specific conversion cost items." Appx1012.

The Court's remand does not require Commerce to determine whether specific geopolitical or macroeconomic events caused particular cost increases. *See Citribel N.V.*, 2025 WL 2427193, at *6.  The inquiry directed by the Court is whether the record shows that annualization of conversion costs produced distortive results in light of actual cost increases reflected in the record. *See id.* Whether those increases can be traced to particular external events is not dispositive of that inquiry.

13

This is reflected in the Department's standard methodology. In determining whether to depart from its typical methodology and instead use quarterly cost-averaging periods, the Department considers:

> (1) whether the change in the cost of manufacturing ... recognized by the respondent during the {period of review} is ... greater than 25 percent ... from the high to the low quarter{ }; and (2) whether the record evidence indicates that sales made during the shorter averaging periods were reasonably linked with the {cost of manufacturing} during the same shorter averaging periods.

*Id.* The test does not include any reference to a causal link between the source of the change – only that there is a significant change. When Commerce assesses whether a change is "significant" with respect to raw material costs, for instance, Commerce does not look into what the causes for those significant changes are. Commerce never asks why raw material costs went up or down during the review period in examining whether the total cost changed by more than 25%.

It is unclear why, at this point, Commerce is requiring such a link be made for conversion costs. Again, Citribel demonstrated that its conversion costs changed significantly during the review period and the change was far too significant to be dismissed as mere distortive fluctuation. Appx1103–1104. As to what might have caused the cost

change, any information provided can only be speculative and serve as background on potential causes.

Commerce treats the absence of extensive discussion of the geopolitical and macroeconomic developments as a basis for discounting Citribel's cost evidence. Appx1012–1014. By doing so, Commerce elevates background information into a substantive evidentiary requirement that the Court did not impose.

In the Remand Redetermination, Commerce argues that the primary focus of the Court's order was not "for Commerce to establish whether Citribel experienced an increase in conversion costs" but instead to make the focus of the remand to be "information which specifically demonstrates that the presumption that conversion costs are incurred erratically should not apply." Appx1028.  Even if this may be the case, the Court's opinion does not require Commerce to find a causal link between macroeconomic factors and changes to its conversion costs.  Instead, the Court instructed the Department to assess the data Citribel did put forward with respect to its conversion costs. *See Citribel N.V.*, 2025 WL 2427193, at *6. Indeed, a large cost change, in and of itself, can demonstrate that such a change is not

15

incurred erratically. Commerce discounts Citribel's financial evidence by characterizing macroeconomic and geopolitical developments as insufficiently linked to specific cost items and by faulting Citribel for not attributing each cost increase to a discrete event. The Court did not require such attribution. The relevant inquiry is whether the record shows that Citribel experienced actual increases in conversion costs during the period of review, not whether Citribel traced those increases to particular external causes. Appx1012–1014.

Citribel did place information on the record regarding broader geopolitical and macroeconomic developments during the period of review to provide context for the cost increases reflected in its financial data. That information was not submitted as an independent basis for recalculating costs, nor to establish a causal attribution between discrete external events and specific conversion cost items. Rather, it served as background information explaining why the period of review was not characterized by ordinary or stable cost conditions.

16

### 3. Citribel's Cost Data Shows an Actual Increase in Conversion Costs

Instead, Commerce should have focused its analysis on the evidence that Citribel submitted with respect to its costs.

Upon reviewing Citribel's cost data itself, it becomes clear that Citribel experienced actual increases in conversion costs during the period of review, as shown in Citribel's quarterly and semiannual profit and loss statements. Appx1095–1096 (citing to relevant financial and production information Citribel placed on the record). These accounting records, together with Citribel's production records, demonstrate significant per-unit cost increases during the period of review rather than erratic fluctuations. *See* Appx1096. Commerce cannot point to the macroeconomic narrative Citribel placed on the record as an invitation to create a new causation element, nor is it clear what evidence Commerce would believe would link Citribel's financial data to these effects beyond the data itself.

As explained in Citribel's comments to Commerce, the record "contains direct evidence showing that Citribel experienced actual increases in conversion costs during the period of review, including

17

Citribel's quarterly and semiannual profit." Appx1103. "Those accounting records, together with production data, demonstrate significant per-unit cost increases across multiple conversion cost categories, including direct labor, variable overhead, and fixed overhead, and not solely natural gas and electricity." Appx1095. This evidence therefore speaks directly to the question the Court identified on remand, which is whether annualization of conversion costs obscured actual cost increases and produced distortive results. By focusing its analysis primarily on energy costs and continuing to rely on period-wide averages for the remaining conversion costs, Commerce did not meaningfully engage with record evidence showing broader cost increases reflected in Citribel's own financial data.

In the Remand Redetermination, Commerce states that "{i}t is unclear how Citribel reaches this conclusion" regarding Citribel's accounting and production data. Appx1030. However, the record shows significant cost increases through four quarterly statements, and significant cost increases through two semiannual statements. Appx1095. If these changes were pure fluctuations, they would be less consistent.

Nonetheless, to the extent Commerce is faulting Citribel for failing to identify any additional evidence, Appx1030–1031, this is because Citribel was not given an opportunity to respond and could not anticipate the new, causal link standard the Department would adopt on remand. Indeed, it is unclear what Commerce's methodology is on remand. For instance, Commerce identifies, for the first time on remand, the suggestion of providing a comparative analysis of this period of review in prior periods to reflect materially different cost circumstances. Appx1031–1032.  This is something Citribel would have been ready and willing to do had it had the opportunity to do so, and had it been clear that this was the methodology Commerce would use. However, Citribel cannot be expected to anticipate this change in practice.

Furthermore, the Remand Redetermination also states that "Citribel cites no precedent where Commerce has found the existence of increasing or decreasing conversion costs, trends of changes in costs, or overall inflation as a sufficient basis to overturn the presumption that such costs are erratically incurred." Appx1031.  Citribel posits that this Court's remand order explains that "Commerce's practice of always

19

annualizing conversion costs is merely a means to the end of avoiding distorted cost calculations, not an end in itself that overrides the statute's directive to 'achieve a fair comparison' between normal value and export price. 19 U.S.C. § 1677b(a)." *Citribel N.V.*, 2025 WL 2427193, at *6.

## II. Commerce's Expense-Specific Assessment Requires that it Re-Open the Record

Commerce's pivot to an expense-specific analysis on remand necessitates re-opening the record in order to allow Citribel a meaningful opportunity to respond by placing additional information on the record.

Generally speaking, and as confirmed in the Remand Redetermination itself, Commerce's established practice in applying the quarterly cost methodology is to treat conversion costs categorically and normalize those costs by using period-wide averages rather than examining individual conversion cost components separately. Appx1037. That categorical treatment reflects Commerce's view that conversion costs are generally incurred erratically throughout the period of review and that annualization is necessary to avoid distortions

caused by ordinary fluctuation. Appx1037. Consistent with that approach, Commerce's analysis focused on whether conversion costs, as a category, should be annualized, not on whether particular conversion cost subcomponents warranted distinct treatment.

In the underlying proceeding, Citribel's submissions were directed toward obtaining a categorical determination that conversion costs should not be normalized under the specific facts of this review, in line with the Department's typical methodology and practice. Appx1108. Citribel argued that conversion costs "categorically" can reflect actual cost changes just like raw materials. In anticipating that Commerce would apply its usual methodology, Citribel only provided information to support this argument. Citribel did not request Commerce to carve out two exemplar costs, natural gas and electricity, from its standard annualization procedure. Had Commerce disclosed its account-specific approach, Citribel would have provided such information.

In its briefing, Citribel identified natural gas and electricity as examples because those expenses were among the most significantly affected during the period of review and most clearly illustrated why annualization of conversion costs could be distortive. Appx1108. Citribel

21

did not present natural gas and electricity as a request for Commerce to disaggregate conversion costs or to apply different methodologies to different conversion cost components. Rather, those expenses were cited as illustrative of broader conversion cost increases reflected in Citribel's cost experience. The record was therefore developed under a categorical framework, not an expense-specific one. Thus, Commerce's decision to now proceed on a conversion-expense-specific basis deprives Citribel of a meaningful opportunity to respond to this new analysis. Commerce, in essence, asked Citribel to anticipate this change in approach.

To provide a meaningful opportunity to participate, Commerce must clearly identify the information it considers necessary to support an expense-specific analysis and reopen the record to permit submission of responsive information. Commerce cannot reasonably rely on a record developed under a categorical framework to sustain an expense-by-expense analysis without providing Citribel notice of the revised approach and an opportunity to address it.

Citribel raised this issue in its comments to the Remand Redetermination. Appx1108. However, Commerce responded that this change "is not reflective of a departure from Commerce's practice of

22

treating these expenses categorically" but was to "address the explicit directive of the Court." Appx1040.  This only confirms that Commerce, in fact, departed from its typical procedure and practice.  Citribel had no way of anticipating this when it first submitted information on the record related to its conversion costs.  Indeed, if Commerce believes (as it appeared to in the Remand Redetermination), then Commerce must reopen the record because the record itself was built on a categorical approach and "addressing the explicit directive of the Court" as seen by Commerce necessarily requires reopening of the record.

In sum, Citribel did not have an opportunity to submit responsive information to Commerce, necessitating the re-opening of the record.

## III.    Commerce Failed to Examine Evidence Regarding the Impact of Production Volume on Per-Unit Conversion Cost

Commerce's analysis of whether conversion costs increased during the period of review necessarily depends on an examination of per-unit costs. In the Remand Redetermination, Commerce failed to examine the impact of declining production volume on per-unit conversion costs.

Conversion costs are incurred in relation to production volume, and changes in production volume directly affect per-unit conversion

23

costs. Where production declines, per-unit conversion costs increase even if total amounts remain unchanged. Accordingly, an examination of per-unit costs is necessary to determine whether conversion costs increased in fact and whether annualization obscured those increases.

The record shows that Citribel's production volume declined significantly in the latter part of the period of review, resulting in a significant increase in per-unit conversion costs. Appx1106. In response to Commerce's questionnaire, Citribel explained the impact of reduced production volume on its per-unit conversion costs as follows:

> Citribel's operational efficiency also fell due to the smaller scale of economy. This resulted in higher per-unit labor and variable overhead costs in 2022. Likewise, Citribel's per-unit fixed overhead costs were higher in 2022 due to the smaller production volume.

*Id*. This statement reflects factual information regarding the relationship between Citribel's conversion costs and production volume. By not examining this factual evidence in assessing whether conversion costs increased during the period, Commerce did not fully address whether annualization masked actual cost increases reflected in the record.

24

In the Remand Redetermination, Commerce argued that "{d}ecline in production output, on its own without any further context regarding the underlying reason for any decline, offers no probative value to resolve the central issue remand by the Court." Appx1037. However, Citribel provided this context. Citribel has stated that citric acid production is dependent on economies of scale and the less it produces, the per-unit cost increases. Appx1096–1097. While Commerce further attempted to categorize the changes that occurred over the period of review as "ordinary fluctuations," these were loss of economies of scale due to higher costs results in less production. Appx1037. Production volume steadily decreasing throughout the period of review cannot, by definition, be an ordinary fluctuation. Indeed, if it was "ordinary" production would eventually cease.

Finally, Commerce also claims that Citribel did not cite to any abnormal circumstances and link them to the decrease in output. Appx1037. Again, Citribel specifically identifies high prices, rising costs, and less sales as reasons for the decreases, as discussed above.

# CONCLUSION

For the foregoing reasons, the Court should find that the Remand Redetermination failed to implement the Court's remand order and were unsupported by substantial evidence and not in accordance with law.

Respectfully submitted,

*/s/ Weronika Bukowski*
Daniel J. Cannistra
Pierce J. Lee
Weronika Bukowski

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 508-8780
Email: plee@crowell.com

*Counsel for Plaintiff Citribel N.V.*

May 26, 2026

26

# CERTIFICATE OF COMPLIANCE AND NON-USE OF

# GENERATIVE ARTIFICIAL INTELLIGENCE

I hereby certify that the foregoing brief complies with the Court's supplemental briefing order in that it contains 4,503 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

I hereby certify that the foregoing brief was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts.

*/s/ Weronika Bukowski*
Weronika Bukowski

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| CITRIBEL NV,<br><br>        *Plaintiff,*<br><br>    v.<br><br>UNITED STATES,<br><br>        *Defendant,*<br><br>    and<br><br>ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC,<br><br>        *Defendant-Intervenors.* | Court No. 24-00010 |

**PROPOSED ORDER**

Upon consideration of the comments in opposition to the Remand Redetermination filed by Plainitff Citribel N.V., and upon all other papers and proceedings herein, it is hereby

ORDERED that the Final Results of Redetermination Pursuant to Court Remand (the "Remand Redetermination") of the Department of

Commerce are unsupported by substantial evidence and otherwise not in accordance with law; and it is further

ORDERED that the U.S. Department of Commerce's Remand Redetermination is remanded for further proceedings.

Dated: _____                                    _____

    New York, NY                                        Judge