UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CITRIBEL N.V., Plaintiff, | ) |
| v. | ) |
| UNITED STATES, Defendant, | ) Court No. 24-00010 |
| and | ) |
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC., Defendant-Intervenors. | ) PUBLIC Version BPI removed from pp. 12, 13, 16, 18, 19, 31 |

**DEFENDANT'S RESPONSE**
**<u>TO COMMENTS ON REMAND REDETERMINATION</u>**


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

*Attorneys for Defendant United States*

Of Counsel:

LESLIE M. LEWIS
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement &
Compliance
U.S. Department of Commerce
Washington, D.C. 20230


August 18, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

GLOSSARY OF ABBREVIATIONS ........ v

BACKGROUND ........ 2

I. Commerce's Final Results Of The 2021-2022 Administrative Review Of Antidumping Duty Order On Citric Acid From Belgium ........ 2

II. The Court Remanded The Final Results For Commerce To Address Citribel's Evidence And Argument That Annualization Of Various Conversion Costs Yields Distortive Results ........ 3

III. On Remand, Commerce Determined That Annualization Of Citribel's Non-Energy Conversion Costs Does Not Produce Distorted Results ........ 4

ARGUMENT ........ 6

I. Standard Of Review ........ 6

II. Commerce's Remand Redetermination Is Supported By Substantial Evidence And Is In Accordance With Law ........ 7

III. Commerce's Remand Redetermination Complies With the Court's Remand Order ........ 14

A. Commerce Analyzed Citribel's Evidence And Arguments Consistent With The Court's Opinion ........ 14

B. Commerce's Analysis Of Record Evidence Regarding The Presumption That Conversion Costs Are Erratically Incurred And Normally Subject To Fluctuation Is Consistent With The Court's Opinion ........ 20

C. Commerce's Analysis Of Changes In Conversion Costs During The POR Is Consistent With The Court's Opinion ....................24

D. Commerce's Consideration Of Production Volume Is Consistent With The Court's Opinion ....................29

IV. Reopening Of The Record Is Unwarranted Because Commerce's Categorical Treatment Of Conversion Costs Does Not Preclude Examination Of Individual Cost Components ....................32

CONCLUSION ....................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## STATEMENT REGARDING CONFIDENTIAL MATERIAL

The brief contains confidential material at pages 12, 13, 16, 18, 19 and 31. The material on pages 12 and 13 describes a trend. The material on page 16 describes a category. The material on page 18 describes, in order: 1) a category, 2) category, 3) effect 3) quantity, 4) effect, 5) effect and 6) time period. The material on page 19 describes 1) an effect, 2) trend, 3) effect, and 4) effect. The material on page 31 describes, in order: 1) a trend, 2) number, 3) effect, 4) time period, 5) trend, 6) time period, 7) trend, 8) trend, and 9) trend.

# TABLE OF AUTHORITIES

Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015) ........................................................ 7

*Citribel N.V. v. United States and Archer Daniels Midland Co. et al.*,
No. 24-00010, 2025 LEXIS 111, Slip Op. 25-110
(Ct. Int'l Trade Aug. 22, 2025)........................................................ passim

*Consol. Edison v. NLRB*,
305 U.S. 197 (1938)........................................................................ 7

*Crawfish Processors All. v. United States*,
483 F.3d 1358 (Fed. Cir. 2007) ........................................................ 6

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................ 6

*Mid Continent Steel & Wire, Inc. v. United States*,
586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ................................ 33, 34

Statutes

19 U.S.C. § 1677b................................................................................ 4, 7

19 U.S.C. § 1516a.................................................................................... 6

Other Authorities

*Citric Acid and Certain Citrate Salts from Belgium: Final Results of Antidumping Administrative Review; 2021-2022*,
88 Fed. Reg. 90,167 (Dep't of Commerce Dec. 29, 2023) ........................ 2

*Polyester Textured Yarn From Thailand: Final Determination*,
86 Fed. Reg. 58,883 (Dep't of Commerce Oct. 25, 2021) ...................... 26

*Stainless Steel Plate in Coils from Belgium: Final Results*,
73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) ........................ 7

*Steel Reinforcing Concrete Bar from Turkey: Final Determination*,
82 Fed. Reg. 23,192 (Dep't of Commerce May 22, 2017) ....................... 7

## GLOSSARY OF ABBREVIATIONS

- **COM:** Cost of Manufacture
- **CONNUM:** Control Number
- **DIRLAB:** Direct Labor
- **FOH:** Fixed Overhead
- **POR:** Period of Review
- **VOH:** Variable Overhead

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CITRIBEL N.V., Plaintiff, v. UNITED STATES, Defendant, and ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC., Defendant-Intervenors. | Court No. 24-00010<br>**PUBLIC** Version<br>BPI removed from pp. 12, 13, 16, 18, 19, 31 |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to comments filed by Citribel N.V. (Citribel or plaintiff), ECF No. 79, concerning the Department of Commerce's final results of redetermination filed in accordance with this Court's decision and remand order in *Citribel N.V. v. United States and Archer Daniels*

*Midland Co. et al.*, No. 24-00010, Slip Op. 25-110 (Ct. Int'l Trade Aug. 22, 2025) (*Remand Order*). *See* Final Results of Redetermination Pursuant to Court Remand, dated February 3, 2026, ECF No. 67-1 (Remand Results). The Court should sustain Commerce's remand redetermination because it complies with the remand order, is supported by substantial evidence, and otherwise in accordance with law.

## BACKGROUND

### I. Commerce's Final Results Of The 2021-2022 Administrative Review Of Antidumping Duty Order On Citric Acid From Belgium

This proceeding arises from Commerce's final results of administrative review of the antidumping duty order covering citric acid and certain citrate salts (citric acid) from Belgium, covering the July 1, 2021, to June 30, 2022, period of review. *See Citric Acid and Certain Citrate Salts from Belgium: Final Results of Antidumping Administrative Review; 2021-2022*, 88 Fed. Reg. 90,167 (Dep't of Commerce Dec. 29, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum.

Commerce selected Citribel as mandatory respondent. Although Citribel requested that quarterly cost data be used for its conversion

expenses, *i.e.*, fixed and variable overhead and labor costs, Commerce used period-wide averages consistent with its practice to annualize conversion costs. *Remand Order*, at *3-4. In the final results, Commerce applied its standard cost methodology. *Id.* at *7-8.

## II. The Court Remanded The Final Results For Commerce To Address Citribel's Evidence And Argument That Annualization Of Various Conversion Costs Yields Distortive Results

Citribel filed this action and ultimately, this Court sustained most aspects of Commerce's final results. *Remand Order*, at *10 (holding that Commerce has the discretion to calculate conversion costs on an annualized basis); and *id.* at *12 (holding that Commerce provided Citribel a meaningful opportunity to make arguments against the agency's policy of using annualized conversion costs).

However, the Court remanded a single issue. According to the Court, Commerce failed to address Citribel's evidence and argument that annualizing conversion costs yielded distortive results. *Id.* at *13-14. The Court observed that, Citribel had identified evidence which "it says shows an actual increase in conversion costs rather than reporting fluctuations that {Commerce}'s annualization policy assumes" and that "{the company}'s point" was "the geopolitical and economic earthquake

of the Russian invasion of Ukraine in February 2022, which triggered a surge in European natural gas and electricity prices, was anything but normal, at least for certain of its expenses." *Id.* at *12-13. The Court held that Commerce's practice of "always annualizing conversion costs is merely a means to an end of avoiding distorted cost calculations, not an end in itself that overrides the statute's directive to 'achieve a fair comparison' between normal value and export price." *Id.* at *14 (quoting 19 U.S.C. § 1677b(a)). The Court found that Citribel had "made the case" that annualizing conversion costs under these facts is distortive, but Commerce dismissed it without analysis or discussion. *Id.* at *14. Consequently, the Court ordered that Commerce consider Citribel's various conversion expenses and determine whether annualization of some or all of them produces distorted results. *Id.*

## III. On Remand, Commerce Determined That Annualization Of Citribel's Non-Energy Conversion Costs Does Not Produce Distorted Results

On remand, Commerce analyzed the record evidence pertaining to Citribel's conversion expenses in light of the company's arguments that annualization of such expenses yields distorted results.

In its draft results, Commerce determined that the record did not support that annualization of non-energy conversion costs (*i.e.*, DIRLAB, FOH, VOH – Maintenance, and VOH – Other) would yield distorted results and, therefore, the agency continued to use annualized non-energy conversion costs. Appx1066-1069. However, Commerce considered the significant increase in energy costs in the market writ large, and the direct correlation between energy consumption and citric acid production to distinguish Citribel's energy consumption from other conversion costs. Appx1061-1063. As such, Commerce used quarterly-cost averaging for the natural gas and electricity conversion expense (VOH – Energy). *Id.*

Even with this recalculation, however, Commerce determined that the change in total cost of manufacture (COM) from high to low quarters of the POR did not rise to a "significant change" as required for the agency to deviate from the standard cost methodology (*i.e.*, annualization). Thus, in the draft results, Commerce declined to apply the alternative cost methodology (*i.e.*, quarterly-cost averaging). Appx1069.

After consideration of Citribel's comments, on February 2, 2026, Commerce released its final results of remand redetermination. Appx1001-1045. Commerce kept in place its conclusion from the draft results, that departure from the standard cost methodology is unwarranted because, despite the revised analysis using quarterly average natural gas and electricity costs (VOH – Energy), the change in Citribel's COM for the majority of CONNUMs sold in the U.S. and home markets did not satisfy the 25 percent threshold to establish a "significant change." Appx1044.

## **ARGUMENT**

I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Crawfish Processors All. v. United States*, 483 F.3d 1358, 1361 (Fed. Cir.

2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015).

## II. Commerce's Remand Redetermination Is Supported By Substantial Evidence And Is In Accordance With Law

On remand, Commerce analyzed record evidence of Citribel's conversion expenses and determined that annualization of non-energy conversion expenses does not produce distorted results. Appx1010. The Court should sustain Commerce's remand redetermination because it is supported by substantial evidence and in accordance with law.

First, Commerce outlined its cost methodology practice. Commerce's standard cost methodology is to calculate period-wide weighted average costs of production for each product control number or CONNUM produced during the POR. Appx1001; 19 U.S.C. § 1677b(b)(3); *see also Stainless Steel Plate in Coils from Belgium: Final Results*, 73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008), and accompanying IDM at Comment 4; and *Steel Reinforcing Concrete Bar*

*from Turkey: Final Determination*, 82 Fed. Reg. 23,192 (Dep't of Commerce May 22, 2017), and accompanying IDM at Comment 2.

Commerce's alternative cost methodology uses quarterly cost-averaging to prevent distortion resulting from annualization during periods of significant cost changes in material inputs. Appx1002. In determining to deviate from the standard cost methodology, Commerce must find that: (1) the respondent's production costs (COM) significantly changed during the POR (significance test); and (2) the sales prices made during the short cost-averaging periods are reasonably linked with the COM during the same shorter cost-averaging periods. *Id.* at 3; *see also Plate from Belgium* IDM at Comment 4 and *Rebar from Türkiye* IDM at Comment 2. A "significant change" in COM is defined as a greater than 25 percent change between the high and low quarters of the POR. Appx1002; *see also Plate from Belgium* IDM at Comment 4 (explaining that the 25 percent threshold derives from International Accounting Standards and indicates that the reporting method will yield distorted results).

For the significance test, Commerce analyzes COM constructed from quarterly average costs for direct material inputs. Appx1004.

However, because conversion costs (*i.e.*, labor and variable and fixed overhead) are normally incurred erratically throughout the year, Commerce analyzes COM using annualized conversion costs regardless of whether the standard or alternative cost methodology is applied. Whereas alternative quarterly-cost averaging addresses unexpected, significant cost changes in direct material inputs, Commerce considers annualized conversion costs to better reflect normalized costs because conversion costs, *e.g.*, bonuses, insurance, depreciation, repairs and maintenance, energy, *etc.*, are normally incurred erratically, fluctuate, and may be recorded at different rates from month to month throughout the year. Appx1005.

Next, Commerce analyzed record evidence, observing that it was remanded to consider whether evidence of the "peculiar facts" regarding the "extraordinary rise" in conversion costs over the POR renders the agency's reliance on period-wide averages to be distortive. Appx1009-1010. Commerce found that Citribel's evidence of macroeconomic and geopolitical events (two news articles, Eurostat price reports, and the labor index in Belgium), establishes that Europe was experiencing inflationary pressures and the Russian invasion of Ukraine impacted

energy prices. Appx1011-1012. Nonetheless, Commerce found that the evidence does not establish an impact on Belgian citric acid producers, the citric acid sector, or Citribel's conversion costs (aside from inflation, generally, and the impact on natural gas and electricity costs). Appx1011-1012. Commerce also found that the Eurostat price data and labor indices corroborate an increased inflationary pressure in the Belgian market during the POR, particularly in the energy market, likely due to the Russian invasion of Ukraine. Appx1012. However, Commerce explained that the presence of inflationary pressure alone is insufficient to show that annualization of Citribel's conversion costs yields distorted results. Appx1012-1013.

For example, no record evidence linked the macroeconomic and geopolitical events to costs in Citribel's cost reconciliation. Nor did Citribel explain how period-wide averaging of its conversion costs is distortive of its cost experience during the POR or how quarterly-averaging either accounted for the impacts of the macroeconomic and geopolitical events or remedied the alleged distortion. *Id.* In the remand results, Commerce explained that:

> Citribel provided no information or analysis which attempts to identify or quantify the impact of the{} {macroeconomic

> and geopolitical} events on individual conversion cost elements nor does Citribel attempt to distinguish increases attributable to these factors {from} increases attributable to the erratic nature in which these expenses are typically incurred throughout the period of review, which underlies Commerce's practice in preferring period-wide cost averaging periods. Instead, Citribel merely relied on the existence of generalized inflation in the Belgian market exacerbated by the impact of Russia's invasion of Ukraine on energy prices {alone} as a basis for its conclusion that {annualization of conversion costs} is necessarily distortive.

Appx1013. As a result, Commerce determined that Citribel failed to overcome its burden to demonstrate how using period-wide averages for conversion costs led to distortive results. Appx1013-1014.

Nevertheless, Commerce also acknowledged the Court's directive to determine whether annualization of some or all of Citribel's conversion costs produces distorted results. Appx1014. Based on record evidence, Commerce found that the geopolitical and macroeconomic events had a significant upward impact on prices in European energy markets and that natural gas and electricity costs rose approximately 50 percent in Belgium during the POR. Appx1014. Upon examination of the company's quarterly cost reporting, Commerce observed that Citribel's energy cost experience did not match these broader market trends. Appx1015. However, Commerce considered the significant

upward impact to energy costs in the greater market and the direct correlation between energy consumption and citric acid production to distinguish Citribel's energy consumption from other conversion costs. Appx1016. Based on record evidence, Commerce determined to treat Citribel's natural gas and electricity costs or VOH – Energy as part of material inputs using quarterly cost averages in constructing COM. *Id.*

Commerce considered Citribel's other, non-energy conversion costs, *i.e.*, DIRLAB, FOH, VOH – Maintenance, and VOH – Other. For example, Commerce explained that record evidence does not show that Citribel's fixed overhead costs (FOH), consisting entirely of depreciation costs, were impacted by the macroeconomic and geopolitical events because the company's cost summary indicates that FOH remained [ trend ]. Appx1019. Commerce also found that Citribel's labor expenses (DIRLAB) did not correspond with the increases in the Belgian labor cost index because after [ trend ]. Appx1020.

Additionally, Commerce explained that the volatility in Citribel's building and materials maintenance variable overhead costs (VOH – Maintenance) typifies the underlying rationale for using period-wide

averages in the first place—these conversion costs are typically incurred erratically on an as needed basis or scheduled during periods of lower usage and increased downtime. By their very nature, VOH – Maintenance costs are "precisely the types of expenses which underl{ie} the logic of {} period-wide averages to smooth for the erratic incursion of such costs over the course of a period." Appx1020-1021. For other variable overhead costs (VOH – Other), which constitute a broad basket of various operational expenses, Citribel did not identify increases to specific cost elements, but the company's per unit costs were [ trend ]. Appx1021. As such, for Citribel's non-energy conversion costs, there was no record basis for Commerce to find that the smoothing effect achieved by period-wide averaging (*i.e.*, annualization) produces distortive results. Appx1019-1022.

Lastly, Commerce revised its analysis to construct COM using quarterly average costs for VOH – Energy, in addition to the quarterly cost averages for direct materials, and using period-wide averaging for the non-energy conversion costs. Appx1016; Appx1019-1022. From this recalculation, Commerce explained that the change in total COM from

high to low quarters of the POR did not pass the 25 percent threshold for five of the seven CONNUMs with sales in either the U.S. or home markets. Accordingly, substantial evidence supports Commerce's continued use of the standard cost methodology.

## III. Commerce's Remand Redetermination Complies With the Court's Remand Order

Citribel argues that Commerce failed to consider Citribel's evidence and improperly focused on a "causal link" between underlying events and the alleged distortion. Pl. Br. 8-20. Citribel's arguments do not demonstrate any failure to comply with the remand order. The Court ordered Commerce to "consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results." *Remand Order* at *14. That is precisely what Commerce did. As explained below, Citribel's claims are unsupported by the record.

### A. Commerce Analyzed Citribel's Evidence And Arguments Consistent With The Court's Opinion

Citribel argues that the remand redetermination does not comply with the Court's order because Commerce "downplay{ed}" its evidence

and failed to "meaningfully address" its arguments. Pl. Br. 9, 10-12. Citribel's claims are belied by the record.

Again, the Court ordered Commerce to "consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results." *Remand Order* at *14. The Court indicated that Commerce's reconsideration should focus on the distortive nature of period-wide averaging for the company's conversion expenses, but it did not direct a specific analysis or identify specific evidence necessary for further consideration. *Id.*; *see also* Appx1027.

During the review, Citribel argued that quarterly averages of its conversion costs should be used because period-wide averages yield distorted results given the significant cost increases in the POR caused by certain macroeconomic and geopolitical events. *See Remand Order* at *12-13. On remand, to determine whether to deviate from its standard practice of annualizing conversion costs, Commerce analyzed Citribel's arguments and evidence including two news articles; Eurostat price reports; the labor index in Belgium; the POR Belgian inflation rate; Citribel's quarterly cost summary for each of the conversion costs;

its reported production quantities; and its energy consumption, production, and [ category ]. Appx1010-1022. Commerce's approach is consistent with the Court's order and Citribel identifies no evidence which was not addressed by Commerce. Pl. Br. 9-12; *see also* Appx1031.

Furthermore, Commerce meaningfully engaged with Citribel's arguments and evidence. Appx1030-1031; Appx1010-1022. For example, with respect to Citribel's arguments regarding increased energy demand and supply chain disruptions in Europe stemming from the post-pandemic economic recovery and Russian invasion of Ukraine, Commerce outlined that:

> Citribel submitted two news articles noting high rates of inflation in the Eurozone at the end of 2021 and the disruptive effects that the impending Russian invasion was inflicting on European energy markets on the eve of the invasion in February 2022. As further support for the impact of these events in the Belgian market *writ large*, Citribel provides Eurostat price reports which substantiate the rise in the price of consumer goods, electricity, and natural gas from July 2021 through June 2022, as well as the labor index in Belgium in the same period.

Appx1010-1011. Rather than "downplay" this evidence, Commerce acknowledged that it establishes the presence of inflationary pressures and increased energy costs in Europe and Belgium during the POR. Appx1011-1012. However, Commerce also found that this evidence

does not establish the impact on Belgian citric acid producers, the citric acid sector, or Citribel's conversion costs (aside from inflation, generally, and the impact on natural gas and electricity costs). *Id.* Commerce explained that the presence of inflation alone is insufficient to show that annualization of Citribel's conversion costs yields distorted results and Citribel provided no evidentiary link between the impact of the underlying events and its own cost experience or conversion costs. Appx1012-1013.

Commerce also analyzed Citribel's arguments and evidence for conversion costs consistent with the Court's opinion. Remand Results 15-17, 20-23. For example, the Court held that Commerce must consider Citribel's various conversion costs and determine whether annualization of "some or all of them" produces distorted results. *Remand Order* at *14. The Court recognized that Citribel may have incurred some or most of its conversion costs erratically, but "that is no reason to annualize other such costs that the company demonstrates were not so incurred and where normalization would produce distorted results." *Id.* at *14 n.10. Accordingly, Commerce examined each of Citribel's conversion costs including DIRLAB (labor), FOH (fixed

overheads), VOH – Maintenance (variable overheads – building maintenance and subcontracting), VOH – Energy (natural gas and electricity) and VOH – Other. Appx1019-1022.

For VOH – Energy, upon examination of Citribel's production quantities and quarterly cost reporting, Commerce determined that Citribel's energy cost experience during the POR did not match that of the broader market, as reflected by market average price reports showing a 50 percent increase in natural gas and electricity costs in the Belgian market overall. Appx1014-1015. Commerce also observed that Citribel's reporting of [ category ] which [ effect ] a [ quantity ] in each quarter (and [ effect ] them [ time period ] of the POR) "further complicates" its claim that energy price impacts in Europe apply to the company's cost experience and, therefore, that period-wide averaging of conversion costs is distortive. Appx1015. Nevertheless, acknowledging that the record establishes a significant upward impact on energy costs in the greater market during the POR and the direct correlation between energy consumption and citric acid production, Commerce determined to treat natural gas and electricity

as material inputs, using quarterly cost averaging for VOH - Energy in constructing COM. Appx1016.

In contrast, Commerce determined that there was no record justification to depart from period-wide averaging of remaining conversion costs (non-energy conversion costs). Appx1016-1022. Again, Citribel's argument is that its conversion costs significantly increased in the POR due to abnormal circumstances, rendering period-wide averaging distortive. However, Commerce found that Citribel's evidence that the increases were abnormal (*i.e.*, not ordinary fluctuation presumed by the agency's standard practice), resulting from certain macroeconomic and geopolitical events, did not reference non-energy conversion costs. Appx1017. Further, Citribel's quarterly cost summary showed that FOH, consisting of depreciation costs, remained [ trend ], Appx1019; DIRLAB expenses [ effect ] and then [ effect ], Appx1020; VOH – Maintenance reflected maintenance expenses which are typically incurred erratically on an as needed basis, Appx1020-1021; and VOH – Other did not show expenses that were so impacted by steadily increasing inflation through the POR that the smoothing effect achieved by period-wide averaging is

distortive. Appx1021-1022. Thus, unlike for VOH – Energy, record evidence did not contradict the presumption that the conversion costs were incurred erratically and subject to ordinary fluctuation, which Commerce normalizes through period-wide averaging. Rather, because record evidence for non-energy conversion costs comported with the rationale underlying annualization, Commerce declined to depart from its standard practice. Appx1016-1017. Citribel's disagreement with Commerce's analysis of the record evidence is insufficient to demonstrate that the remand results are unsupported by substantial evidence and or not in accordance with law.

### B. Commerce's Analysis Of Record Evidence Regarding The Presumption That Conversion Costs Are Erratically Incurred And Normally Subject To Fluctuation Is Consistent With The Court's Opinion

Citribel claims that Commerce "attempts to sidestep" evidence of its cost experience and improperly "focuses on the speculative causal link between that cost experience and the macroeconomic factors that may have contributed to it." Pl. Br. 13, 12-17. As detailed above, Commerce did not "sidestep" Citribel's cost evidence, as evidenced by the 12 pages of analysis in the agency's remand redetermination. Appx1012; Appx1014-1015; Appx1019-1022, Appx1034-1035, Appx1038-

1039. Furthermore, in determining whether annualization yields distortive results, Commerce's focus on evidence which speaks to the agency's presumption that conversion costs are erratically incurred and ordinarily subject to fluctuation complies with the Court's remand order. Additionally, for the cost categories, where evidence established a significant upward impact to energy costs in the greater market during the POR and the direct correlation between energy consumption and citric acid production, Commerce determined to treat natural gas and electricity as material inputs, using quarterly cost averaging for VOH - Energy in constructing COM. In contrast, for the other cost categories (*e.g.,* depreciation, *etc.*) where evidence did not establish conditions sufficient for departing from Commerce's practice, Commerce continued to use annual cost averaging.

At the outset, Citribel correctly points out that the Court did not "require Commerce to determine whether specific geopolitical or macroeconomic events caused particular cost increases." Pl. Br. 13; *see also* Appx1027. However, according to Citribel, "{w}hether those increases can be traced to particular external events is not dispositive." Pl. Br. 13. Citribel misses the point. The Court remanded Commerce

"to consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results." *Remand Order* at *14. Annualization reflects the presumption that conversion costs are normally incurred erratically and normally subject to fluctuation, such that period-wide averaging normalizes them over the entire year. *Id.* at *13. Accordingly, the presumption may not apply when cost increases are not attributable to normal fluctuation, *i.e.*, when normalization yields distorted results. This is precisely the reason why Commerce considered whether record evidence linked the "peculiar events" and conversion cost changes: if the changes link to abnormal events, they may not reflect normal fluctuation.

Additionally, the Court identified that the focus of Commerce's reconsideration is evidence that the presumption should not apply to Citribel's conversion costs and which speaks to the distortive nature of period-wide averaging, explicitly identifying Citribel's evidence of macroeconomic and geopolitical events. Indeed, Citribel itself argued that annualization is distortive because specific macroeconomic and geopolitical abnormalities caused significant increases in its conversion

costs. Appx1027. However, as Commerce explained, evidence of increases is insufficient to overcome the presumption of ordinary fluctuation. Appx1033. The record must also support a conclusion that the increase is not owing to normal fluctuation. As such, Commerce complied with the Court's order by analyzing whether the trends in Citribel's cost data comport with the information Citribel itself provided to show that the increases are not normal fluctuations, as presumed by the agency's practice. Appx1033.

Citribel contends that Commerce "treats the absence of extensive discussion of the geopolitical and macroeconomic developments as a basis for discounting Citribel's cost evidence." Pl. Br. 15. As shown above, Commerce did not discount Citribel's cost evidence. Moreover, the existence of the geopolitical and macroeconomic events was not in dispute. Appx1059. Commerce explained that Citribel's evidence establishing the macroeconomic and geopolitical events referenced the significant upward impact on energy costs in the greater market during the POR. From examination of the cost data, Commerce determined to treat Citribel's natural gas and electricity costs as material inputs, using quarterly cost averages to calculate COM. However, this evidence

did not similarly reference impacts to non-energy conversion costs. Thus, for non-energy conversion costs, no record information supports that cost changes are not attributable to normal fluctuations. Furthermore, upon examining Citribel's quarterly conversion cost data, Commerce determined that the company's non-energy conversion costs "did not exhibit significant fluctuations from on quarter to another during the period, and there is no other record information which might support {...} that changes in Citribel's other conversion costs were impacted by {abnormal} factors." Appx1034. Thus, for non-energy conversion costs, the presumption of normal fluctuation was not rebutted with record evidence.

C. Commerce's Analysis Of Changes In Conversion Costs During The POR Is Consistent With The Court's Opinion

Citribel next argues that Commerce failed to engage with its cost data showing an "actual" increase in conversion costs. Pl. Br. 17-20. Citribel's argument is erroneous in two ways.

First, as demonstrated above, Commerce analyzed Citribel's quarterly cost data and cost increases in the remand redetermination and, where appropriate, revised its treatment of certain costs.

Second, Citribel assumes that an increase in conversion costs is sufficient to demonstrate distortion. Nothing supports Citribel's assumption. Citribel cites no authority for such a proposition nor did the Court state as much. *See* Appx1032; Appx1027-1028; *Remand Order* at *13. Instead, the Court referenced record information that "{Citribel} says shows" an increase in conversion costs and remanded Commerce to determine, whether, as the company says, annualization of some or all of them produces distorted results. *Remand Order* at *14. Increase (or, alternatively, decrease) in costs does not automatically equal distortion. Citribel's contention that the record contains "direct evidence showing that {the company} experienced actual increases in conversion costs" is unavailing; the existence of cost changes *alone* has no probative value to whether period-wide averaging of per unit conversion costs is distortive. Pl. Br. 17; *see* Appx1033. Because conversion costs are presumed to be erratically incurred and subject to fluctuation, common sense dictates that evidence of cost changes alone is insufficient to rebut the presumption.

With respect to non-energy conversion costs, Citribel provided nothing to overcome the presumption underlying Commerce's

annualization practice beyond evidence of cost changes. Citribel's view that its information "demonstrate{s} significant per-unit cost increases {…} rather than erratic fluctuations" overlooks that Commerce, the fact-finder, found that Citribel's non-energy conversion costs did not exhibit significant fluctuations from one quarter to another during the period. Appx1034; Appx1010-1022. Citribel did not rebut the agency's analysis or conclusions in this regard. Appx1031. Nor did Citribel identify how changes to its non-energy conversion costs demonstrate distortion or produce distortive results. *Id.*

In the remand results, Commerce elaborated that: Citribel provided no analysis of trends in the quarterly cost data to support its contention that period-wide averaging is distortive; no analysis of sub-accounts or specific transactions included in conversion costs to demonstrate they are not erratically incurred; and no additional information regarding the macroeconomic climate or cost pressures in Citribel's sector, *etc.* *Id.* Citribel also failed to distinguish its cost circumstances from those in cases identified by Commerce to support that the standard presumption is well-established and reasonable, including *Yarn from Thailand* where the agency applied the

presumption upon consideration of arguments similar to those made by Citribel. *Id.* (citing *Polyester Textured Yarn From Thailand: Final Determination*, 86 Fed. Reg. 58,883 (Dep't of Commerce Oct. 25, 2021), and accompanying IDM at Comment 14)). Finally, Citribel provided no comparative analysis of its conversion cost changes relative to normal periods which might have been probative. Appx1031-1032.

Citribel asserts that its evidence of cost increases "speaks directly to the question the Court identified on remand," *i.e.*, whether annualization of some or all of the conversion costs produces distorted results. Pl. Br. 18; *Remand Order* at *14. Despite Citribel's assertion, *how* the cost changes show that annualization produces purportedly distorted results for non-energy conversion costs is still a mystery that Citribel expects Commerce to solve. Rather than providing an explanation or analysis, Citribel places the onus on Commerce to ferret out some distortion, even though it is unsupported by the record. In the remand results, Commerce explained that:

> Even presuming some trend of changes in cost would be a sufficient standard to support {Citribel's} conclusion (which Commerce insists it should not, absent any further support from the record establishing the "regular" nature of underlying expenses), Citribel fails to identify how patterns of changes would be probative, generally, to the question of

> whether the averaging distorted the results of the test (which must consider the relative change in the context of the high and low quarters ultimately compared), nor how the patterns exhibited in this review, in fact, rebut the presumption of erratic incursion of these types of costs.

Appx1033.

Citribel excuses itself, claiming that it was "not given an opportunity to respond, and could not anticipate the new, causal link standard {Commerce} would adopt on remand." Pl. Br. 19. However, Commerce did not develop a new practice or causal link standard on remand. Annualization of conversion costs reflects Commerce's default practice, based on the presumption that conversion costs are incurred erratically throughout the POR and that period-wide averaging is necessary to avoid distortions caused by ordinary fluctuation. *See Rebar from Türkiye* IDM at Comment 2; *Yarn from Thailand* IDM at Comment 14.

As the movant party, it was Citribel's burden in the administrative review to provide information demonstrating why the presumption does not apply and why an alternative methodology is warranted. Additionally, even Citribel's comments on the draft results

did not provide a substantive rebuttal to Commerce's analysis or conclusions. Appx1030-1031.

It is not incumbent on Commerce to review Citribel's cost data under a framework which presumes Citribel's conclusions to be correct. Appx1033-1034. Pursuant to the Court's order, Commerce considered record evidence regarding Citribel's conversion costs and determined that there are no changes to suggest that annualizing non-energy conversion costs produces distorted results. Appx1035. To the contrary, Commerce found that Citribel's "costs did not uniformly and progressively increase throughout the period, the difference between high and low quarter{s} may reflect fluctuations not attributable to an 'actual' increase, and the normalization of outlying quarters is not inherently distortive." *Id.*

D. Commerce's Consideration Of Production Volume Is Consistent With The Court's Opinion

Citribel argues that Commerce failed to examine the impact of declining production volume on per-unit conversion costs. Pl. Br. 23. However, Commerce considered production volume, analyzed production trends, and acknowledged a decrease in production during the latter portion of the POR. Appx1036; *see also* Appx1010-1022.

Moreover, Commerce's analysis of the conversion costs factored in production volume, as it represented the denominator of the per unit cost averages. Appx1036. Citribel may disagree with Commerce's analysis, but its claim that Commerce did not address declining production volume is incorrect. Pl. Br. 23-24.

Furthermore, that per unit costs are likely to increase when production declines does not rebut the presumption that conversion costs are normally incurred erratically throughout the POR. Appx1037. "Decline in production output, on its own" and absent context regarding the underlying reason for any decline in production, "offers no probative value to resolve the central issue of distortion remanded by the Court." Appx1037. Commerce found no record evidence to support the proposition that the changes in per unit costs were attributable to abnormal circumstances, as opposed to normal fluctuations. In particular, the news articles regarding macroeconomic and geopolitical events do not reference production output; Citribel provided no analysis of its normal production levels to demonstrate that the decrease in the latter half of the review was unusual and inconsistent with normal fluctuations; and Citribel cited nothing to establish abnormal

circumstances linked to decreased production. Appx1038. Here again, Citribel presumes that the decrease in production output reflected in its cost data is sufficient to overcome the presumption underlying the annualization of conversion costs. It is not.

According to Citribel, "{p}roduction volume steadily decreasing throughout the period cannot, by definition, be an ordinary fluctuation," because "if it was 'ordinary' production would eventually cease." Pl. Br. 25. However, upon examination of the cost data, Commerce determined that Citribel's production did not [ trend ]. Appx1038-1039. In fact, Commerce found that for [ number ] CONNUMs, production [ effect ] in the [ time period ] and/or was [ trend ] with the [ time period ]. Appx1038. Furthermore, Citribel's cost information did not support the narrative that [ trend ] impacted Citribel such that conversion costs [ trend ] and production [ trend ] from the beginning to the end of the POR. Appx1039. As Commerce explained, the overall trend (in production overall and on a CONNUM-specific basis) reflects that production was stable for the first three quarters of the POR and notably decreased in the fourth quarter,

but with no information to support whether that period of decreased production was attributable to normal fluctuation. Appx1039.

## IV. Reopening Of The Record Is Unwarranted Because Commerce's Categorical Treatment Of Conversion Costs Does Not Preclude Examination Of Individual Cost Components

Citribel asserts that Commerce's "expense-specific" analysis requires "reopening of the record" to provide it a "meaningful opportunity to respond by placing additional information on the record" as Commerce's practice is to treat conversion costs categorically. Pl. Br. 20. However, as explained below, Commerce reasonably exercised its discretion not to reopen the record.

As an initial matter, Commerce's analysis is responsive to Court's remand order. Appx1040-1042. That is, the Court ordered Commerce to consider Citribel's "various conversion costs" and determine whether annualization of "some or all of them" produces distorted results. *Remand Order* at *14. According to the Court, Citribel may have incurred some or most of its conversion costs erratically, as Commerce's practice assumes, but "that is no reason to annualize other such costs that the company demonstrates were not so incurred and where normalization would produce distorted results." *Id.* at *14 n.10. As

such, the Court contemplated Commerce's consideration of individual conversion cost components.

Furthermore, although the Court ordered that Commerce consider Citribel's evidence of "various conversion costs" to determine whether annualization of "some or all" produces distortion, it did not direct that Commerce reopen the record. In fact, the Court characterized Citribel's supportive evidence as "considerable." *Id.* at 13. It was within Commerce's discretion not to reopen the record on remand. *See, e.g., Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2022) (sustaining Commerce's decision not to reopen record on remand where party had prior opportunity to submit evidence).

Citribel asserts that the company's prior submissions were "directed toward obtaining a categorical determination that conversion costs should not be normalized" and that had Commerce "disclosed its account-specific approach, {it} would have provided such information." Pl. Br. 21. However, Commerce's remand redetermination did not depart from agency practice. Appx1040-1043. That is, Commerce's categorical treatment of conversion costs did not preclude its

examination of individual cost components. Appx1042. Nothing restricts Commerce from evaluating whether record evidence supports the inapplicability of the presumption for each component expense or considering costs separately under the standard categorical approach. Appx1042. In fact, such approach offers precision. As such, there was nothing for Commerce to "disclose" before Citribel could provide the information supporting its position. Ultimately, it was Citribel's burden to demonstrate that deviation from Commerce's practice of annualizing conversion costs is warranted. During the administrative review, Citribel had an opportunity to submit all relevant information. Citribel's assertion amounts to an admission that it failed to satisfy that burden to support with sufficient record evidence its request that Commerce deviate from practice. A remand proceeding is not an opportunity for parties to supplement the record with information they were required to provide in the first instance. Appx1043; *see Mid Continent Steel & Wire*, 586 F. Supp. 3d at 1359.

**CONCLUSION**

For these reasons, this Court should sustain Commerce's remand redetermination and enter final judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K.HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

Of Counsel:

LESLIE M. LEWIS
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement &
Compliance
U.S. Department of Commerce
Washington, D.C. 20230

*Attorneys for Defendant United States*

August 18, 2026

# CERTIFICATES OF COMPLIANCE

I hereby certify, pursuant to the Court's order dated June 11, 2026 and section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 6,083 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

I hereby certify that the foregoing submission was not prepared with the assistance of any generative artificial intelligence program.

I hereby certify that the foregoing document contains 38 unique words (including numbers) marked confidential. This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

/s/ Tara K. Hogan