**Slip Op. 26-134**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

---

**Court No. 24-00010**

---

CITRIBEL NV,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

ARCHER DANIELS MIDLAND COMPANY; CARGILL, INCORPORATED; and PRIMARY PRODUCTS INGREDIENTS AMERICAS LLC,

*Defendant-Intervenors*.

---

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the Department of Commerce's redetermination.]

Dated: October 29, 2026

*Daniel J. Cannistra*, *Pierce J. Lee*, and *Weronika Bukowski*, Crowell & Moring LLP, Washington, DC, on the comments for Plaintiff.

*Tara K. Hogan*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of

Justice, Washington, DC, on the comments for Defendant. Of counsel for Defendant was *Leslie M. Lewis*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Stephen P. Vaughn* and *Daniel L. Schneiderman*, King & Spalding LLP, Washington, DC, on the comments for Defendant-Intervenors.

*Baker*, Judge: This case involving an administrative review of an antidumping duty order on citric acid from Belgium returns from a court-ordered remand. *See Citribel NV v. United States*, Slip Op. 25-110, 2025 WL 2427193 (CIT 2025) (Remand Op.).

In summary, producer Citribel challenged the Department of Commerce's calculation of its costs of production. The company objected to the "annualization" of its conversion costs[1] over the entire review period through averaging. It argued that because this approach distorted the cost of manufacturing, the agency should have instead used its alternative methodology of using quarterly calculations.[2]

---

[1] The costs of manufacturing save for raw material inputs.

[2] The Department employs "'two primary criteria' . . . to determine when to deviate from using annualized costs: '(1) the change in the [cost of manufacturing] is at least 25 percent between the high[] period and the low[] period, and (2) there is a reasonably positive correlation between the [cost of manufacturing] and the sales price.'" Remand Op. at 4–5 n.2, 2025 WL 2427193, at *2 n.2 (brackets in

(footnote continues on next page)

The court held that Commerce has discretion to always calculate conversion costs on an annualized basis and rejected the company's contention that it had no meaningful opportunity to argue against this practice. *Id.* at 11–13, 2025 WL 2427193, at **4–5. But the agency failed to explain the basis for its dismissal of Citribel's argument that annualizing such costs on this particular record led to distorted results. *Id.* at 14, 2025 WL 2427193, at *6. "How and why the Department reached this conclusion [was] a mystery." *Id.* "In layman's terms, [Commerce] didn't show its work . . . ." *Green Farms Seafood Joint Stock Co. v. United States*, Slip Op. 24-46, at 13–14, 2024 WL 1653791, at *5 (CIT 2024).

I

On remand, Commerce observed that Citribel reported three main categories of conversion costs: direct labor, fixed overhead, and variable overhead. Appx001010. Variable overhead, in turn, had three subcategories—energy (natural gas and electricity), maintenance, and "other." *Id.* The Department noted that the company submitted news articles and price reports about supply-chain disruptions in Europe stemming from the pandemic and the Russian invasion of Ukraine, both of which caused high inflation during 2022. Appx001011.

---

original) (quoting Appx4410). But even if the agency finds these criteria satisfied as to the other costs of manufacturing, it still always annualizes conversion costs because such expenses are normally incurred erratically throughout a given year. *See id.* at 5, 2025 WL 2427193, at *2.

Commerce found, however, that there was no evidence in the record establishing that Citribel itself experienced the same cost pressures or that any cost increases the company did experience "were specifically and exclusively attributable to those factors," although it acknowledged that the company was presumably "impacted" by higher energy prices. Appx001012. It emphasized that the record evidence showed only that the macroeconomic and geopolitical events affected the market at large, not Citribel. *Id.* The agency rejected the producer's theory that the existence of such market trends and events is "*prima facie* evidence that . . . reflects its own cost experience . . . ." *Id.*

But, to ensure it complied with the court's instruction that it "consider Citribel's various conversion expenses and determine whether, as the company says, annualization of some or all of them produces distorted results," Remand Op. at 15, 2025 WL 2427193, at *6, the agency examined the cost data on the record. It acknowledged that the evidence showed an upward impact on natural gas prices, but it found the company's data did not substantiate its claim that its cost increases mirrored the Belgian market's overall 50-percent increase in natural gas and electricity costs. Appx001015.

Because of the overall market trend, however, the Department recategorized Citribel's energy costs as "part of the material inputs." Appx001016. It then recalculated the cost of manufacturing for each of the five control numbers with the largest volume of home- and U.S.-market sales, using quarterly cost averages for energy. *Id.* In other words, for energy costs—which

were the centerpiece of the company's argument that annualization produced distorted results—the Department acquiesced to Citribel's request to use the agency's alternative methodology if the applicable criteria were satisfied.

After doing so, the agency found that for the majority of control numbers the change between the review period's high and low quarters was still below 25 percent. The record therefore did not satisfy the Department's requirements for departing from the standard methodology's annualized averages even after including energy costs. *Id.*

Citribel's remaining conversion costs—direct labor, maintenance, other variable overhead, and fixed overhead—were all "recorded at different rates from month to month." Appx001016–001017. That's why the agency views annualization, or the use of a period-wide average, as the most accurate approach. Appx001017.

Even so, to comply with the remand order, Commerce assessed whether annualization distorted these remaining costs. Appx001019. As to each relevant category—fixed overhead, *see id.*, direct labor, *see* Appx001020, building and material maintenance variable overhead, *see id.*, and other goods and services, *see* Appx001021, the agency found that "period-wide averaging of the non-energy conversion costs" did "not lead to distortive results," Appx001022.

Finally, Commerce observed that it has a "distinct high inflation methodology, distinguished from the

alternative cost" approach. Appx001017. When it applies, the Department "modifies the quarterly cost test to account for high inflation such that the comparison of quarterly [costs of manufacturing] excludes the impact of inflation . . . ." Appx001018. But Citribel acknowledged "that the Belgian inflation rate was not sufficient to apply this methodology." *Id.*

In sum, because the evidence did not support the use of the alternate quarterly methodology even after including energy costs, and because annualizing the remaining conversion costs did not yield distorted results, the Department made no change to the dumping margin. Appx001000–001001.

II

Citribel attacks the redetermination on three grounds. First, it contends that Commerce failed to comply with the court's instructions. ECF 79, at 8–20. Second, it complains that the Department did not reopen the record to allow submission of "expense-specific" data. *Id.* at 20–23. And third, it asserts that the agency failed to consider that production declined during the latter part of the review period, resulting in higher per-unit conversion costs. *Id.* at 23–25. The court considers those arguments in turn.

A

As an initial matter, Citribel does not challenge the reasonableness of Commerce's criteria for determining when to apply its quarterly cost methodology. *See* note 2. Nor does the company dispute the agency's conclusion that under those criteria, the company's cost of

manufacturing—even after including energy costs—was ineligible for departure from the standard annualization methodology. That uncontested determination therefore stands. *See* 28 U.S.C. § 2639(a)(1).

That leaves the Department's finding that annualizing Citribel's remaining conversion costs did not lead to distortive results. As to fixed overhead expenses, the agency explained that the quarterly cost summary remained stable in all four quarters of the period, which did not support a conclusion that the use of the period-wide average was distortive. Appx001019.

Regarding direct labor, Commerce admitted that record information did show that Belgian labor costs rose overall during the review period, but it found no evidence showing what that increase meant for Citribel's expenses. Appx001020. Although the company's quarterly cost summary showed an increase from the first to the second quarter, "labor costs remained stable in the remaining quarters." *Id.* The record thus did not establish any connection between the nationwide figures and the producer's own labor costs. *Id.* It therefore did not support a conclusion that using period-wide figures would be distortive. *Id.*

For variable maintenance overhead, the Department found that costs did "not reflect the steady increase from beginning to end which would otherwise be expected if solely attributable to the information on the record regarding higher-than-expected inflation." *Id.* Instead, they showed the "volatility" to be expected "by their very nature." Appx001020–001021. This

volatility was precisely why "period-wide averaging . . . is appropriate and not distortive." Appx001021.

Finally, there was no information about what the other variable overhead costs were, and Citribel made no attempt to identify the causes of any increases. *Id.* Instead, the company "effectively argu[ed]" that the Department should "presume" that inflation causes the increases. *Id.*

The agency disagreed, finding no evidence to show that costs "were impacted by factors other than simply the erratically incurred and recorded nature of such costs." Appx001022. "Moreover," the company's "reported quarterly cost summary does not support the conclusion that these expenses were so impacted by steadily increasing inflation through the [period of review] so as to render the period-wide average distortive." Appx001021.[3] Thus, there was no evidence that annualization of these expenses "was distortive." *Id.*

As to each of those findings by category, Citribel has nothing to say. They therefore must be presumed correct. *See* 28 U.S.C. § 2639(a)(1).

The company instead asserts that Commerce "failed to consider evidence submitted by Citribel." ECF 79, at 9. But as outlined above, that's not true. The Department examined the company's quarterly cost summaries. As to each relevant category, it

[3] Under seal, the agency provided a detailed explanation for this finding based on "[p]er-unit quarterly cost averages." *See id.*

reasonably explained why annualization did not yield distorted results.

Finally, Citribel argues that Commerce erred by requiring that the company demonstrate a "causal link between [its] cost experience and the macroeconomic factors that may have contributed to it." ECF 79, at 12–13.

The court need not resolve this question. Even if Citribel is correct, any such error by the agency was harmless. The Department dutifully—if reluctantly—undertook the exercise that the court ordered, which was to consider whether annualization of conversion costs led to distorted results. Category by category, it went down the list and explained why annualization did not create distortions. The company offers no response to those specific findings. Instead, it relies on broad macroeconomic trends.[4]

In short, the government aptly summarizes the situation: "Citribel assumes that an increase in conversion costs is sufficient to demonstrate distortion. Nothing supports [that] assumption. [The company] cites no authority for such a proposition nor did the Court state as much." ECF 89, at 26.

---

[4] As discussed above, Commerce is not oblivious to macroeconomic trends that might affect its calculations. It has a "distinct high inflation methodology." Appx001017. But Citribel does not dispute that the Belgian inflation rate was not sufficient to trigger this approach. Appx001018.

B

For its second attack on the redetermination, the company asserts that Commerce was required to reopen the record on remand because of its "pivot to an expense-specific analysis." ECF 79, at 20. It argues that because the Department normally treats conversion costs as a single category, rather than breaking them out by specific type, Citribel focused on "obtaining a categorical determination that conversion costs should not be normalized under the specific facts of this review" and "only provided evidence to support this argument." *Id.* at 21. And in the agency's remand proceedings, the company asserted that "Commerce must clearly identify the information required to support an expense-specific analysis and reopen the record to permit submission of responsive information." Appx001039–001040.

The Department agreed that its standard practice is to treat conversion costs categorically and normalize them using a period-wide average without examining individual cost components. Appx001040. It said it broke out energy expenses here to comply with its understanding of the court's instructions. *Id.* And it stated that those instructions directed it to re-examine the existing record, not to reopen it to collect new evidence. Appx001041.

"Reopening the record is not something the court will require simply based on a plaintiff's argument that better information is available. Instead, Commerce retains significant discretion to determine whether to reopen the record on remand." *Mid*

*Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1359 (CIT 2022) (cleaned up). "The remand order . . . neither instructed the Department to reopen the record nor prohibited [it] from doing so," which means the decision was "for the agency to make." *Hung Vuong Corp. v. United States*, Slip Op. 21-142, at 12, 2021 WL 4772962, at *5 (CIT 2021) (citing *GGB Bearing Tech. (Suzhou) Co. v. United States*, 279 F. Supp. 3d 1233, 1251 (CIT 2017)). The same is true here. Citribel fails to establish that the agency abused its discretion by not reopening the record.

C

The company contends that "Commerce's analysis of whether conversion costs increased during the period of review necessarily depends on an examination of per-unit costs. In the [remand results, the Department] failed to examine the impact of declining volume on per-unit conversion costs." ECF 79, at 23. It asserts that its production volume declined significantly at the end of the period of review, resulting in higher per-unit conversion costs during that quarter. *Id.* at 23–24.

But the agency addressed that argument and provided a detailed rebuttal to Citribel's assertions. It stated, "The unassailable mathematical fact that per unit costs will increase, even where fixed, when output declines does not reflect significant evidence in itself to compel Commerce to disregard the presumption that conversion costs, categorically, are generally incurred erratically throughout the period of review." Appx001037.

The Department observed that a decline in output on its own, without evidence showing the reason for the decline, is not probative because such variation is precisely why "period-wide averaging is necessary to avoid distortions caused by ordinary fluctuation."[5] *Id.* Thus, it explained, the "central issue is not whether production decreased"—the question is whether the record confirms the company's claim that any change in per-unit costs was the result of "abnormal circumstances in this review and not normal fluctuations." *Id.* Commerce found no such information in the record here. Instead, it summarized that Citribel simply insists that a decrease in production output, by itself, is enough to render period-wide average conversion cost data distortive. Appx001038.

And the company's argument that the analysis was inadequate because "[p]roduction volume steadily decreasing throughout the period of review cannot, by definition, be an ordinary fluctuation," ECF 79, at 25, misrepresents what the Department found. The agency stated that "[t]he overall trend (in production overall and on a [control number]–specific basis) simply reflects that production was *stable for the first three quarters* of the period and notably decreased in the fourth quarter, but with no information to support

---

[5] Defendant-Intervenors offer a helpful hypothetical to illustrate why Citribel's proposed approach would be distortive. *See* ECF 90, at 6–7. Unfortunately, the court cannot rely on that hypothetical as a reason to sustain because the Department did not use it. An agency's order must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

whether that period of decreased production was attributable to normal fluctuation or a direct result of peculiar circumstances in the review." Appx001039 (emphasis added).

In sum, the redetermination belies the company's argument. The agency addressed the evidence and found it unconvincing. As the government states, "Citribel may disagree with Commerce's analysis, but its claim that [the Department] did not address declining production volume is incorrect." ECF 89, at 31.

* * *

The court directed Commerce to reconsider Citribel's argument that annualization of conversion costs yielded distorted results. The Department complied. Its finding that no such distortion occurred is supported by substantial evidence.

The court therefore sustains the agency's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated: October 29, 2026 <u>/s/ *M. Miller Baker*</u>
New York, NY Judge